Damion D. D. Robinson (State Bar No. 262573)
   drobinson@vzrlaw.com
VAN VLECK ZALLER & ROBINSON LLP
6310 San Vicente Boulevard, Suite 430
Los Angeles, California 90048
Telephone:  (323) 592-3505
Facsimile:  (323) 592-3506

Darrel C. Menthe (SBN 186252)
   dmenthe@sagelawpartners.com
Sage Law Partners, P.C.
9696 Culver Blvd., Suite 301
Culver City, CA 90232
(310) 601-1200 (TEL)
(310) 601-1201 (FAX)

Attorneys for Jacquelynn G. Perske

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:16-bk-18600-RK |
| JENS F. LARSEN | Chapter 7 |
| Debtor. | Adv. No. _____ |
| JACQUELYNN PERSKE, | **COMPLAINT OF JACQUELYNN PERSKE FOR (1) DETERMINATION OF NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523; and (2) DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. § 723** |
| Plaintiff, | |
| v. | |
| JENS F. LARSEN, | (Hearing Date To Be Set By Summons) |
| Defendant. | |

Plaintiff and creditor Jacquelynn Perske ("Plaintiff" or "Perske"), by and through undersigned counsel, hereby files this Complaint for (1) Determination of Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523 and (2) Denial of Discharge Pursuant to 11 U.S.C. § 727 against defendant and debtor Jens F. Larsen (the "Debtor" or "Larsen") and alleges as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J). Plaintiff further consents to the entry of final orders and judgments by the Court in connection with this proceeding.

2.     Venue is proper in this Court and judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises under title 11 of the United States Code and is related to the Debtor's pending Chapter 7 bankruptcy case.

### PARTIES

3.     Plaintiff Jacquelynn Perske is a resident of the state of California and a creditor of the Debtor.

4.     Defendant Jens F. Larsen is a resident of the state of California and debtor in a pending Chapter 7 bankruptcy case that was commenced in this Court on or about June 28, 2016 (the "Petition Date").

### GENERAL ALLEGATIONS

5.     Plaintiff fell victim to a fraud carried out by the Debtor, who has a long history of financial misdealing, fraud, and check kiting. The scheme undertaken by the Debtor involved the use of series of sham companies entirely owned and controlled by him, which he used to solicit funds and services from Plaintiff and others under false pretenses in order to finance his extravagant personal lifestyle while shielding his assets.

6.     Through his fraud, the Debtor caused Plaintiff to personally take on over $100,000 in purported business debts on his behalf, which he had no intention of repaying, and to loan him and his companies $30,000 from her personal 401(k) account, which she saved over 14 years of work as a legal secretary. After the Debtor spent all or substantially all of these funds—having failed to repay any of the loans or business debts that Plaintiff incurred at his behest—and Plaintiff sued him in Los Angeles Superior Court, the Debtor failed to answer and instead commenced this bankruptcy proceeding in response.

7.     In doing so, the Debtor has materially misstated, concealed, and failed to disclose his assets and liabilities under oath. In addition, the Debtor has failed to appear, or appeared

1 unprepared at his Section 341(a) examination repeatedly, failing to disclose the facts and

2 circumstances surrounding his alleged massive personal debt or lack of personal assets, and to

3 produce documents requested by the Chapter 7 Trustee.  In addition, the Debtor repeatedly agreed

4 to sit for an examination under Bankruptcy Rule 2004, but then refused to produce ordinary

5 financial records to which Plaintiff is entitled in order to determine the extent of his misconduct

6 and omissions with respect to his financial affairs.   Accordingly, Plaintiff will amend this

7 Complaint as further information is developed.

8          8.     Plaintiff brings this adversary proceeding to determine (a) that the Debtor's liability

9 to her is non-dischargeable on the grounds of fraud, misrepresentation, and breach of fiduciary

10 duty, under 11 U.S.C., section 523; and (b) that the Debtor is not entitled to a discharge on account

11 of his willful concealment and misstatements, failure to maintain required documents without

12 explanation, giving false testimony in a bankruptcy proceeding, and failure to satisfactorily explain

13 his purported inability to pay his debts under 11 U.S.C., section 727.

14          **LARSEN CAUSES PERSKE TO INCUR OVER $100,000 IN BUSINESS DEBTS**
   **AND TO LOAN HIM AND HIS BUSINESS $30,000 THROUGH FRAUD**

15

16          9.     Beginning in the summer of 2015, Larsen contacted Perske, a high school

17 acquaintance from years earlier, on Facebook.com.  Apparently learning from her Facebook profile

18 that Perske was an avid equestrian, Larsen ingratiated himself by claiming that he was also a horse

19 lover and had invested in several racehorses.   At that time, Larsen represented he was an

20 accomplished and wealthy movie writer and producer, and a successful entrepreneur.

21          10.    Larsen did not disclose to Perske that he has a lengthy history of fraud in the form of

22 passing bad checks and similar misconduct.  Indeed, at all relevant times, Larsen had outstanding a

23 warrant for his arrest in Los Angeles County for check fraud.

24          11.    For several months, Larsen asked Perske to join his start up business rescuing and

25 re-homing retired racehorses in order to save them from slaughter.  The business plan, according to

26 Larsen, was to begin by training and selling certain horses that he owned, directly or through his

27 companies, to amateur riders.  Larsen also said that he planned to buy, train and resell racehorses

28 owned by others.   He claimed that he needed Perske to help him pick horses that would be

VAN VLECK
ZALLER &
ROBINSON LLP

ADVERSARY COMPLAINT

1  desirable for amateur equestrians and help oversee their training and resale.  According to Larsen,

2  he would pay all of the expenses of the business and share the profits with Perske for her work.

3       12.     Perske agreed to join Larsen's business in July 2015.

4       13.     Larsen then courted Perske, inviting her to a number of expensive "business" dates,

5  and buying her gifts.  Larsen also told Perske that he, too, was a single parent, and made

6  arrangements for their children to meet and spend time together.  Soon, Larsen and Perske began a

7  romantic relationship, and eventually began looking for a house so that they and their families

8  could move in together.

9       14.     After the two began dating, Larsen urged Perske incur a number of large expenses

10  for the business, insisting that they were necessary for business purposes, and that he would pay for

11  them.  They included, among others:

12       a.     In late July 2015, Larsen encouraged Perske to buy a $15,000 "jumper"

13            horse to show in the Southern California horse circuit, despite Perske telling Larsen that she

14            could not afford this purchase.  Larsen stated that he would pay for the horse and all

15            associated costs as a business expense.  Perske bought the horse on a payment plan, and

16            also spent several thousand dollars in out-of-pocket expenses.

17       b.     On August 15, 2015, Larsen agreed to buy another horse for business

18            purposes that Perske could keep after it was no longer needed by the business.  He gave the

19            owner a check for the full purchase amount of $46,500, but asked the owner to hold the

20            check for "a few weeks" until they could take the horse to a veterinarian.

21       c.     On August 19, Larsen told Perske that she needed a nicer car to drive to

22            business meetings.  He encouraged Perske to trade in her only car for a lease on a fully-

23            loaded Lexus with a price of nearly $60,000.  Larsen again promised Perske that he would

24            pay all of the payments on the car and that he could "write it off as a business expense."

25            Perske purchased the car based on this promise.

26  Each of these purchases was far beyond Perske's means, and she only agreed to make them based

27  on Larsen's promise to pay for them, either directly or through his limited liability companies, as

28  business expenses for the business they were starting together.

VAN VLECK
ZALLER &
ROBINSON LLP

ADVERSARY COMPLAINT

15.     Larsen made the initial payments for each of these items by check, and did not have sufficient funds to cover them.   Eventually all of the checks that Larsen tendered for these purchases were returned for insufficient funds.   Perske is informed and believes that at all relevant times, Larsen knew that he did not have the funds to pay for these purchases and had no intention of actually paying for them.

16.     At that time, and through the remainder of their business and personal relationship, Perske is informed and believes based on statements made later by Larsen that he was involved in a scheme whereby he would continually shift funds between personal and business bank accounts to give the appearance that these accounts were adequately funded, similar to check kiting.   After the matters alleged herein had come to a head, on October 21, 2015 Larsen wrote Perske a text message effectively admitting as much, as follows:

> All of my accounts were shut down due to me paying stuff out of them for u. My B of A, chase, citi bank, all of them.  I should of not paid for anything but i did for you and ur son now im suffering.  Tell them u will have full payment friday.  Tell them there was a mix up in the bank.  Your fidelity continues to pull out of the account daily.  It has screwed everything up for me that i have to hault everything for my film cause i have no way of doing anything now for 15 days.  Im sorry im not blaming u i just should of stuck to my guns and done what i was suppose to but im sure i will get audited again for sure.

17.     When the checks Larsen issued began to bounce, he repeatedly assured Perske that it was due to problems with his bank or with the way the checks were filled out, rather than a lack of funds, which were causing the checks to be rejected rather.   He then issued replacement checks for these expenses, which also eventually bounced.

18.     The horse business failed to materialize.   Instead, after signing a lease for stable space, Larsen then failed to bring in any of the horses that he claimed he would contribute to the business, and simply dropped out of contact with the stable.   On information and belief, Larsen took no meaningful steps towards getting this business off the ground, and all of the actions he took were simply designed to give Perske the appearance that he was starting a legitimate business.

19.     In the meantime, shortly after Perske disclosed that she had saved $30,000 in her personal 401(k) account, Larsen claimed that he had owned a number of successful smoke shops

through various companies, and had identified one in Los Angeles that he wanted to purchase. Larsen told Perske that he wanted her to become part owner with him in this shop and two others, and that Perske should borrower against her 401(k) account and loan him the $30,000.

20.     According to Larsen, he was offering Perske this opportunity so that she could become a small business owner and financially independent, and was personally investing in an amount at least equal to Perske's investment.  Larsen promised that he and/or his limited liability companies would repay Perske's at $700.00 per month until the first smoke shop was profitable. Thereafter, he and the businesses would pay her all profits until her loan was repaid in full.  In exchange, Larsen promised to give Perske a minimum of 25% of the equity in each shop, and as much as 50%.

21.     Based on Larsen's representations and promises, Perske borrowed the $30,000 from her 401(k) account and loaned it to him, making payments both to Larsen, the landlord of the shop, and to one of Larsen's limited liability companies.

22.     At that time, Larsen also asked Perske to sign a lease on the shop, claiming that it was necessary in order for her to act as a "co-signer," and that he had signed "his lease" separately as the primary lessee.  Perske who had never executed a commercial lease believed this, and signed the lease, committing to personally pay $1,500 per month for two years—a total of $36,000.  She only learned later that Larsen had not actually signed a lease, and that she was the only lessee.

23.     On information and belief, Larsen did not contribute any funds towards this business and instead relied entirely on Perske's investment.

24.     Virtually none of the payments Larsen made towards the business expenses Perske incurred were honored, and neither he nor his business entities have made any payments towards her $30,000 loan.

## PERSKE DISCOVERS LARSEN'S FRAUD AND HE RESORTS TO THREATS AND INTIMIDATION

25.     Soon after the shop was opened, Larsen began distancing himself from Perske, failing to respond to calls and messages about the business, claiming that he was too busy with the shop and other matters.  Larsen repeatedly failed to pay bills for the purported horse business or

the smoke shop, including the large purchases he induced Perske to make.

26.    In early October 2015, Larsen presented Perske with a list of expenditures for the business, which he claimed totaled over $47,000.  These expenditures were entirely made up.  In reality, Larsen had simply doubled (or more than doubled) all of the expenses incurred to make it appear as though he had invested his own money in the shop when he had not done so.

27.    Around the same time, Perske learned that many of the payments Larsen purported to make on the car, and the two horses had again bounced.  Perske also learned at that time that Larsen had stopped paying the ordinary expenses of the smoke shop, and that he had not actually signed a lease on the shop.

28.    When Perske confronted Larsen, he claimed that she had caused all of his bank accounts to be frozen, and that he was suddenly on the verge of bankruptcy.  Realizing that she had been duped, Perske and Larsen ended their romantic relationship.

29.    Larsen then began to threaten Perske, claiming that she was liable for half of the ongoing expenses of the smoke shop, which he falsely claimed exceeded $70,000.  He also threatened to report Perske for failure to pay business taxes on the shop, even though no such taxes were owing.  At the same time, Larsen demanded that Perske either pay half of these fabricated business expenses or give up her interest in the smoke shop.

30.    When Perske refused, in late October, Larsen claimed that he had assigned the shop to one of his limited liability companies, and threatened to file for personal bankruptcy.

**LARSEN ABSCONDS WITH BUSINESS ASSETS THAT BELONG TO PERSKE.**

31.    Meanwhile, Larsen—without Perske's knowledge or consent—listed the smoke shop for sale online for $34,000.  On information and belief, Larsen intended to simply pocket the sale proceeds for himself without ever informing her, as was his plan from the beginning.

32.    After discovering this, Perske demanded to be taken off the lease and that Larsen return her $30,000.  Larsen responded by calling Perske and sending her hostile emails and text messages at all hours, threatening to disclose private information about her, and driving by her home late at night, for several weeks.  On at least one occasion, Larsen parked in Perske's driveway for several hours while she was away, causing her son to fear for his safety.

33.     Based on this conduct, Perske applied for and received a temporary restraining order which, among other things, required Larsen to close the smoke shop because the lease was in Perske's name.   When Perske went to the smoke shop, all of the inventory had been removed and the shop was nearly empty.

34.     On December 8, 2015, the two agreed to a mutual "stay away" order, which lifted the prohibition on Larsen operating the smoke shop.

35.     The following weekend, Larsen reopened the shop and all of the inventory was back.   He then listed the shop for sale for $17,000 on a "first come first served" basis, on Craigslist.com and Facebook.com, again without telling Perske that he was doing so.

36.     At some point thereafter unknown to Perske, Larsen closed the shop.   Perske is informed and believes that Larsen either took or abandoned all of the inventory and assets of the shop.   Larsen has failed to disclose these assets, or transfers of these assets, in his bankruptcy schedules.

37.     As a result of Larsen's conduct, Perske has been left in severe financial distress, owing $30,000 to her 401k to avoid a substantial tax penalty, and having $100,000 in business debts that she cannot pay back.

### PERSKE SUES LARSEN IN SUPERIOR COURT AND HE RESPONDS BY FILING HIS BANKRUPTCY PETITION

38.     Perske sued Larsen and his limited liability companies in Los Angeles Superior Court on April 11, 2016 for fraud, breach of express and implied contract, and indemnity, and also sought imposition of a constructive trust on business assets and proceeds, as well as an accounting. That case, which is captioned *Perske v. Larsen*, et al., Case No. BC616732, remains pending but has been stayed against Larsen due to the automatic stay.

39.     On May 3, 2016, the state court issued a temporary protective order prohibiting Larsen and his companies from transferring any assets, and creating a lien on those assets.

40.     Although Larsen repeatedly stated that he would voluntarily accept service and defend himself in the state court action, he then evaded service for several weeks, forcing Perske to serve him by publication pursuant to an order entered by the state court.

VAN VLECK
ZALLER &
ROBINSON LLP

ADVERSARY COMPLAINT

41.     Shortly before his deadline to answer, Larsen filed his bankruptcy petition.

42.     Larsen's schedules in this case and his amended schedules list hundreds of thousands of dollars in debts, but claim that Larsen has no assets except a number of racehorses, and that his only source of income is an approximately $1,700 per month stipend from his father.

**FIRST CLAIM FOR RELIEF**
**Determination of Non-Dischargeability of Debt  (11 U.S.C. § 523(a)(2))**

43.     Plaintiff repeats and re-alleges each of her allegations in the preceding paragraphs as though set forth fully herein.

44.     The Debtor is indebted and liable to Plaintiff on account of over $135,000 in loans and business debts incurred by Plaintiff at the Debtor's behest.

45.     As detailed above, the Debtor knowingly and actively solicited these loans and obligations directly and through a series of limited liability companies wholly owned and controlled by him as part of a fraudulent scheme.  The entire course of conduct between the Debtor and Plaintiff involved a fraudulent scheme in which the Debtor used a host of misrepresentations and sham business entities in order to create the appearance that he was undertaking two business ventures when he was simply using this ruse to extract money to pay for his extravagant personal lifestyle.

46.     This scheme relied on a series of false pretenses and misrepresentations, including the following:

    a.     The false representation that the Debtor was a successful entrepreneur and movie producer who had operated a number of successful businesses;

    b.     The false representation that the Debtor was in the process of starting two businesses in which he wanted Plaintiff to participate as an employee, manager, and/or investor, when he had not intention or meaningful prospect bringing these businesses about, and instead simply used the prospect of these businesses to get Plaintiff's money;

    c.     Giving the appearance of legitimacy to the horse rescue business by purporting to purchase a $46,500 horse and entering into stable lease, and tendering payment by bad check, in each case with no intention of fulfilling these obligations;

d. Tendering payment for various business expenses by checks drawn on accounts with insufficient funds, and delivering these checks to Plaintiff and others in Plaintiffs' presence in order to create the appearance of legitimacy for his purported businesses;

e. The false promise that Larsen would cover all of the expenses Plaintiff was incurring and would repay her loan as "business expenses" although he had no means or reasonable prospect of doing so, and had no intention of doing so;

f. The false representation that the Debtor was personally contributing to these businesses by making capital contributions, contributions of assets, and executing a business lease, when, in fact, he was relying entirely on Plaintiff to finance the operations of these businesses and to take on all of the business debts.

47. In addition, the Debtor with the intent to deceive made numerous materially false written statements concerning his financial condition to Plaintiff in writing, through online, email and text message communications, on which Plaintiff reasonably relied in incurring business debts and loaning the Debtor funds. The Debtor also made false written statements about the financial viability of himself and his business ventures by issuing checks on accounts that he knew had insufficient funds to cover them to give the appearance that he had significant wealth.

48. Plaintiff is informed and believes, and thereon alleges, that at all relevant times, the Debtor was engaged in fraudulent transfers of funds and assets without consideration between and among himself and a series of limited liability companies—the total number of these entities is currently unknown to Plaintiff—wholly owned and controlled by him for other than legitimate business purposes. Through this scheme, the Debtor financed his personal expenses by writing checks on accounts with insufficient funds, eventually causing them to be frozen, and by taking funds from Plaintiff. In addition, the Debtor intended to use this scheme to allow him to sell his and Plaintiff's jointly owned business without paying a share of the proceeds to Plaintiff.

49. Plaintiff relied on these false pretenses, misrepresentations, and fraud in lending the Debtor $30,000 and incurring over $100,000 in business expenses at his behest.

50. In addition, shortly before or after filing his bankruptcy petition, the Debtor caused

VAN VLECK
ZALLER &
ROBINSON LLP

ADVERSARY COMPLAINT

1  various separate business entities that he owned and controlled to be dissolved, without notice to

2  creditors of these entities, including Plaintiff, as required by applicable law.  As a result, the Debtor

3  has fraudulently transferred into his bankruptcy estate assets of these entities over which Plaintiff

4  has a constructive trust.

5       51.     Therefore, the debt owed by the Debtor to Plaintiff is for money and property that

6  were obtained through false pretenses, false representations, and/or actual fraud that is non-

7  dischargeable pursuant to 11 U.S.C. § 523(a)(2).

8                            **SECOND CLAIM FOR RELIEF**
   **Determination of Non-Dischargeability of Debt  (11 U.S.C. § 523(a)(4))**
9

10      52.     Plaintiff repeats and re-alleges each of her allegations in the preceding paragraphs as

11  though set forth fully herein.

12      53.     The Debtor is indebted and liable to Plaintiff on account of over $135,000 in loans

13  and business debts incurred by Plaintiff at the Debtor's behest.

14      54.     The Debtor owed Plaintiff fiduciary duties as a partner, joint-venturer, investor,

15  and/or co-owner of two businesses with him.  In addition, relying on the Debtor's representations

16  and false promises, Plaintiff incurred extensive business debts, and entrusted the Debtor with a

17  $30,000 investment to hold in trust for the purpose of starting and operating a joint business.

18      55.     Instead of complying with his fiduciary obligations, the Debtor defrauded Plaintiff,

19  embezzled, absconded and diverted her funds, and used Plaintiff's funds and the proceeds of those

20  funds to finance his personal lifestyle.

21      56.     Ultimately, the Debtor either abandoned the business assets he purchased with

22  Perske's money, an act of waste, or took the proceeds himself, an act of embezzlement.

23      57.     Therefore, the debt owed by the Debtor to Plaintiff is for fraud or defalcation while

24  acting in a fiduciary capacity, embezzlement, or larceny that is non-dischargeable pursuant to 11

25  U.S.C. § 523(a)(4).

26                            **THIRD CLAIM FOR RELIEF**
   **Determination of Non-Dischargeability of Debt  (11 U.S.C. § 523(a)(6))**
27

28      58.     Plaintiff repeats and re-alleges each of her allegations in the preceding paragraphs as

VAN VLECK
ZALLER &
ROBINSON LLP

ADVERSARY COMPLAINT

1 │ though set forth fully herein.

2 │      59.    The Debtor is indebted and liable to Plaintiff on account of over $135,000 in loans

3 │ and business debts incurred by Plaintiff at the Debtor's behest.

4 │      60.    As alleged above, at all times during which the Debtor, among other things,

5 │ solicited, received, and held Plaintiffs funds, and caused Plaintiff to incur business debts on his

6 │ behalf, he intended to defraud, harm, and maliciously injure Plaintiff by improperly using and

7 │ misappropriating those funds and obligations to personally profit.

8 │      61.    Therefore, the debt owed by the Debtor to Plaintiff is for a willful and malicious

9 │ injury caused by the Debtor to Plaintiff that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

### FIFTH CLAIM FOR RELIEF
### Denial of Discharge  (11 U.S.C. § 727(a)(2))

12 │      62.    Plaintiff repeats and re-alleges each of her allegations in the preceding paragraphs as

13 │ though set forth fully herein.

14 │      63.    As alleged above, the Debtor has falsified various business records and made

15 │ misrepresentations about the entity or entities liable for debts to Plaintiff.  Initially, when Plaintiff

16 │ threatened to sue the Debtor, the Debtor claimed that he was not personally in business with

17 │ Plaintiff, but that she was in business with one or more of his business entities, and that only those

18 │ entities were liable to her.  The entities that the Debtor claimed were liable differed in his various

19 │ communications to Plaintiff, but each of them was wholly owned and controlled by him.

20 │      64.    The Debtor also failed to appear and failed to produce required documents or

21 │ information at three sessions of the Section 341(a) meeting in this case.

22 │      65.    On information and belief, the debtor has, among other things, (a) concealed

23 │ property and his interests in property, including business assets and business interests, (b)engaged

24 │ in sham transfers of assets in a manner designed to conceal them from creditors, and created sham

25 │ obligations, (c) absconded with, removed, and failed to disclose the existence of assets and their

26 │ proceeds, and (d) abandoned or hidden assets that could constitute part of the estate in this matter.

27 │      66.    Much of this conduct took place through routine transfers of assets initiated by the

28 │ Debtor, without consideration, between and among various business entities controlled by him,

VAN VLECK
ZALLER &
ROBINSON LLP

ADVERSARY COMPLAINT

1  which he has failed to disclose.   These transfers were undertaken for the express purpose of

2  hindering, delaying, and defrauding Larsen's creditors, including Plaintiff.

3        67.    The Debtor engaged in this conduct willfully with the intent to hinder, delay, and

4  defraud creditors, including Plaintiff, within a year before filing his petition in this case, or after the

5  inception of this case.

6        68.    Therefore, the Debtor should be denied a discharge pursuant to 11 U.S.C. §

7  727(a)(2).

8
### SIXTH CLAIM FOR RELIEF
### Denial of Discharge  (11 U.S.C. § 727(a)(3))
9

10        69.    Plaintiff repeats and re-alleges each of her allegations in the preceding paragraphs as

11  though set forth fully herein.

12        70.    The Debtor has asserted that he no longer has books, documents, records, or other

13  papers, relating to his co-mingled personal and business bank accounts or his various purported

14  business ventures or business entities.  Alternatively, the Debtor has also claimed that he may have

15  access to these books and records, but is unwilling to produce them in this proceeding because it

16  would be "too onerous" to do so.  These are records from which the Debtor's financial condition

17  and business affairs can be determined and which the Trustee, Plaintiff, and other creditors are

18  entitled to review.

19        71.    At all relevant times, including during the period of time immediately after the

20  Debtor's business relationship with the Plaintiff ceased, the Debtor was aware of a dispute with

21  Plaintiff that would likely result in litigation.  At all relevant times, beginning at least by October

22  2015, the Debtor also knew that he intended to file a petition in bankruptcy.  Nonetheless, on

23  information and belief, the Debtor lost, destroyed, or disposed of business and personal records

24  relevant to this dispute and to his business and financial affairs with the intention of preventing

25  Plaintiff and other creditors from reconstructing his financial dealings leading up to this bankruptcy

26  proceeding necessary to recover from him.

27        72.    The Debtor's destruction of business records and his failure to preserve those

28  records was not substantially justified under the circumstances.

73.     Therefore, the Debtor should be denied a discharge pursuant to 11 U.S.C. §
727(a)(3).

//

### SEVENTH CLAIM FOR RELIEF
### Denial of Discharge  (11 U.S.C. § 727(a)(4))

74.     Plaintiff repeats and re-alleges each of her allegations in the preceding paragraphs as
though set forth fully herein.

75.     The schedules to his bankruptcy petition, which the Debtor signed under penalty of
perjury, and to which he attested at one or more Section 341(a) meetings, required the Debtor to list
all assets, sources of income, and transfers of property occurring outside of the ordinary course of
business or financial affairs during the two years prior to the petition date.

76.     As detailed above, the debtor failed to disclose numerous transfers of his assets and
business interests outside of the ordinary course of business and financial affairs, including but not
limited to, the following:

a.     Various transfers of funds to, from, between and among various business
entities owned and controlled by the Debtor as part of a fraudulent scheme;

b.     The purported transfer of the Debtor's business in which Plaintiff was an
investor to a shell company owned and controlled by the Debtor;

c.     The closure of various business entities owned and controlled by the Debtor,
including entities that owed Plaintiff money, and the transfers of their assets to the Debtor
or others in winding up;

d.     The Debtor selling, transferring, or absconding with assets of the purported
business in which Plaintiff was an investor.

e.     The sale of the Debtor's purported smoke shop business to the extent that he
did sell this business.

The Debtor knowingly failed to disclose these transfers of assets in his bankruptcy schedules.

77.     On information and belief, these transfers by the Debtor were simply part of a series
of concealed transfers of interests in property outside the ordinary course of business and financial

affairs, without consideration or for less than reasonably equivalent value, that the Debtor knowingly and fraudulently failed to disclose, all with the intent to hinder, delay, and defraud creditors, including primarily Plaintiff.

78.     In addition, Plaintiff is informed and believes, and thereon alleges, that the Debtor has failed to list certain material assets and sources of income in his bankruptcy schedules.  Due to the Debtor's failure to produce documentation at the initial meeting of creditors, or to submit to a Rule 2004 examination, Plaintiff is unaware of the full extent of these undisclosed assets and sources of income.

79.     Plaintiff is also informed and believes, and thereon alleges, that the Debtor has scheduled certain debts that are either not legitimate debts of the Debtor, that may be debts of the Debtor's business entities, but not the Debtor personally, or that have been improperly inflated to avoid payment of Plaintiffs' claims.

80.     The Debtor also falsely represented the nature of his employment at his initial meeting of creditors under Section 341(a), and failed to deliver to the Chapter 7 Trustee various books, records, and documents, including documents relating to the business entities owned and controlled by the Debtor.

81.     Therefore, the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(4).

### SEVENTH CLAIM FOR RELIEF
### Denial of Discharge  (11 U.S.C. § 727(a)(5))

82.     Plaintiff repeats and re-alleges each of her allegations in the preceding paragraphs as though set forth fully herein.

83.     As noted above, the Debtor's schedules and statement of financial affairs list hundreds of thousands of dollars in personal debts, but state that his only assets are a number of racehorses, which he values at over $200,000, and fail to reflect his ownership of various business entities, the disposition of those entities or their assets, or the transfers of property and funds between and among the Debtor and these various entities.

84.     The Debtor also claims that he is unemployed, although he is apparently able to

work, and purported to be employed as a successful movie producer, writer, and entrepreneur at all relevant times.

85.    The Debtor has not explained, and cannot satisfactory explain, how it came to be that he has massive liabilities, but that his only assets are racehorses, an expensive luxury item, or the deficiency of his assets to satisfy his liabilities, including the fraudulent transfers of assets alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a.    A judgment in Plaintiff's favor and against the Debtor on all of Plaintiff's claims for relief;

b.    A determination that the debt owed by the Debtor to Plaintiff is not less than $135,000, plus interests and costs allowable at law and punitive damages on account of the Debtor's willful and fraudulent conduct;

c.    A determination that the debt owed by the Debtor to Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523;

d.    A determination that the Debtor is not entitled to a discharge pursuant to 11 U.S.C. § 727; and

e.    Such other and further relief as the Court may deem just and proper.

Dated:  October 3, 2016

By:    _s/ Damion D. D. Robinson_
        Damion D. D. Robinson,
        VAN VLECK ZALLER & ROBINSON, LLP

Attorney for Plaintiff Jacquelynn Perske

VAN VLECK
ZALLER &
ROBINSON LLP

ADVERSARY COMPLAINT