FILED & ENTERED

SEP 23 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bakchell  DEPUTY CLERK

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | No. 2:16-bk-18600-RK |
| JENS F. LARSEN, | Chapter 7 |
| Debtor. | Adv. No. 2:16-ap-01446-RK |
| | **MEMORANDUM DECISION AFTER TRIAL ON COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) AND 523(a)(6) AND FOR DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §§ 727(a)(2), 727(a)(3), 727(a)(4) AND 727(a)(5)** |
| JACQUELYNN PERSKE, | |
| Plaintiff, | |
| v. | |
| JENS F. LARSEN, | |
| Defendant. | |

# I.   **PROCEDURAL HISTORY**

This adversary proceeding came on for trial before the undersigned United States Bankruptcy Judge on October 26, 2017, November 9, 2017, January 22, 2018, January 26, 2018, February 16, 2018 and March 7, 2018 on the Complaint of Plaintiff Jacquelynn Perske ("Perske") for (1) non-dischargeability of debts allegedly incurred through false pretenses, false representation, or actual fraud pursuant to 11 U.S.C. § 523(a)(2)(A), through fraud or defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. § 523(a)(4), and for willful and malicious injury by the debtor to another entity pursuant to 11 U.S.C. § 523(a)(6), and (2) denial of discharge for alleged failure to maintain and disclose required documents and false testimony in a bankruptcy proceeding pursuant to 11 U.S.C. § 727(a)(2), § 727(a)(3), § 727(a)(4), and § 727(a)(5), Electronic Case Filing Number ("ECF") 1, filed on October 3, 2016. Damion D. D. Robinson, of the law firm Affeld Grivakes, LLP, appeared for Perske. Joseph W. Kellener ("Kellener"), of the law firm Kellener & Kellener appeared for Debtor and Defendant Jens F. Larsen ("Larsen").

Before the trial began, on July 18, 2017, the parties filed their joint pretrial stipulation, which the court approved and adopted as its final pretrial order on September 5, 2017. Pre-Trial Stipulation, ECF 62, filed on July 18, 2017; Order Approving Pretrial Stipulation and Exhibit Lists; Advancing Hearing on Motion to Strike; and Continuing Trial, ECF 105, filed and entered on September 5, 2017. In the Pre-Trial Stipulation, the parties stipulated that certain facts were admitted and required no proof. Stipulation of Facts, ¶¶ 1-14, Pre-Trial Stipulation, ECF 62.

On August 2 and 3, 2017, Perske filed trial declarations for herself and the witnesses whom she called to testify, Marnye Langer, Steve McAllister and Damion Robinson. ECF 78, 79. On August 16, 2017, Larsen filed his trial declaration, ECF 90, and on August 22, 2017, he filed an amended trial declaration, ECF 93.

On August 29, 2017, Perske filed her trial brief. Plaintiff's Trial Brief, ECF 100. On September 5, 2017, the court filed and entered its Order Denying Plaintiff's Motion for Partial Summary Judgment and Granting Motion in Part Deeming Certain Facts Established, ECF 106. In granting Plaintiff's motion in part, the court's order provided that pursuant to Federal Rule of Bankruptcy Procedure 7056, making Federal Rule of Civil Procedure 56(g) applicable

to this adversary proceeding, certain facts were deemed established for purposes of this case and that the parties need not submit evidence thereon.  Established Facts, ¶¶ 1-17, Order Denying Plaintiff's Motion for Partial Summary Judgment and Granting Motion in Part Deeming Certain Facts Established, ECF 106.  On September 28, 2017, Perske filed her Motion in Limine No. 1 and Motion in Limine No. 2. ECF 114, 115.

On September 29, 2017, Perske filed an Amended Motion in Limine No. 1. ECF 118. These Motions in Limine were granted in part and denied in part at trial on October 26, 2017. Audio Recording of Trial, October 26, 2017 at 4:00-4:16 p.m. [1]  Perske filed a notice of lodgment of Deposition Transcripts on October 19, 2017, ECF 129.  Larsen filed a notice of lodging of Deposition Designations of (1) Jacquelynn Perske; and Plaintiff's Objections Thereto. ECF 130.

On the last day of trial on March 7, 2018, the court orally ordered the parties to prepare and lodge proposed findings of fact and conclusions of law pursuant to Local Bankruptcy Rule 7052-1 based on the following schedule: (1) Perske to lodge her proposed findings of fact and conclusions of law on or before April 20, 2018; (2) Larsen to lodge his proposed findings of fact and conclusions of law and to file any objections to Perske's proposed findings of fact and conclusions of law; and (3) Perske to file any objections to Larsen's proposed findings of fact and conclusions of law.  Audio Recording of Trial, March 7, 2018 at 1:40-1:47 p.m.

On April 20, 2018, Perske filed a notice of lodgment with her Proposed Findings of Fact and Conclusions of Law after Trial.  ECF 147.

On May 8, 2018, Kellener filed a motion to be relieved as counsel for Larsen and an application for a hearing on the motion on shortened notice.  ECF 151, 152.  On May 9, 2018, the court granted Kellener's application to hear his motion to be relieved as counsel on shortened notice, and the hearing was held on May 15, 2018.  The court granted Kellener's motion to withdraw as Larsen's counsel at the hearing on May 15, 2018.  On May 21, 2018, to allow Larsen sufficient time to retain replacement counsel and file his proposed findings of fact and conclusions of law, the court entered its Order Extending Deadlines for Filing Opposition

---

[1]   The references to the audio recordings of the trial in this matter are to the official audio recordings of the trial proceedings on the court's FTR Gold court recording program which can be tracked in real time. The audio recording files for the trial are maintained by the court and available to the parties for duplication through the court for a nominal fee.

1  and Reply to Proposed Findings of Fact and Conclusions of Law.  ECF 161.  The court set the

2  deadline of September 7, 2018 for Larsen to submit these documents.  *Id*.  However, Larsen

3  did not file any opposition or reply to Perske's proposed findings of fact and conclusions of law

4  before the extended deadline of September 7, 2018.

5         On September 17, 2018, Larsen filed a declaration on his own behalf requesting an

6  additional 60 days to retain replacement counsel and a sanction of $3,000 against his former

7  counsel Kellener.  ECF 164.  On October 5, 2018, Perske filed a Response to Declaration of

8  Jens Larsen, suggesting a reasonable extension for Larsen to file his opposition and reply to

9  her proposed findings of fact and conclusions of law of no more than 60 days from the original

10  September 7, 2018 deadline.  ECF 163.  By order entered on October 11, 2018, the court

11  granted Larsen's request for an extension of time to lodge his proposed findings of fact and

12  conclusions of law, extending his time to lodge them to November 7, 2018, and denied his

13  request for sanctions against his former attorney Kellener without prejudice.  ECF 165.

14         Because Larsen had not filed any opposition or reply to Perske's proposed findings of

15  fact and conclusions of law or lodged any alternative proposed findings of fact and conclusions

16  of law as of February 1, 2019, on February 5, 2019, the court entered an Order deeming the

17  matter submitted after trial.  ECF 167.

18         Subsequently, on April 9, 2019, Larsen filed a Statement on his own behalf requesting

19  that the court issue its ruling on his case, meaning the adversary proceeding, and requesting

20  permission from the court to file a lawsuit against Perske and Perske's counsel, requesting

21  sanctions against Perske and her counsel, Robinson, for allegedly lying under oath in state

22  court. [2]  ECF 68.  Larsen requested that the court consider the Statement in lieu of the

23  proposed findings of fact and conclusions of law under Federal Rule of Civil Procedure 52.  *Id.*

[3]  Perske filed her Response to Statement of Defendant Jens Larsen addressing Larsen's

---

[2] Larsen's Statement was filed in the main bankruptcy case, No. 2:16-bk-18600-RK, rather than in the adversary proceeding, which is the matter pending before the court.

[3] As set forth in the Statement, Larsen explained:  "It has been a hard road for me since June 2016 and I knew filing Bankruptcy would not be easy.  From the start with my first attorney, who never filed the paperwork right or even met with me prior, then the adversary and the attorney's uncle sexually assaulting my daughter and I lose my attorney who never returned the money I paid him to finish the case.  It has not gone well and has put me in a bad situation.  I am losing my place where I live because it has been hard to find a job. . .With the Adversary.  I can not retain an attorney.  I am not

allegations on April 16, 2019, pointing out that Larsen failed to cite to the record as ordered by the court.  ECF 171.

Having considered the testimony of witnesses, the documentary evidence received at trial, the oral and written arguments of the parties, the proposed findings of fact and conclusions of law and objections submitted by the parties, and the other matters of record before the court, the court hereby makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## II.   FACTUAL DISCUSSION

### A.  Establishment of the Parties' Relationship

In the summer of 2015, Perske was working as a legal secretary and had worked as a legal secretary for about fifteen years.  Trial Declaration of Jacquelynn Perske ("Perske Trial Declaration"), ¶¶ 2-3, ECF 78, filed on August 2, 2017.  She had no prior business or investment experience.  *Id.*  At that time, Larsen's occupations were his involvement in his mother's horse breeding business and being a caregiver for his father.  Transcript of Deposition of Jens Larsen ("Larsen Deposition Transcript"), Vol. I, March 31, 2017, at page: line(s) 12:18-13:25, 14:1-6 and 14:18-23; Amended Trial Declaration of Jens Larsen ("Larsen Amended Trial Declaration"), ¶¶ 3, 5, ECF 93, filed on August 22, 2017.  Larsen was struggling financially and was receiving support from his father.  Larsen Deposition Transcript, Vol. I at 119:6-15 and Vol. II, April 4, 2017, at 477:7-23.  Larsen had no other employment or other sources of income at the time.  Larsen Deposition Transcript, Vol. I at 14:1-13 and 24:7-14; Larsen Testimony, Audio Recording of Trial on October 26, 2017 at 10:30-10:31 a.m.

After Larsen's mother had a stroke in 2009, he tried to keep his mother's horse breeding business running.  Larsen Amended Trial Declaration, ¶ 3.  After Larsen's mother died in 2012, however, he decided to try to wind down the horse business.  Larsen Amended Trial Declaration, ¶ 5; Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 10:55-10:56

---

sure how to do the rule 52 (I think it's called).  Please accept the following defense as my statement and what I feel should be done."  ECF 68 at 2.  Larsen's Statement does not constitute the proposed findings of fact and conclusions of law that the court had ordered because the Statement does not contain any citations to the evidentiary record to support Larsen's contentions of fact and law.

a.m.; Larsen Deposition Transcript, March 31, 2017, Vol. I at 106:1-25 and 107:1-6.  Larsen did not complete high school and has no formal education in accounting or bookkeeping, nor does he have any degree in finance.  Larsen Amended Trial Declaration, ¶ 1.  In 2015, Larsen was not trying to start a new business related to horses, and specifically, he was not starting a business to buy and rescue horses that were retiring, commenting, "That would be the worst thing to do with your money."  Larsen Deposition Transcript, March 31, 2017, Vol. I at 106:1-25 and 107:1-6.

Perske and Larsen were acquaintances in high school, but they did not maintain contact afterwards.  Perske Trial Declaration, ¶ 5.  They renewed their acquaintance when on July 22, 2015, Larsen contacted Perske through the Facebook social media website.  Larsen Amended Trial Declaration, ¶ 7; Perske Trial Declaration, ¶¶ 5, 7 and Exhibit 44 attached thereto, Copy of Facebook messages between Perske and Larsen; Stipulation of Facts, ¶ 1, Pre-Trial Stipulation.  Perske and Larsen thereafter entered into a business and romantic relationship, which continued through late October or early November 2015.  Stipulation of Facts, ¶ 2, Pre-Trial Stipulation.

As Perske acknowledged in her trial declaration, she is an "avid equestrian, and was very involved in the equestrian community, primarily in jumping".  Perske Trial Declaration, ¶ 4.  Perske testified at trial that she had been riding horses since she was 5 years old.  Perske Testimony, Audio Recording of Trial, January 22, 2018 at 10:38 a.m. [4]  At the time that Perske and Larsen were reacquainted, she was regularly taking horse riding lessons and spending time helping care for horses at the Hansen Dam Equestrian Center ("Hansen Dam") through a company called Team McAllister, and Perske had worked out an arrangement to "help around the barn for discounted lessons."  Perske Trial Declaration, ¶ 4.  As Perske further testified, "Most of my free time that I did not spend with my son, I spent riding and caring for horses."  *Id.*  Perske posted "lot of information on my Facebook profile about my riding and other horse-related things."  *Id.*, ¶ 8.

---

[4]  When Perske testified at trial, she identified herself as Jacquelynn Grace Lundgren, apparently due to a subsequent name change.  However, she identifies herself in her pleadings before and after trial as Jacquelynn G. Perske, and in this decision, she will be referred to by the surname Perske rather than Lundgren.

Larsen noticed that Perske "was into the horse scene on Facebook" and decided to contact her.  Larsen Amended Trial Declaration, ¶¶ 7, 8.  Larsen's initial intention in contacting Perske was because he "was looking to get rid of some horses."  *Id.*  Larsen Amended Trial Declaration, ¶ 7.  *See also id.*, ¶¶ 8, 59.

In his initial Facebook message to Perske, Larsen said that he noticed that she jumps horses, telling her that he raced and bred thoroughbreds for racing in Southern and Northern California.  Perske Trial Declaration, ¶¶ 5, 7 and Exhibit 44 attached thereto, Copy of Facebook messages between Perske and Larsen.  Larsen said that he owned 23 horses altogether and usually donated retired horses to people who jump or show horses, and he asked Perske if she knew anyone who wanted a retired horse because he was going to have some coming up in a month or two.  *Id.*  Perske initially responded that she might know of someone, and she asked Larsen if she could take a look when the horses were ready.  *Id.*  In a further message in this Facebook message chain of July 22, 2015, Perske wrote to Larsen, saying: "Wish I had my own [horses].  Maybe you could invest in one with potential and we could market it and sell it after I jumper train it."  *Id.*  Larsen responded, commenting that he "had success with doing that" and had a filly that he let another person take as a yearling and sell for $60,000 as a three-year old.  *Id.*  Larsen added that he had an "awesome career that affords me the expennsive [sic] hobby [of racing horses].  Sorry about misspells I am driving late for a business dinner in Hollywood[,]" and Perske responded, asking him, "what do you do as a career?" and further asking him, "Want to spend another few grand a month on a Hollsteiner jumper investment horse?  lol."  *Id.*

In response to Perske's question about his career, Larsen represented that he was a television series writer: "I am a writer.  Was on austin and alley last three seasons.  I am starting Hereos [sic] on nbc next season and just done with a film.  If it makes money im [sic] all about it . . . ."  *Id.*  Then Larsen mentioned that he was a "single dad" with two children living with him full-time, and Perske responded that she was a "single mom" taking care of her son.  *Id.*  Larsen also suggested that he wanted to take Perske out to dinner so "we can talk horses," and she responded "sure."  *Id.*; Perske Trial Declaration, ¶ 10.

Larsen and Perske exchanged phone numbers and "called each other the next day."  Larsen Amended Trial Declaration, ¶ 12.  According to Larsen, "[s]he wanted to meet for

dinner and I told her that I could not because I had plans.  However, my plans cancelled and I picked her up and we went out to dinner.  *Id.*, ¶¶13, 14; Perske Trial Declaration, ¶ 10.

On Larsen's Facebook page, he represented that he works as a "Writer/Producer" and studied at Yale University.  Perske Trial Declaration, ¶ 6 and Exhibit 43 attached thereto (Copy of Jens Larsen Facebook Profile Pages).  In his Facebook posting of June 5, 2015, Larsen represented that he has "been a writer on a TV show" and announced that he just registered his first screenplay.  *Id.*  On his Facebook page, Larsen referred to his businesses, including Larsen Investment Group LLC and his smoke shop businesses.  *Id.*  For example, in his Facebook posting on September 10, 2014, Larsen represented that he had just purchased a new smoke shop in Reseda, California.  *Id.*  Larsen's Facebook page displayed photographs of race horses and baby horses, and a photograph of him at a horse race, which included a representation that Larsen's company had owned the winning horse in the photograph.  *Id.*  Larsen's Facebook page also showed multiple photographs of luxury cars that he represented were his, including a Cadillac XTS sedan and Lincoln Sport Utility Vehicle.  *Id.*

According to Perske, before she and Larsen met for dinner they spoke by phone, and he talked about his career.  Perske Trial Declaration, ¶ 11.  Perske testified that in these phone conversations, "Jens constantly talked about his success as a movie and television writer and producer, and said that he recently sold a script to the studios.  He claimed that he had a number of companies in the horse business, and that his successful career allowed him to invest heavily in horses.  He also told me that he had been successful investing in horses, including buying, selling, breeding, and racing.  He repeatedly said that he had 23 horses, including several valuable breeding horses and racehorses."  *Id.*  According to Perske, "I believed what Jens said.  The things that he told me were consistent with the information on his Facebook profile, and my knowledge of the horse business.  He seemed very knowledgeable about horses, and I had no reason to disbelieve him."  *Id.,* ¶ 12.

Also, according to Perske, "[d]uring these conversations, Jens told me that he was starting a business to rescue and rehome racehorses that were either too old to race or not good for the track and would otherwise be sent to slaughter.  I told Jens in our Facebook conversation that the first jumper I rode, 'Danny,' was originally a racehorse.  Jens said that he wanted to start retraining racehorses as jumpers to resell to amateur equestrians.  He said that

he had success in doing this, and that one of his racehorses was eventually retrained and sold for $60,000. Jens told me that he wanted me to work with him helping him pick horses, training them, and eventually helping him resell them to amateur equestrians because I was already active in the jumper community." *Id.,* ¶¶ 13, 14.

Before getting together for dinner, Larsen invited Perske to go with him to the Burke Williams Spa for a massage. Larsen Amended Trial Declaration, ¶ 16; Perske Trial Declaration, ¶ 15. According to Perske, while they were at the spa, Larsen signed her up for a spa membership, saying to her that if she was going to be actively working with horses in his business, she was going to need regular massages." Perske Trial Declaration, ¶ 15. However, according to Larsen in his amended trial declaration, while he invited her to come along for a massage at his cost, he did not promise to purchase a spa membership for her. Larsen Amended Trial Declaration, ¶ 17.

After the massage, Larsen and Perske went to dinner at Nobu Restaurant, and according to Larsen, at dinner, "all she talked about was the 'Jumper' World." *Id.,* ¶¶ 15, 18. Larsen further stated in his trial declaration that "[i]t was during dinner that I explained my mothers [sic] death, her loves [sic] of horses, and how my father lives with me who is not doing well and I take care of him." *Id.,* ¶ 19.

According to Perske, "[d]uring our dinner, Jens continued to talk about his businesses and his career. He showed up to the spa and dinner in a new car, and again said that he was a writer and producer in television and movies. He said that he had been very successful both in the entertainment industry and in other businesses, including with horses. He told me about a horse he owned named 'Congo King,' who was a valuable breeding horse due to his racing history and said that he had a number of young horses bred by Congo King that were getting to be racing age." Perske Trial Declaration, ¶ 16.

Regarding dinner and afterwards, Perske stated in her trial declaration about conversations she had with Larsen: "We spoke more about the horse business during dinner and over the next few days. Jens said that he was going to start by bringing over some of his horses, including older horses and others that were not fit for the track, and retraining them. Once he got started retraining and reselling these horses, Jens said that he was going to buy other horses that were unable to race to do the same thing." *Id.,* ¶17. Perske further stated in

her trial declaration: "In each of these conversations, Jens said that he wanted me to work with him to get his business started, that he would cover all of the expenses, and that I would share in the profits when we resold the horses.  He also said later on that I would be allowed to keep some of the horses after we no longer needed them for the business.  Jens said he already had businesses set up in the horse industry, which he would use to cover the business expenses." *Id.,* ¶18.

According to Perske, "After having dinner with Jens, I talked to a few people I knew from Hansen Dam about the business, to see if it was feasible and how we would go about setting it up.  After talking to them, it seemed like a business that made sense, and I was drawn in by the idea of saving racehorses from slaughter.  Based on the things Jens told me about his career, his experience and success with horses, and his business plan, as well as his promises to pay all of the expenses, I agreed to join him in getting the business started.  We started dating a short time later." *Id.,* ¶¶ 19, 20.

Many of the representations that Larsen made to Perske in their Facebook message exchange, on his Facebook page and in their conversations were misleading and/or false. *See e.g.,* Established Facts, ¶ 2, Order Denying Plaintiff's Motion for Partial Summary Judgment and Granting Motion in Part Deeming Certain Facts Established, ECF 106, filed and entered on September 5. 2017 ("Larsen admits that several of his statements to Perske were 'lies.'").  Although Larsen's Facebook page represented that he studied at Yale University, he never attended Yale University as a student, but he was only "at Yale," having been born at the Yale-New Haven Hospital.  Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 10:32-10:33 a.m. [5]  The multiple photographs of luxury cars that Larsen represented were his and his statements that he was getting detail work done on these cars, were apparently publicized on his Facebook page to create an image of wealth and financial success.  This was misleading, however, because as Larsen admitted during his testimony at trial, he did not

---

[5]  At trial, Larsen in his testimony disclaimed any responsibility for the representation that he studied at Yale University, saying that it was his daughter, who was 11 years old at the time, who made that representation on his Facebook page.  The court finds that Larsen's testimony on this point is not credible because, not only was Larsen's daughter underage, (she was only 11 years old at the time of the representation), but the entire Facebook page showed that Larsen was trying to project a certain image of himself as being wealthy and successful.  This image was false and misleading, and the court finds that Larsen was the only one who had the motive and ability for crafting such an image.

actually own these cars; he only had short one-month rentals of these cars.  Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 10:34-10:35 a.m.

Although Larsen told Perske that he was "involved in Hollywood" and was a television writer, this was not true.  Larsen admitted in his trial declaration that "My brother is successful in Hollywood and I was able to tag along and participate in certain events and go to sets that my brother had a role in."  Larsen Amended Trial Declaration, ECF 93, ¶¶ 10, 11.  During his deposition, Larsen admitted: (i) that he did not make any income from writing at any point in time, (ii) that he was not a writer on the "Austin and Ally" television show, (iii) that he was not going to be a writer for the "Heroes" television show on the NBC network, (iv) that his occupations were only horse racing and breeding in his mother's horse breeding business and being a caregiver for his father.  Larsen Deposition Transcript, March 31, 2017, Vol. I at 13:1-25, 14:1-13, 14:18-23 and 207:1-25; Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 10:26-10:31 a.m.  When Larsen was asked at his deposition about his statement in his Facebook message to Perske that "I have an awesome career [in television writing] that affords me this expennsive [sic] hobby [of horse racing and breeding]," he candidly admitted that it was a lie and that "I was just saying that to get down her panties."  Larsen Deposition Transcript, Vol. I, March 31, 2017, at 207:1-10; Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 10:26-10:27 a.m.

After their first dinner date, according to Perske, "[o]ver the next several weeks, I was actively involved in trying to help Jens set up the business he claimed he was starting.  Within a few days, Jens said that I needed to start riding more consistently and riding in shows so that we could get our names out in the industry to market the business . . . Jens and I talked about buying several horses for the business that I would train with and ride in the show circuit, as well as riding consistently at Hansen Dam, and that we could eventually resell for a profit.  I told Jens many times that I could not afford to pay for the horses or upkeep.  I also told him about my arrangement with Team McAllister for discounted lessons because I could not afford riding lessons.  Jens reassured me that my role would be to help him with selecting, training, and selling the horses, in exchange for a share of the profits and allowing me to keep some of the horses, and that I would not need to pay for the expenses of the business because he would pay them."  Perske Trial Declaration, ¶¶ 21-23.

In late July and early August 2015, Larsen started to go with Perske to Hansen Dam to watch her ride horses. Perske Trial Declaration, ¶ 24; Larsen Amended Trial Declaration, ¶ 49. At this time, Perske introduced Larsen to Steve McAllister ("McAllister"), who runs Team McAllister, and Marnye Langer ("Langer"), who runs Langer Equestrian Group. Perske Trial Declaration, ¶ 24; Trial Declaration of Steve McAllister ("McAllister Trial Declaration"), ECF 79, ¶ 4; Trial Declaration of Marnye Langer ("Langer Trial Declaration"), ECF 78, ¶¶ 4-5. Both McAllister and Langer had equestrian businesses connected with the Hansen Dam. *Id.* According to Perske, in or around late July 2015, Larsen spoke to McAllister and Langer about potentially starting such an equestrian business with Perske. Perske Trial Declaration, ¶¶ 24-26; Langer Testimony, Audio Recording of Trial, October 26, 2017 at 9:41-9:42 a.m., 9:49-9:55 a.m.; McAllister Trial Declaration, ¶¶ 4-7.

According to Larsen, on or about July 25, 2015, Larsen received a call from Perske, inviting him and his kids to a barbecue meal with Steve McAllister, of Team McAllister, so Perske could introduce him to McAllister. Larsen Amended Trial Declaration, ¶ 20; *see also* Perske Trial Declaration, ¶ 24; McAllister Trial Declaration, ¶ 4. According to Larsen, his meeting and interaction with McAllister only lasted about 5 to 10 minutes. Larsen Amended Trial Declaration, ¶ 23.

According to McAllister, Larsen told him that he [Larsen] was in the entertainment industry and owned a number of racehorses, and he [Larsen] was interested in bringing the horses to the Hansen Dam Equestrian Center for boarding in order to retrain them as jumpers and resell them. McAllister Trial Declaration, ¶ 5-6. According to McAllister, "[w]hen I first met him, Jens [Larsen] claimed that he owed more than 20 racehorses. He said that he wanted to start bringing his horses to Southern California and reselling them as jumpers." *Id.,* ¶ 5. Also, according to McAllister, "Jens [Larsen] also said that he had a source for other racehorses that were getting too old to race, and once he was finished selling the ones he owned, he was going to buy others to retrain and resell them. He said that he and Jackie were going to make a business out of doing this." *Id.,* ¶ 6.

Because Larsen indicated an interest in leasing stalls at Hansen Dam for his horses, McAllister put Larsen in touch with Sterling Champ ("Champ"), who oversees leasing of boarding stalls for horses at Hansen Dam, and Gioia Lamendola ("Lamendola"), who works

with Team McAllister and would arrange feed and supplies for horses that were going to be boarded in leased stalls.  McAllister Trial Declaration, ¶ 10.  Larsen never entered into any lease, however, and ignored follow-up inquiries from Champ and Lamendola despite telling both that he was still planning to bring the horses over to Hansen Dam.  *Id.*, ¶¶ 10-11.

According to Larsen, he had met Champ about leasing boarding stalls for his horses, and Champ offered for Larsen to lease 10 stalls at $3,000 per month.  Larsen Amended Trial Declaration, ¶¶ 60-61.  According to Larsen, he was setting up transportation to move his horses over to the horse stalls to be leased at Hansen Dam because the price was a great opportunity for him "to re-home" his horses, but Champ no longer wanted to lease the stalls to Larsen for the agreed price, and therefore, Larsen did not bring the horses to Hansen Dam.  Larsen Amended Trial Declaration, ¶¶ 60-66.

Perske also brought Larsen to some parties put on by Langer, who runs the Langer Equestrian Group, and introduced Larsen to her.  Perske Trial Declaration, ¶ 24; Langer Trial Declaration, ¶¶ 4-5.  According to Langer, Larsen told her that he was in the entertainment industry and owned a number of racehorses, and he was interested in bringing the horses to Hansen Dam for boarding in order to retrain them as jumpers and resell them.  Langer Trial Declaration, ¶5.  However, Langer said that although she was at Hansen Dam almost daily, Larsen never brought any horses to the equestrian center.  *Id., ¶ 6.*

B. **The Horse Purchases**

a. **The Failed Purchase of "Leo"**

During the time period of late July and August 2015, McAllister talked to Larsen about buying a horse named "Leo" that McAllister was importing from Germany and wanted to sell.  McAllister Trial Declaration, ¶ 12.  McAllister thought that Leo would be a good horse for Perske to ride in equestrian shows that, in McAllister's view, would help Perske and Larsen market the horse business that he thought they were starting.  *Id*.  Perske liked Leo and thought that he would be a good horse to start riding in the show circuit, and she expressed this view to Larsen.  Perske Trial Declaration, ¶ 28.  According to Perske, Larsen told her that he was interested in buying Leo for "our business."  Perske Trial Declaration, ¶¶ 28-29; *see also,* Larsen Amended Trial Declaration, ¶ 51.  According to Perske, Larsen agreed: (i) that he

thought that Leo would be good for the business, (ii) that they would train Leo as a jumper, (iii) that she would ride him competitively in the show circuit, and (iv) that she would either keep Leo or they would sell him with her getting a share of the profits. Perske Trial Declaration ¶ 29.

On August 15, 2015, Larsen agreed to buy Leo from McAllister and gave a check drawn on the account of Larsen Investment Group LLC payable to Jenni Martin Enterprises, McAllister's business name for buying and selling horses, in the amount of $46,500.00 for the purchase of Leo.  McAllister Trial Declaration. ¶¶ 12-13 and Exhibit 15 (check), ECF 79; Perske Trial Declaration, ¶ 30.  According to McAllister, Larsen told him that he (Larsen) and Perske were going to be partners on Leo.  McAllister Trial Declaration, ¶ 13.

The purchase of Leo was contingent upon the horse being examined by Larsen's veterinarian.  See e.g., McAllister Trial Declaration ¶14; Perske Trial Declaration, ¶ 31; Larsen Testimony, Audio Recording of Trial, October 26, 2016 at 11:00 a.m.   Although numerous veterinarian appointments were made, Larsen later canceled them, and a veterinarian never came to examine Leo.  See McAllister Trial Declaration, ¶14; Perske Trial Declaration, ¶ 31; Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 11:00-11:01 a.m.   When McAllister attempted to contact Larsen about finalizing the sale of Leo, Larsen did not respond. See McAllister Trial Declaration, ¶14.

According to Larsen, on or about August 23, 2015, McAllister sent Larsen a Facebook message asking him what to do with the check for Leo.  Larsen Amended Trial Declaration, ¶ 92.  Larsen said that he questioned Perske about it because he "knew" that she could not handle or ride Leo based on his conversations with others, including Langer.  Id., ¶ 93.  Larsen said that he informed Perske that he could not and would not buy Leo because not only was Leo unsafe for her, but by then, they had begun discussions related to a smoke shop business, and Larsen had told Perske that he needed the capital to open the smoke shop.  Id., ¶ 94. According to Larsen, he sent McAllister a message on Facebook, instructing McAllister to destroy the check.  Id., ¶ 95.  Larsen said that he told McAllister that "my money was not to be used for buying the horse and maybe in the future we will be able to do business together." Id., ¶ 96.

The sale of Leo to Larsen was never completed, and McAllister sold Leo to another buyer.  McAllister Trial Declaration, ¶15; Perske Trial Declaration, ¶ 32; McAllister Testimony,

Audio Recording of Trial, January 22, 2018 at 10:14-10:17 a.m.  According to Perske, Larsen did not go through with the purchase of Leo, even though Perske was supposed to either keep Leo or receive a commission on his sale.  Perske Trial Declaration, ¶135.  According to Larsen, Perske wanted to buy Leo, but he did not agree to buy Leo with her as a gift for her. Larsen Amended Trial Declaration, ¶¶ 51, 54.

The testimony of Larsen is inconsistent with the testimony of Perske and McAllister regarding the circumstances of Larsen's purchase of Leo.  The court finds that Perske's testimony is credible, including: (i) that Perske liked Leo and thought that he would be a good horse to start riding in the show circuit, (ii) that when she told Larsen this, he told her that he was interested in buying Leo for "our business," (iii) that Larsen agreed that he thought that Leo would be good for the business, (iv) that they would train Leo as a jumper, (v) that she would ride him competitively in the show circuit, and (vi) that she would either keep Leo or they would sell him with her getting a share of the profits.  McAllister, who owned Leo, testified that he thought that Leo would be a good horse for Perske to ride in equestrian shows, which would have helped market the business that Larsen and Perske were starting.  McAllister Trial Declaration, ¶12.  McAllister would not have so testified if he thought Leo was unsafe for Perske to ride, and the court finds that this testimony is also credible.

The court also finds that the version of the facts in the testimony of Perske and McAllister is credible—specifically, that Larsen (i) tendered the check to McAllister to purchase Leo, (ii) never followed through with arranging for the veterinarian examination, which was a condition of the purchase, and (iii) never communicated with McAllister about his reasons for not following through.  There is no reason for McAllister, a neutral third party, to take sides and give untruthful testimony in this case.  Furthermore, McAllister's testimony corroborates Perske's version of the facts.

The court finds that Larsen's testimony regarding the circumstances of the purchase of Leo is not credible.  The evidence does not support Larsen's version of the facts.  Larsen claimed that he did not want to buy Leo, only Perske did, because Leo was unsafe for Perske. Larsen's conduct, however, fails to support this claim.  Larsen made a check for full payment to buy Leo on one of his business accounts; he stated on the check and to McAllister that the only condition for the purchase was an examination by Larsen's veterinarian.  These facts are

inconsistent with Larsen's testimony that he did not want to buy Leo because it was unsafe for Perske. Moreover, the reason that Larsen gave for reneging on the purchase of Leo—to preserve capital for a smoke shop business—is not credible because, as discussed herein and demonstrated by the evidence at trial, Larsen had no capital to put into a smoke shop.

Larsen is probably right that he was not buying Leo as a gift for Perske since the evidence indicates that he was buying Leo for the new horse business that he and Perske had discussed and agreed to start, even though he did not really intend to start that business. There is no satisfactory explanation for Larsen's purchase of Leo, if he was not buying a gift for Perske, other than he purchased Leo ostensibly for the new business that he told Perske that they were starting. At that early point in their relationship, if Larsen felt Leo was unsafe for Perske to ride, he would have not purchased Leo for her and would have tried to dissuade her from agreeing to buy Leo. The purchase of Leo ostensibly for the new business is evidence that Larsen and Perske were actually starting their new business to purchase, retrain and resell retired racehorses as jumpers. Leo was tangible evidence for Perske that their joint business venture was beginning.

### b. The Purchase and Return of "Alex"

In July and August 2015, Langer was selling a horse named "Alex," whom Perske had ridden many times. Langer Trial Declaration, ¶ 8. According to Langer, she trained Alex to a higher level than Perske needed, but Perske and Alex "got along very well." *Id.* According to Langer, during the first part of August 2015, Perske rode Alex regularly, and Perske brought Larsen to Hansen Dam to watch her ride Alex and discuss terms about buying Alex with McAllister, who was acting as the agent for both buyer and seller. Langer Trial Declaration, ¶ 9. Also, according to Langer, both Perske and Larsen told Langer that they were looking at buying several horses that Perske could train and ride in the show circuit, and potentially sell as part of their business. *Id.*

On August 17, 2015, Perske purchased Alex from Langer Equestrian Group, Inc. Stipulation of Facts, ¶ 3, Pre-Trial Stipulation; Langer Trial Declaration, ¶ 10 and Exhibit 45 attached thereto (Purchase Agreement and Bill of Sale for Alex). The parties dispute whether this was a business or personal purchase. Stipulation of Facts, ¶ 3, Pre-Trial Stipulation.

According to Perske, Larsen saw her ride Alex in a horse show and said that he definitely wanted to buy Alex to get "our name" out and promote their new business.  Perske Trial Declaration, ¶ 34.  According to Perske, Larsen also represented that when they no longer needed Alex, either she could keep Alex or they could resell him with Perske getting a commission.  Id.  According to Perske, Larsen also told her that Alex was her horse and she could keep him as long as she wanted.  Perske Trial Declaration, ¶ 34.

According to Larsen, on or around August 10, 2015, he met with Perske at the "barn" at Hansen Dam to watch her ride, and she pulled him into a tack room to meet with Langer to discuss Perske buying a horse named Alex.  Larsen Amended Trial Declaration, ¶¶ 49-50.  According to Larsen, Perske and Langer agreed for Perske to purchase Alex for $15,000 based on payments of $1,000 a month, and Larsen made two of these payments because Perske was broke and could not afford her purchase of Alex.  Id., ¶ 55.  Larsen stated that it was never his intent to purchase Alex.  Id.  Also, according to Larsen, he never intended to purchase Alex for a horse business or anything else besides Perske's simple pleasure of participating in horse jumping because he "was trying to get rid of [his] horses," which was his stated reason for contacting Perske to begin with.  Id., ¶¶ 58, 59.

The Purchase Agreement and Bill of Sale for Alex shows Langer Equestrian Group as the seller and Perske as the buyer.  Langer Trial Declaration, ¶ 10 and Exhibit 45 attached thereto (Purchase Agreement and Bill of Sale).  Langer agreed to a payment plan for the purchase of Alex of $1,000 down payment, $1,000 per month until February 2016 and $9,000 in February 2016.  Id.; Perske Trial Declaration, ¶ 35.

Larsen is not listed as a buyer on the Purchase Agreement and Bill of Sale for Alex.  Langer Trial Declaration, ¶ 10 and Exhibit 45 attached thereto.   According to Langer, both Perske and Larsen agreed to buy Alex on August 17, 2015, and Alex was registered in Perske's name only at Larsen's request because he told Langer that he was going to pay for Alex, and he was asking that Alex be registered in Perske's name only as a "romantic gesture." Id., ¶ 11.  According to Langer and Perske, Langer specifically asked Larsen whether he wanted Alex to be in his and Perske's names, and he insisted that even though he was paying for Alex, he wanted Alex to be in Perske's name only and only Perske's name to be on the

Purchase Agreement.  Langer Trial Declaration, ¶ 12; Perske Trial Declaration, ¶ 36.

According to Perske, she agreed to these terms based on Larsen's statements to her about his

career, his investments in horses, the business he was starting and his promise to pay for

Alex.  Perske Trial Declaration, ¶ 37.  Perske said that all of Larsen's statements and behavior

convinced her that he was serious about starting the horse rescue business and had the

financial ability to cover the business expenses.  *Id.*

Larsen made the initial monthly payment of $1,000 for Alex that day by check and may

have made one more monthly payment, but he stopped paying altogether by October 2015.

Langer Trial Declaration*,* ¶ 13; Perske Trial Declaration, ¶39; Larsen Amended Trial

Declaration, ¶ 55; Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 1:37 p.m.

Langer asked Perske several times about the status of payments for Alex, and Perske

eventually told Langer that Larsen was not paying the bills for the horse business as he had

promised.  Langer Trial Declaration*,* ¶ 14.  Perske would eventually surrender Alex to Langer.

*Id.*

On October 22, 2015, Perske received an email from Langer telling Perske that she

could no longer ride Alex and Langer was holding Perske's equipment as security because the

installment payments for Alex were not being made.  Perske Trial Declaration, ¶ 94.  Because

no monthly installment payments for the purchase of Alex were made after September 2015,

Perske returned Alex to Langer in October 2015.  Perske Trial Declaration, ¶ 134.  Langer later

resold the horse for $2,000.  Langer Testimony, Audio Recording of Trial, October 26, 2017 at

9:54-9:59 a.m.  Langer testified at trial that she incurred a loss on the resale of Alex after

repossessing him from Perske but did not bring a lawsuit against Perske for breach of contract

and does not intend to pursue further recourse against Perske or Larsen for breach of contract

regarding Alex.  *Id.* at 9:54-10:04 a.m.

After Perske bought Alex, she started riding him in shows and training with him

regularly.  Alex was boarded at Hansen Dam and put in a training program with Team

McAllister, McAllister's horse training business. Perske Trial Declaration, ¶¶ 23, 48; McAllister

Trial Declaration, ¶¶ 2,16,17.  According to Perske, she incurred at least $6,510.32 in horse-

1   related expenses, including: (i) $1,490.32 in boarding expenses for Alex from August to

2   October 2015 billed by Team McAllister, (ii) $495.00 in veterinarian expenses which she said

3   she paid, (iii) $225.00 in veterinary dental expenses which she said she also paid, (iv)

4   $3,500.00 in training expenses for Alex through Team McAllister, which she said she paid to

5   McAllister after he agreed to settle in this amount, although the actual amount exceeded

6   $5,000.00, (v) $300.00 in horse equipment for Leo, which she said she paid, and (vi) $500.00

7   for horse equipment for Alex which she said she paid.  Perske Trial Declaration, ¶¶ 48, 49 and

8   133 and Exhibits 48, 49, 73 and 74 attached thereto (copies of invoices for Alex).  As to the

9   $800 in horse equipment purchases for Alex and Leo, Perske offered into evidence copies of

10  her bank account statements showing debit card charges paid to horse-related businesses,

11  and she also said that some of these equipment items were returned to pay off other bills for

12  Alex.  Perske Trial Declaration ¶ 133(e) and Exhibit 49 attached thereto.  However, in support

13  of Perske's claim of horse equipment charges of $800.00 for the business, she did not offer

14  into evidence copies of the invoices that the debit card charges related to, and a number of the

15  debit card charges post-dated after she returned Alex to Team McAllister in October 2015

16  ($100.00 on November 19, 2015, $314.86 on November 19, 2015, $100.00 on December 17,

17  2015 and $100.00 on January 19, 2016).  *Id.*  Additionally, the purchase of Leo fell through

18  because it was never finalized.  *Id.*  The court finds that Perske's claim of horse equipment

19  purchases totaling $800.00 is not proven because there are no invoices to corroborate the

20  equipment purchases and most of the charges (a total of $614.86) post-dated her care for Alex

21  and Leo as shown on her bank account statements.   Moreover, as discussed herein, these

22  equipment expenses were incurred after Perske and Larsen ended their romantic relationship

23  and stopped doing business with each other in late October or early November 2015, and thus,

24  are unlikely to have been incurred in their business.

25          In late September 2015, Perske learned that Team McAllister had not received

26  payments from Larsen for Alex's boarding and training, so she asked Larsen about it.  Perske

27  Trial Declaration, ¶ 80.  On September 30, 2015, Larsen responded to Perske by text that

28  Alex's expenses were paid, and he could see the withdrawal out of his account.  *Id.*  On the

following day, Larsen told Perske that the payment check was returned to his bank as having

the wrong address, though he confirmed that the address was correct, and he would issue a

new check in 24 hours so she could take it to the barn the following day.  *Id.*  When Perske

followed up with Larsen on the next day, he claimed he was sick.  *Id.*  Afterwards, Perske

asked Larsen several times if he had made the payments of Alex's boarding and training

expenses.  Plaintiff's Exhibit 57 at 0705-0713.  For example, Perske's text to Larsen of

October 3, 2015 at 2:41 p.m. stated:  "Also I need a check for 1200 for board for September

and October because we never paid for last month for Alex".  Larsen's response on October 3,

2015 at 2:48 p.m. stated: "Ok."  *Id.* at 0705.  Perske's text to Larsen of October 9, 2015 at

10:25 a.m. stated: "Also, did all Alex's bills get paid?  I just got a text from Giola cause they

were asking about board on Alex this morning.  She asked me about training fees yesterday

too.  I am trying not to bug you about this stuff but if you can please let me know it is done or in

the process and will be don't 100% sure today please??"  Plaintiff's Exhibit 57 at 0713.  Larsen

texted in response on October 9, 2015 at 11:57 a.m.: "yes yes yea yes yes".  However, Larsen

never made the payments, and on October 25, 2015, Perske met with Langer and McAllister

about the past due payments for Alex, telling them what was happening with Larsen and

agreeing that she would return Alex to Langer because she could not afford the payments.

Perske Trial Declaration, ¶ 99.

According to Perske, she settled the outstanding debt with Team McAllister incurred for

training of Alex for $3,500.  Perske Trial Declaration, ¶ 133(d) and Exhibits 73 and 74 attached

thereto (copies of text messages between Perske and McAllister and copy of cashier's check).

However, Perske owed a debt to Team McAllister not just for training expenses for Alex, but

also, boarding and care expenses for him, and the evidence indicates that the entire bill owed

to Team McAllister was compromised of multiple expenses, as indicated in McAllister's

testimony and the text message exchange between her and McAllister referring to the "entire

bill," and not just for training.  *Id.;* McAllister Trial Declaration, ¶¶ 17-19.  This would include the

$1,490.32 in boarding expenses for Alex from August to October 2015 billed by Team

McAllister as shown on its invoices as part of Exhibit 73.  *Id.*  There is no evidence that Team

1  McAllister is looking for further payment from Perske after the settlement reached by Perske

2  and McAllister.

3        The testimony of Larsen conflicts with the testimony of Perske and Langer regarding the

4  circumstances of Perske's purchase of Alex.  The court finds that Perske's testimony is

5  credible, including: (i) that Larsen saw her ride Alex in a horse show and said that he definitely

6  wanted to buy Alex to promote the business they were starting, (ii) that Larsen said when they

7  no longer needed Alex, either Perske could keep Alex or they could resell him with her getting

8  a commission, (iii) that Larsen told Perske that Alex was her horse and she could keep him as

9  long as she wanted, and (iv) that she agreed to purchase Alex in her name only based on

10 Larsen's statements about his career, his investments in horses, the business he was starting

11 and his promise to pay for Alex.  The purchase of Alex by Perske, and the purchase of Leo by

12 Larsen two days before, which purchases were based on their agreement to buy these horses

13 for their new horse business, were both tangible signs to Perske that their joint business

14 venture to purchase, retrain and resell retired racehorses as jumpers was underway.

15       The court also finds that the version of the facts in the testimony of Perske and Langer

16 is credible.  Specifically, the court finds the testimony credible: (i) that both Perske and Larsen

17 agreed to buy Alex on August 17, 2015, (ii) that Larsen told Langer that he was going to pay

18 for Alex, but asked that Alex be registered in Perske's name, which appeared to be a "romantic

19 gesture," and (iii) that Larsen made the first installment payment and perhaps the second to

20 purchase Alex on the contract.  There is no reason for Langer, a neutral third party, to take

21 sides and give untruthful testimony in this case, and her testimony corroborates Perske's

22 testimony.

23       The court finds Larsen's testimony not to be credible regarding the circumstances of the

24 purchase of Alex.  The evidence does not support Larsen's version of the facts.  Larsen's

25 claims: (i) that only Perske wanted to buy Alex, (ii) that he made two of the installment

26 payments only because Perske was broke and could not afford her purchase of Alex, but it

27 was never his intent to purchase Alex, and (iii) that he never intended to purchase Alex for a

28 horse business or for anything else besides Perske's simple pleasure of participating in horse

1   jumping are inconsistent with the record.  Although it was true that it was Larsen's intent to get

2   rid of his horses rather than acquiring new ones, this was an intent that he concealed from

3   Perske as he told her the contrary—that he wanted to acquire horses for retraining and resale.

4   As Perske testified, she would not have purchased Alex on her own because as a working

5   single mother employed as a legal secretary, she could not afford to do so.  Perske's testimony

6   is supported in the record by her prior experience volunteering for Team McAllister at Hansen

7   Dam for discounted riding lessons.  Also, as Langer testified, both Perske and Larsen had

8   agreed to purchase Alex, and Larsen told Langer that he was going to pay for Alex.  The text

9   messages between Perske and Larsen from October 2015 about him paying Alex's expenses

10  also corroborate Perske's testimony that Larsen had agreed to pay those expenses since the

11  text messages show that he said he was going to pay them.  All of this evidence rebuts

12  Larsen's uncorroborated testimony that Perske intended to buy Alex on her own and he was

13  only going to help her make the first two installment payments.  Moreover, this evidence rebuts

14  Larsen's testimony that Perske was happy with this arrangement, and therefore, the court finds

15  that Larsen's testimony regarding the purchase of Alex not to be credible.

16          With respect to Perske's claim that she incurred at least $6,510.32 in horse-related

17  expenses, which she said that Larsen promised to pay, but did not, the court finds that she has

18  substantiated her claim of $3,500.00 which she paid to McAllister in settlement of Team

19  McAllister's claim for training expenses for Alex based on her testimony, McAllister's testimony

20  and her proof of payment.  The court finds that she has substantiated her claim of $225.00

21  which she paid for veterinary dental expenses for Alex based on her testimony, which the court

22  finds credible as supported by a copy of the invoice for such expenses.  As discussed

23  previously, the court finds that Perske has not substantiated her claim of $800.00 for horse

24  equipment for Alex and Leo in connection with the horse business with Larsen because the

25  purchases are not substantiated by invoices to corroborate the debit card charges on her bank

26  account statements and many of the charges claimed as equipment purchases post-dated the

27  return of Alex to Team McAllister in October 2015.  The court also finds that Perske has not

28  substantiated her claim of $1,490.32 for boarding expenses for Alex from August to October

2015 billed by Team McAllister based on her testimony and the invoices from Team McAllister because she did not provide proof of payment of such expenses and the evidence indicates that the settlement between her and McAllister settled the entire bill that she owed to Team McAllister.  The court further finds that Perske has not substantiated her claim of $495.00 in veterinarian expenses which she said she paid based on her testimony, which is not corroborated by any invoice or written documentation of such expenses.  Thus, the court finds that Perske has substantiated a total of $3,725.00 with respect to her claim that she incurred at least $6,510.32 in horse-related business expenses for the joint business venture of Perske and Larsen in buying, retraining and reselling racehorses as jumpers.

### C. **The Car Lease**

On or around August 19, 2015, Perske leased a Lexus vehicle from Keyes Lexus. Stipulation of Facts, ¶ 4, Pre-Trial Stipulation, ECF 62.  The parties dispute whether this was a business or personal purchase.  *Id.*

Before Perske met Larsen in July 2015, she owned a 2007 Lexus vehicle, which was paid off.  Perske Trial Declaration, ¶ 40.  According to Perske, Larsen told her that she needed a new car because she would be meeting with wealthy clients, and her car was not nice enough to drive to business meetings or to drive clients around.  *Id.*  Also, according to Perske, she told Larsen that she could not afford a new car, but he told her that this was a business expense for the horse business which was a "write off" and that he and his businesses "would cover it."  *Id.*  Thus, Perske says that she agreed to trade in her 2007 Lexus for a new car.  *Id., ¶* 41.

According to Larsen, Perske "began to change and became more focused on my money and her ownership of material possessions."  Larsen Amended Trial Declaration, ¶ 27. Also, according to Larsen, Perske felt she needed a new car because the radio, brakes and tires of her 2007 Lexus were not working properly.  *Id.*, ¶ 28.  Larsen claimed that, at the time, he offered to buy her new tires and brakes, but she refused his offer.  *Id.*, ¶ 29.

A day or two before August 19, 2015, Perske and Larsen went car shopping together for her.  Perske Trial Declaration, ¶¶ 42-44; Larsen Amended Trial Declaration, ¶¶ 30-32, 41-46.

1  According to Perske, they first tried to find a car that could tow a horse trailer because it would

2  save money on trailering horses to shows.  Perske Trial Declaration, ¶ 42.  Perske and Larsen

3  went to a Range Rover dealership, but she could not qualify for a lease there.  *Id.*  According

4  to Perske, Larsen said he could not co-sign a lease for her because he had already signed for

5  his own vehicle and had co-signed for his father's vehicle.  *Id.*

6          A day or two later, on August 19, 2015, Perske and Larsen went to the Keyes Lexus

7  dealership to discuss leasing a Lexus Sport Utility Vehicle ("SUV") for her.  Perske Trial

8  Declaration ¶ 43; Larsen Amended Trial Declaration, ¶ 44. At Keyes Lexus, Perske did not

9  qualify for a lease on a Lexus SUV that could haul a horse trailer.  Perske Trial Declaration,

10  ¶ 43.

11          Perske and Larsen then looked at various smaller cars at Keyes Lexus, and according

12  to Perske, Larsen suggested that she lease a fully loaded RC 350, an almost $60,000 car.  *Id.,*

13  ¶ 44.  According to Perske, although she never had a sports car before, Larsen said that it

14  would be a good car for meeting with clients and driving them around.  *Id., ¶* 44.  According to

15  Perske, most of their potential clients in the horse industry would be wealthy, so it made sense

16  to her to have a luxury car.  *Id.*  Even so, Perske thought that she had no way to make the

17  payments on the car, which were over $900 per month, and she told Larsen this at the time,

18  and according to her, he assured her that he was going to make the lease payments as a

19  business expense.  *Id., ¶* 45.  Based on Larsen's statements and agreement to make the lease

20  payments, she traded in her old car and entered a lease of the 2015 Lexus RC 350 car.  *Id.,*

21  ¶ 46 and Exhibit 46 attached thereto (Motor Vehicle Closed- End Lease Agreement).  The

22  lease agreement showed that Perske was the sole signatory and lessee under the lease of the

23  new car from Keyes Lexus, that she received a trade-in credit of $8,500.00 for her old car, that

24  the lease payments on the new car were $910.85 per month, and that the total payments due

25  over the term of the lease were $21,860.40.  *Id.*

26          According to Larsen, however, he and Perske went to the Lexus dealership; she fell in

27  love with a car; she was "adamant about having the vehicle," and she was approved for it.

28  Larsen Amended Trial Declaration, ¶¶ 44-46.  Also, according to Larsen, he told Perske that

1    he was not going to be responsible for her car payments, and the obligation to make the car

2    payments would be her responsibility.  *Id.,* ¶ 47.  Larsen represented that he was "proud of her

3    and seeing her so happy for getting the new car she wanted," admitting, "I did offer and did in

4    fact make the first car payment."  *Id.,* ¶¶ 47-48.

5          Larsen made the first monthly payment on Perske's new car lease.  Larsen Amended

6    Trial Declaration, ¶ 48; Perske Trial Declaration, ¶ 47.  According to Perske, Larsen made the

7    first lease payment of $910.85 by using a credit or debit card at the dealership.  Perske Trial

8    Declaration, ¶¶ 47-48 and Exhibit 46 attached thereto (Motor Vehicle Closed- End Lease

9    Agreement showing a first lease payment of $910.85 due at leasing signing or delivery).  Also,

10   according to Perske, Larsen tried to make an online lease payment around September 19,

11   2015, but it was rejected, and afterwards, Larsen told her it was a mistake, and sent a check

12   for the lease payment by mail, which also was rejected as shown on the lease account history.

13   *Id.,* ¶¶ 47, 81 and Exhibit 47 attached thereto (Lexus Account History).

14         On October 22, 2015, Perske received a call from Lexus telling her that she needed to

15   surrender the car due to missed lease payments.  Perske Trial Declaration, ¶ 94.  Perske

16   returned the Lexus in December 2015 because Larsen was not making the monthly payments,

17   and she could not afford to make the monthly payments.  Perske Trial Declaration, ¶ 131.

18   After Perske returned the car to Lexus, Lexus notified her by letter in February 2016 that she

19   owed a balance of $10,877.88 resulting from early termination of the lease pursuant to the

20   lease agreement.  Perske Trial Declaration, ¶ 136 and Exhibit 76 attached thereto (Lexus

21   Balance Due Letter dated February 17, 2016, including a balance due after Lexus resold the

22   car).  However, Perske did not offer any evidence that Lexus has taken any legal or other

23   action to demand payment of the balance on the lease since sending her the notice letter in

24   February 2016.

25         The testimony of Larsen conflicts with the testimony of Perske regarding the

26   circumstances of Perske's lease of the new Lexus car.  The court finds that Perske's testimony

27   is credible.  Specifically, the court finds credible Perske's testimony: (i) that Larsen told her that

28   she needed a new car because she would be meeting with wealthy clients in connection with

their horse business, (ii) that her current car was not nice enough to drive to business meetings or to drive clients around, (iii) that she told him that she could not afford a new car, (iv) that he told her that this was a business expense for the horse business which was a "write off", (v) that he and his businesses "would cover it," and (vi) that she thus agreed to trade in her 2007 Lexus for a new car.  Perske signed the car lease only two days after her purchase of Alex, and only four days after the purchase of Leo by Larsen.  Those purchases were tangible signs to Perske that their horse business was underway, and thus, support her testimony that with Larsen's encouragement and offer to make the car payments, she was leasing the new Lexus for the business.

The court finds Larsen's testimony not to be credible regarding the circumstances of the lease of the new Lexus car.  The evidence does not support Larsen's version of the facts.  Specifically, the court finds not credible Larsen's claims: (i) that Perske felt she needed a new car because the radio, brakes, and tires were not working in her car, (ii) that at the time, he offered to buy her new tires and brakes, but that she refused his offer, (iii) that Perske fell in love with a car, and she was "adamant about having the vehicle," and (iv) that he told her that he was not going to be responsible for her car payments and that the obligation to pay the car would be her responsibility.  As Perske testified, she would not have traded in her old car, despite that it may have needed new tires and some repairs, and leased the new Lexus vehicle on her own because, as a working single mother employed as a legal secretary, she could not afford to do so.  She only did so because Larsen told her that he would make the payments as part of their business.  As proof of that, he made the first payment.  Perske's testimony is credible as she immediately returned the car after Larsen stopped making the payments because she could not afford to do so.  It is not credible that Perske would have signed the lease just because, as Larsen testified, he only would make the first payment.

As Perske credibly testified, the horse business never really materialized as, after setting up a lease of horse stalls at Hansen Dam with Sterling Champ, claiming that he was buying Leo and Alex and paying for their upkeep expenses for the business, and getting Perske to trade in her car for a new leased car, Larsen did not do anything to get the business

started, though he continued to tell her that he was working on the horse business until

October 2015. Perske Trial Declaration, ¶ 50. Larsen backed out of the lease of horse stalls

with Sterling Champ and the purchase of Leo, never brought his horses to Hansen Dam,

stopped making the payments on Alex and related horse expenses, and all of his payments

related to the new car lease, discussed herein, were returned. *Id.*

### D. The Smoke Shop Business and Perske's Investment

In September 2015, Perske gave Larsen money as an investment in connection with a

series of businesses that she and Larsen were to ostensibly start. Stipulation of Facts, ¶ 5,

Pre-Trial Stipulation, ECF 62. The amount of Perske's investment and whether the businesses

were actually contemplated is contested. *Id.* Perske delivered her investment money to

Larsen on September 17 and 21, 2015. *Id.,* ¶ 7. There is a dispute as to the amount of

Perske's investment given to Larsen. *Id.* Larsen has not paid Perske any of her investment

back. Established Facts, ¶ 3, Order Denying Plaintiff's Motion for Partial Summary Judgment

and Granting Motion in Part Deeming Certain Facts Established, ECF 106.

Larsen was to be responsible for the day-to-day operation of the smoke shop business[6],

which was one of the businesses that he and Perske actually contemplated. Stipulation of

Facts, ¶¶ 5-6, Pre-Trial Stipulation. On September 21, 2015, Perske entered into a

Commercial Lease Agreement for the smoke shop business with landlord Adnan Aljojo for the

premises at 4718 Melrose Avenue, Los Angeles, California, 90029. *Id.,* ¶ 8. Perske also

delivered a check to the landlord of the parties' smoke shop location for $4,000 as a

contribution to this business. *Id.,* ¶ 7.

According to Perske, the idea of a smoke shop business first came up when she and

Larsen were dating. Perske Trial Declaration, ¶ 51. He told her that he was part owner of

several smoke shops in the Los Angeles area. *Id.* She drove by a smoke shop in Burbank,

CA with Larsen in August or September 2015, and as they drove by, Larsen told her that he

was a 25% owner of that shop. *Id.* On other occasions, when they drove by other smoke

---

[6] According to the Collins Dictionary, a smoke shop is a shop that sells tobacco, cigarettes, pipes, etc.
The Collins Dictionary (online edition accessed on September 10, 2019 at
https://www.collinsdictionary.com/us/dictionary/english/smoke-shop).

shops, he told her that he was part owner of the smoke shops.  *Id.*  Larsen told her that he had

helped get one well known smoke shop started and was a part owner.  *Id.*  He also told her

that he wanted to start a chain of smoke shops in the Los Angeles area.  *Id.*

Larsen's representations to Perske that he had prior smoke shop experience were

untrue.  Larsen testified at trial that he did not own or co-own a smoke shop before he opened

the smoke shop with Perske and that the total experience he had with a smoke shop was that

a buddy of his owned one.  Larsen Testimony, Audio Recording of Trial, October 26, 2017 at

11:16-11:18 a.m. and 11:21-11:23 a.m.; Larsen Testimony, Audio Recording of Trial, January

22, 2018 at 4:37 p.m.   Larsen's entry on his Facebook page posted on September 10, 2014,

stated: "Bought a new smoke shop today in Reseda, CA.  Hopefully going to buy another in

Burbank tomorrow and one in North Hollywood this weekend.  As long as Mr. Michael A.

Mersola, Jr. Can get the two deals done. Today was a good day!"  Plaintiff's Exhibit 43 at

01618.  This posting was not true since Larsen had not owned or co-owned a smoke shop

before he opened the one with Perske in October 2015. [7]

Perske said that she and Larsen were getting more serious in their relationship, and he

started to tell her that he wanted to move in together with their children, and he wanted her to

quit her job and stay at home with their children.  Perske Trial Declaration*,* ¶ 52.  At first,

Larsen talked about them buying a house where they could keep the horses, and they met with

a real estate agent about buying a horse property.  *Id.*, ¶ 52.  Whenever the agent sent them

listings, however, Larsen would find some reason that he did not like them.  *Id.*  Larsen never

indicated that he could not afford any of the houses they discussed.  *Id.*  When they were

unable to find a house to buy, they started looking into renting a house together because

Larsen's lease was going to end.  *Id.*, ¶ 54.  Larsen and Perske agreed to lease a house in

[7]   Later, after Perske and Larsen had ended their romantic relationship, and Perske filed a request for a
domestic violence restraining order in the Superior Court of California for the County of Los Angeles,
Larsen filed with the court a response under a declaration of penalty of perjury, dated December 5,
2015, declaring: "In September 2015, we [Larsen and Perske] decided to open a business together.  I
co-own two others [sic] similar stores and was comfortable with the business."  Plaintiff's Exhibit 2 at
0005.  This statement of Larsen's under penalty of perjury that he co-owned two other similar stores,
i.e., smoke shops, was untrue, as he admitted at trial.  Larsen Testimony, Audio Recording of Trial,
October 26, 2017 at 11:22 a.m.

1  Burbank, but the lease fell through because Larsen wanted to postpone the move-in date after

2  having the landlord get the house ready for them early.  *Id.*   During this time, according to

3  Perske, Larsen asked her if she wanted to invest in a chain of smoke shops that he wanted to

4  open.  *Id., ¶* 55.  Perske testified that according to Larsen, he was going to open a chain of

5  smoke shops around the area, and he said that he had been looking at a location on Melrose

6  Avenue for the first shop for a long time, and that it had come up for lease.  *Id.*

7      According to Perske, he told her that he wanted her to invest in three smoke shops with

8  him as a co-owner, and that by investing she could start becoming financially independent and

9  would be able to leave her job and spend more time with their children.  *Id., ¶* 56.  She said

10 that he also told her that after the shops were up and running, she could manage one of them

11 and otherwise be a stay-at-home mother.  *Id.*

12     Larsen in his trial declaration recalled the specific date when he first talked to her about

13 opening a smoke shop with him.  Larsen Amended Trial Declaration, *¶¶* 75-79.  This was on or

14 about August 21, 2015 when Larsen took Perske to the Boa Steak House for dinner.  *Id., ¶* 75.

15 Larsen in his trial declaration said that during dinner he expressed that he cared about Perske

16 and that as a token of his love he gave her a bracelet that his daughter had helped him pick

17 out the day before.  *Id., ¶¶* 74-76.  After their dinner date, Larsen expressed to Perske that he

18 really wanted to open a smoke shop and explained to her that he knew some people in the

19 business and that if each of them invested, they could have the opportunity to create a

20 franchise.  *Id., ¶¶* 78-79.

21     According to Perske, Larsen told her that he would match her investment in the shops.

22 Perske Trial Declaration, *¶* 57.  Perske told Larsen that she could borrow $30,000 that she had

23 saved in her 401(k) plan that she had through work, and he said that he would put in $30,000

24 of his own money.  *Id.*  According to Perske, Larsen said that they would use the money to

25 open three smoke shops, which he would manage until they were up and running.  *Id.*

26 According to Perske, Larsen described a plan wherein they would put $10,000 of her

27 investment and $10,000 of his investment into each of the three smoke shops.  *Id.*

28

1    Larsen told Perske that he would match her investment in the smoke shop business,

2    that they would each initially invest $30,000 and that he would put in at least $30,000.  Larsen

3    Deposition Transcript, Vol. I at 176:14-24 and 177:9-19; Larsen Testimony, Audio Recording of

4    Trial, October 26, 2017 at 1:31 p.m.; Larsen Testimony, Audio Recording of Trial, January 22,

5    2018 at 4:37 p.m.  Larsen did not have the money to make the $30,000 investment, but he

6    said at trial that at the time he was going to get it from his father.  Larsen Testimony. Audio

7    Recording of Trial, October 26, 2017 at 1:31-1:33 p.m.  Larsen testified at trial said that before

8    he told Perske that he would match her investment, he had talked to his father about borrowing

9    $30,000 for the smoke shop and his father said yes.  *Id.* [8]  However, Larsen's father said that

10   Larsen did not ask him for money for the smoke shop until mid-December 2015. Transcript of

11   Deposition of Earl Larsen, September 27, 2017, at 25:18-26 and 27:19-25.  Larsen's father did

12   not contribute any of the initial investment funds in the smoke shop.  Earl Larsen Deposition

13   Transcript at 28:4-11.  At trial, Larsen did not offer any records of any money given to him by

14   his father for the smoke shop or other source showing his investment in the smoke shop

15   because he had no records of funds invested in the smoke shop.  Larsen Testimony, Audio

16   Recording of Trial, October 26, 2017 at 1:38-1:40 p.m.; *see also,* Larsen Deposition Transcript,

17   Vol. I at 254:20–257:20 (Larsen admitting that he has no records in his possession evidencing

18   his investment of money in the smoke shop).  On the date of Perske's investment, the one

19   account that Larsen had with funds in it had 58 cents in the account when he deposited

20   Perske's investment money in that account.  Larsen Testimony. Audio Recording of Trial,

21   October 26, 2017 at 1:34-1:35 p.m.; Plaintiff's Exhibit 119 (bank account statement).

22       According to Perske, Larsen agreed to treat her investment in the smoke shop as a

23   loan, saying that he and his businesses would make minimum payments of $700.00 per month

24   until the first of the three smoke shops was profitable, which was the minimum amount that she

---

[8]    The deposition testimony of Larsen's father, Earl Larsen, does not support Larsen's testimony that Larsen had asked the father for money to start the smoke shop and the father said yes.  The father was asked, "When Jens [Larsen] was starting the smoke shop, did you have any discussions with him about it?"  Transcript of Deposition of Earl Larsen, September 27, 2017, at 26:17-24.  The father answered: "Just a small one."  *Id.*  The next question posed to the father was:  "What was the substance of that discussion?"  *Id.*  The father's response was: "You know, keep the books and don't give stuff away for nothing."  *Id.*  Larsen's then counsel, Kellener, then commented:  "Sound business advice."  *Id.*

needed to make the bi-weekly payments of the loan that she was planning to take from her 401(k) plan.  Perske Trial Declaration, ¶ 58; *see also,* Larsen Deposition Transcript, Vol. I at 261:15–24.  Finally, according to Perske, Larsen also said that he would use the profits from the first smoke shop to pay back her investment before taking any money out of the business, and he would give her a 25% interest in all three of the shops.  Perske Trial Declaration, ¶ 58.  Larsen later increased Perske's interest to 50% in one shop, however, after he used her entire investment on that first shop.  *Id.*  According to Perske, she and Larsen agreed that she was to get the $30,000 in funds for investment in the smoke shop by taking out a loan from her 401(k) retirement account and the smoke shop business was to pay her minimum payments of $700 per month until there were profits from the shop, so that she could make the payments of her $30,000 loan.  Perske Trial Declaration, ¶¶ 57–58; Larsen Deposition Transcript, Vol. I at 261:15–24.

In order for Perske to take out the full $30,000 loan from her 401(k) plan, she had to pay off a previous loan with a balance of $3,403.69, which, according to Perske, Larsen offered to pay the remaining balance on the existing loan, so she could take out the new loan to allow her to invest the full $30,000.  Perske Trial Declaration, ¶ 59; Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 11:36-11:38 a.m.; Larsen Deposition Transcript, Vol. I at 234:24-236:10.  Although Larsen says that he initially objected to her taking out a 401(k) loan, he immediately changed his mind and told her to go ahead.  Perske Testimony, Audio Recording of Trial, January 22, 2018 at 1:16 p.m.; Larsen Deposition Transcript, Vol. I at 175:19–176:8 (". . . at first, she wanted to take out the loan from her 401(k).  I said no, which I have text messages saying that.  She persisted.  I said fine.").

Perske applied to Fidelity, her 401(k) plan administrator, for the $30,000 loan from her 401(k) plan account on or around September 10, 2015, and Larsen gave her the information to set up an online payment from one of his bank accounts through her work benefits website.  Perske Trial Declaration, ¶¶ 62 and 82 and Exhibit 59 attached thereto.  According to Perske, she was talking to Larsen on the telephone when she set up this online payment and filled in the information exactly as he gave it to her.  Perske Trial Declaration, ¶ 62.

In his trial declaration, Larsen acknowledged that Perske told him that she could take out a loan through Fidelity as her contributing capital to "our business venture," but denied that she told him that the "money would come out of a 401k."  Larsen Amended Trial Declaration, ¶¶ 80-81.  This statement was inconsistent with Larsen's deposition testimony above when he admitted that he agreed to her taking out a new 401(k) loan, and he also acknowledged in his trial declaration: (i) that Perske told him that to borrow any money through Fidelity she would have to pay back a different loan, (ii) that Perske told him that the outstanding balance to be paid on the existing loan before she could borrow any money "for our business" was approximately $3,000, (iii) that she asked if he would pay the $3,000, and (iv) that he provided her his routing number and bank account number so that she "could go online and make her payment."  *Id.,* ¶¶ 82-85.

Fidelity approved Perske's loan request and disbursed loan proceeds of $30,000 to her bank account on September 16, 2015.  Perske Trial Declaration, ¶ 63 and Exhibit 49 attached thereto.  Perske initially gave Larsen the entire $30,000 from her new loan as her investment in the smoke shop through a series of cashier's checks and in cash.  Perske Trial Declaration, ¶ 63 and Exhibit 50 attached thereto; Stipulation of Facts, ¶ 7, Pre-Trial Stipulation.  On September 17, 2015, Perske gave Larsen (i) a cashier's check for $22,000 made out to Frederick Investments, LLC, a limited liability company of which Larsen was the sole member and manager; (ii) a $2,000 cashier's check made out to Larsen personally; and (iii) $6,000 in cash for purchase of merchandise since most of the vendors only accepted cash.  Perske Trial Declaration, ¶ 64 and Exhibits 51 and 52 attached thereto.  Larsen returned the cashier's check for $22,000 to Perske, stating that he wanted it "broken down" differently for "tax purposes."  Perske Trial Declaration, ¶ 65.

On September 21, 2015, Larsen and Perske went to her bank together, and she returned the $22,000 cashier's check, and then the bank issued to Perske: (i) a $10,000 cashier's check to Larsen Investment Group, LLC, another limited liability company owned by Larsen; (ii) a $4,000 cashier's check to Adnan Aljojo ("Aljojo"), the landlord of the smoke shop for a security deposit; and (iii) cash of $8,000 for purchase of additional merchandise.  Perske

Trial Declaration, ¶¶ 66-69 and Exhibits 53-55 attached thereto.  Perske gave the $10,000

cashier's check and the $8,000 cash to Larsen and delivered the $4,000 cashier's check to

Aljojo, the landlord, that same day.  *Id.*  According to Perske, Larsen then gave her about

$1,250 from the $8,000 cash that she had given him.  *Id.*, ¶ 72.  Perske was to use the $1,250

to pay for expenses for horse equipment, and Larsen kept the rest of $8,000 cash (i.e., $6,750)

for the smoke shop.  *Id.*, ¶ 72.

Larsen disputes the amount of Perske's investment in the smoke shop business, though

he has admitted that he did not keep records of her investments in the business.  Stipulation of

Facts, ¶ 7, Pre-Trial Stipulation; Larsen Amended Trial Declaration, ¶ 93 ("Plaintiff has lied

about the total sum of money she has tendered for the business."); Larsen Deposition

Transcript. Vol. I at 174:8-21, 260:23-261:14 (Q: . . . What I'm asking is whether you have any

documentation of people's investment in the business. . . You didn't keep any records like

that?. A: No.  We were boyfriend and girlfriend.  I didn't think we had to do that. . . .").  Larsen

also made inconsistent statements of how much Perske's investment in the smoke shop

business was, ranging from $14,000 in his deposition on March 31, 2017, to $30,000 in emails

from October and November 2015.  Larsen Deposition Transcript, Vol. I at 173:22-174:7;

Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 11:57 a.m.-12:01 p.m., 1:29-

1:31 p.m.  Larsen testified in his trial declaration that the $2,000 check to him personally was

to reimburse him for a puppy that he bought for her son.  Larsen Amended Trial Declaration,

¶ 100.  The court does not find this testimony to be credible since there is no proof that there

was such a purchase.

Perske has also taken different positions as to the amount of her investment in the

smoke shop.  Perske asserts in her proposed findings of fact and conclusions of law, at

paragraph 147, and in her trial declaration, at paragraphs 131 and 132, that she invested the

full amount of $30,000 from her 401(k) loan.  In her trial declaration, she acknowledged that

except for the $1,250 in cash that Larsen gave her back from her $30,000 401(k) loan, he kept

the rest of the loan proceeds for the business, or $28,750.00.  However, based on the

evidence described above, including Perske's testimony, which the court finds to be generally

credible, and the supporting documentation, the court finds that Perske made a total

"investment" of $28,750 in the smoke shop business from her $30,000 401(k) loan that she

took out from Fidelity.  That investment consisted of: (i) the $2,000 check that Perske wrote out

to Larsen personally; (ii) $6,000 in cash that Perske first gave Larsen for the business; (iii) the

$10,000 cashier's check payable to Larsen Investment Group, LLC, one of Larsen's limited

liability companies; (iv) a $4,000 cashier's check to Aljojo, the landlord of the smoke shop; and

(v) cash of $8,000 that Perske subsequently gave Larsen for the business, minus the cash of

$1,250 that he returned to her to buy horse equipment.  While Perske generally refers to the

amount that she contributed to the smoke shop as an "investment," in her testimony, she also

refers to the amount as a "loan" since she and Larsen agreed that she would get a percentage

interest in the business, but he would pay her "loan" back.

On September 21, 2015, Larsen and Perske met Aljolo, the landlord, at 4717 Melrose

Avenue in Los Angeles, the premises where the first smoke shop was located, and Perske

signed the lease for the smoke shop.  Perske Trial Declaration, ¶¶ 69-71 and Exhibit 56

attached thereto; Larsen Amended Trial Declaration, ¶ 114.  Perske was the only named

lessee on the lease.  Perske Trial Declaration, ¶ 71 and Exhibit 56 attached thereto; Larsen

Amended Trial Declaration, ¶¶ 112, 114.  According to Larsen, he could not sign the lease due

to his credit, so Perske did.  Larsen Amended Trial Declaration, ¶ 112.  According to Perske,

Larsen told her that he needed her to sign the lease as a "co-signer" because his ex-wife had

"ruined his credit," and he only needed Perske to act as a "co-signer."  Perske Trial

Declaration, ¶¶ 69-71 and Exhibit 56 attached thereto.  Because Perske had never signed a

commercial lease before, she believed him.  *Id*.  Later, Perske found out from the landlord,

Aljolo, that Larsen had not signed another lease and that she was the only person on the

lease.  *Id.,* ¶ 71.  When the lease was signed, Larsen and Perske gave the landlord, Aljojo,

Perske's $4,000 cashier's check to cover the balance of the rent for the smoke shop premises

for the first and last month of the lease, and as a security deposit, after Larsen had previously

given Aljojo $500 in cash for the total amount due of $4,500.00.  Larsen Amended Trial

Declaration, ¶ 111; Perske Trial Declaration, ¶ 69 and Exhibit 56 attached thereto.

Larsen then started getting the smoke shop ready to open in late September 2015, and, according to Larsen, it took roughly 11 days for the shop to be built and ready to open. Perske Trial Declaration, ¶ 73; Larsen Amended Trial Declaration, ¶ 115. The smoke shop named "Twenty Past Four," officially opened for business on or about October 3, 2015. Larsen Amended Trial Declaration, ¶ 116; *but see* Perske Trial Declaration, ¶ 73 ("[the smoke shop] officially opened for business on October 1, 2015"). Perske had little involvement in running the smoke shop. Larsen Trial Declaration, ¶ 119.

On October 7, 2015, less than a week after opening, Larsen sent Perske an email message entitled "Smoke shop costs," stating that he wanted to let her know what had been spent on the smoke shop so far, which were expenses totaling $47,153.29, consisting of: $8500 for "Rental space", $4600 for "Taxes", $3200 for "Licenses and permits", $2600 for "Insurance", $3500 for "Build out" and $24,773.29 for "Inventory". Perske Trial Declaration, ¶ 74 and Exhibit 22 attached thereto (copy of email exchange). It appeared to Perske that the representations in Larsen's email were not accurate, and as an example, he had listed a "Rental space" expense as $8500, but she knew that the rent was only $1500 per month and they had already paid the first month's rent on September 21, 2015. *Id.* In this email message, Larsen said to Perske that "I have all receipts and statements for you," but according to Perske, the amounts of the expenses, such as taxes, licenses and permits and insurance, were constantly changed by Larsen, and she had never seen these expenses substantiated. *Id.*

Also, in the email message to Perske dated October 7, 2015, Larsen wrote: "Do u want to use my accountant or u have someone in mind. Mine has done smoke shops and horses for me and is in Burbank. Just let me know." Perske Trial Declaration, ¶ 74 and Exhibit 22 attached thereto. Perske responded in an email message sent about an hour later, writing: "I will use your accountant because after all, eventually it is our accountant anyways, hopefully." *Id.* Larsen in asking Perske whether she wanted to use his accountant for the business because the accountant "has done smoke shops . . . for me" impliedly represented to her that

1 | he (Larsen) had prior smoke shop business experience and that the accountant also had prior

2 | experience handling smoke shop accounting work.

3 |      Even though Larsen had asked for and obtained Perske's authorization to have his

4 | accountant do the accounting work for the smoke shop business, as he admitted at trial,

5 | Larsen never gave his accountant any records for the smoke shop, nor did he maintain records

6 | for the smoke shop. Larsen Testimony, Audio Recording of Trial on January 22,

7 | 2018 at 3:54-3:57 p.m., 4:28-4:30 p.m. In his deposition on March 31, 2017, Larsen admitted

8 | he did not keep any documentation of the money invested in the smoke shop based on his

9 | belief that he and Perske were "boyfriend and girlfriend," and so he stated, "I didn't think we

10 | had to do that [keep investment records]." Larsen Deposition Transcript, Vol. I at 260:23–

11 | 261:14. On October 27, 2015, Perske received an envelope with a certified mail receipt from

12 | Larsen containing what appeared to be copies of inventory receipts allegedly costing about

13 | $43,000 for the smoke shop. Perske Trial Declaration, ¶¶ 106-108 and Exhibit 27 attached

14 | thereto. According to Perske, the receipts were not originals, but only copies, including

15 | handwritten and illegible receipts, and only added up to about $22,000. *Id*. According to

16 | Perske, Larsen never provided her with other receipts or other documentation of the business

17 | expenses for the smoke shop. *Id*.

18 |      Larsen never made his matching investment of $30,000, though he claimed that he had

19 | done so during his deposition on March 31, 2017, and admitting he had no documents

20 | showing any such investment. Larsen Deposition Transcript, Vol. I at 254:20–257:20; Larsen

21 | Testimony, Audio Recording of Trial, October 26, 2017 at 1:30-1:40 p.m. At trial, Larsen

22 | stated he intended to invest $30,000 into the smoke shop business through a loan from his

23 | father, but he did not actually have the money when he spoke with Perske about opening the

24 | smoke shop and when he received Perske's investment. Larsen Testimony, Audio Recording

25 | of Trial, October 26, 2017 at 1:30-1:33 p.m. No money came from Larsen's father to finance

26 | the smoke shop when it opened in October 2015. Earl Larsen Deposition Transcript at 28:4-1.

27 | This evidence shows that the only source of capital used by Larsen to finance the smoke shop

28 | when he and Perske opened it in October 2015 was Perske's investment from her 401(k) loan.

1    Larsen operated the smoke shop through one of his limited liability companies,

2    Frederick Investments, LLC.  Larsen Testimony, Audio Recording of Trial, January 22, 2018 at

3    4:02-4:03 p.m.; Larsen Testimony, Audio Recording of Trial, February 16, 2018 at 11:12 a.m.;

4    Larsen Deposition Transcript, Vol. II at 334:5-11.   Larsen testified at trial that it was his

5    understanding that he, through Frederick Investments, LLC, was the 100% legal owner of the

6    smoke shop and that Perske was "only on the lease."  Larsen Testimony, Audio Recording of

7    Trial, January 22, 2018 at 4:02-4:03 p.m.

8    Although the smoke shop was to be operated by Frederick Investments, LLC, Larsen

9    deposited Perske's investment funds into a commingled Chase bank account for another of his

10   LLCs, Larsen Investment Group, LLC.  Larsen Testimony, Audio Recording of Trial, January

11   22, 2018 at 4:36-4:37 p.m.; Larsen Testimony, Audio Recording of Trial, February 16, 2018 at

12   11:16-11:17 a.m.  Larsen used this Chase bank account for his various business expenses, his

13   personal expenses and his father's personal expenses, because he did not have a personal

14   bank account.   Larsen Deposition Transcript, Vol. I at 116:3-17; Larsen Testimony, Audio

15   Recording of Trial, October 26, 2017 at 11:16-11:17 a.m., 11:38-11:42 a.m., 2:59-3:02 p.m.;

16   Established Facts, ¶ 9, Order Denying Plaintiff's Motion for Partial Summary Judgment and

17   Granting Motion in Part Deeming Certain Facts Established, ECF 106.

18   In October 2015, Larsen listed the smoke shop business for sale online on Craigslist

19   without Perske's knowledge.  Larsen Testimony, Audio Recording of Trial, October 26, 2017 at

20   1:57-1:59 p.m.; Perske Trial Declaration, ¶¶ 96-98 and Exhibit 21.  Around the same time,

21   Perske began to receive notices from the benefits department at work that Larsen's payment

22   of her prior 401(k) loan, a condition for the lender to make a new 401(k) loan, had been

23   rejected for insufficient funds.  Perske Trial Declaration, ¶ 82 and Exhibit 59 attached thereto.

24   The benefits department started to call Perske frequently about this.  Id. When Perske told

25   Larsen about this, he told her that the account information that she put in to make the online

26   payment from his account must have been wrong.  Id., ¶ 83.  According to Perske, Larsen told

27   her that this was obviously a mistake because, as he told her, "you know how much money I

28   have in my account," even though she was not privy to his bank account balance information.

*Id.* According to Perske, Larsen also told her that he would make sure that the prior loan was paid off and promised to provide her with written confirmation from Chase Bank, including on October 9 and 12, 2015, but he never provided any confirmation. *Id.* ¶¶ 83, 84.

On October 13, 2015, Perske's benefits department told her that her $30,000 401(k) loan would go into default the next day if payment for the prior loan was not received. Perske Trial Declaration, ¶ 85. Perske then texted Larsen about this, and in response, he sent back a series of pictures which he claimed were from his online banking account showing that payment had been made. *Id.* Because she could not tell if these pictures actually showed money being transmitted out of his account, she continued to ask him for written confirmation of payment, but he would not provide it. *Id.* Although Larsen and Perske set up an online payment for the $3,403.69 loan balance connected to Larsen's Chase bank account, he knew there was no money in this Chase bank account so that the payment of Perske's 401(k) loan balance could not be made either because he had intentionally withdrawn the money or there was no money in the account to begin with to cover the payment. Larsen Deposition Transcript, Vol. I at 236:11-21, 238:12–239:5; Larsen Testimony, Audio Recording of Trial, October 26, 2017, at 11:41-11:46 a.m.

Larsen's account about why the payment from his bank account did not go through to pay Perske's prior 401(k) loan is somewhat different from Perske's. According to Larsen, when he provided her his routing number and bank account number so payment from that account could be made to her prior 401(k) loan, "[i]t was at this point in time that I confirmed it was all 401k loans and that she had no independent money," and he then "explained to her that I intended to not allow the transaction to go forward because I did not want her to take any loans against her 401k which would create a business obligation that was not necessary." Larsen Amended Trial Declaration, ¶¶ 85, 87 and 89. Further, according to Larsen, he "asked her every day to cancel the transaction and that I informed I stopped it so she needed to tell Fidelity" and "[t]he payment was eventually blocked by my bank and not paid to Fidelity." *Id.,* ¶¶ 90-91. This testimony is contrary to Larsen's admission during his deposition that despite his initial objection, he told her to go ahead with the 401(k) loan, which admission is

1    corroborated by Perske's trial testimony.  Larsen Deposition Transcript, Vol. I at 175:19–176:8

2    (". . . at first, she wanted to take out the loan from her 401(k).  I said no, which I have text

3    messages saying that.  She persisted.  I said fine."); Perske Testimony, Audio Recording of

4    Trial, January 22, 2018 at 1:16-1:16 p.m.  Larsen's testimony that he stopped payment from

5    his account to pay off the old 401(k) loan balance is pretextual because he never intended to

6    make that payment as he promised Perske, inducing her to take out the new 401(k) loan,

7    which she used to invest in the smoke shop he wanted, or otherwise, he would not have been

8    able to open the smoke shop.

9        In his deposition testimony, Larsen acknowledged that he knew that he was supposed

10   to pay off Perske's prior 401(k) loan balance.  Larsen Deposition Transcript, Vol. I at 234:24-

11   235:4 ("Q: So did you tell her that you weren't going to pay off the prior loan?  A: No.  First I

12   wrote a check for her---no, I didn't write a check.  She did it online for the amount.").  Larsen's

13   testimony that he did not want Perske to take out the loan from her 401(k) account to fund their

14   smoke shop business is not credible also because, as he acknowledged, he knew the source

15   of Perske's loan proceeds from her 401(k) account and took the money to start the smoke

16   shop.  Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 11:35-11:37 a.m.  If he

17   had any reservations or objections to her borrowing from that account, he would not have

18   taken the funds from the loan for the business.  Larsen admitted that he "stopped" any

19   payment from his bank to pay off Perske's prior 401(k) loan balance, which he effectively did

20   by withdrawing the funds from the account, to the extent that there were any funds in the

21   account.  Having considered the testimony and demeanor of both Larsen and Perske

22   regarding the 401(k) loan transactions, the court finds Perske's testimony on these

23   transactions to be completely credible while Larsen's testimony is lacking in credibility.

24   Larsen's testimony generally lacked credibility not only because his testimony at trial is

25   inconsistent with his behavior at the time of the events at issue in this case, many of the

26   statements that he made in this case have been shown to be untrue.

27       According to Perske, when she started to press Larsen about why his payments of her

28   prior 401(k) loan, for Alex and for the Lexus were being missed or rejected, he started to

distance himself.  Perske Trial Declaration, ¶ 86.  For his part, Larsen admitted that he stopped making these payments after Perske made her investment in the smoke shop, though he claims that he did so because their relationship was then going "sour" rather than because of having gotten her investment in the smoke shop.   Larsen Testimony, Audio Recording of Trial, January 22, 2018 at 4:37 p.m.

On October 15, 2015, Larsen sent Perske a text message, saying that he was going to come to her house to talk to her about their relationship and suggesting that he could no longer be with her.  Perske Trial Declaration, ¶ 86.  Larsen, however, did not go over to Perske's house that day.  *Id.*  On the following day, October 16, 2015, Perske went to the smoke shop to see Larsen.  *Id.,* ¶ 87.  According to Perske, they talked about what was going on, and she told him that if they were not going to be together romantically, he needed to respond to her questions about the business because she had invested with him.  *Id.*

According to Perske, on October 21, 2015, she started to realize that Larsen was not being honest with her about the business, and she started to have anxiety attacks because she had completely overextended herself for the two businesses based on Larsen's promises that he would recover the expenses and repay her loan.  Perske Trial Declaration, ¶ 93.  Perske began to realize that Larsen was not going to repay her loan and otherwise cover their business expenses.  According to an email that Perske sent Larsen on October 22, 2015, she was in a hospital for an anxiety attack, dehydration and heart palpitations.  Plaintiff's Exhibit 57 at 0739.  Langer, seeing Perske at this time, described her as distraught.   Langer Testimony, Audio Recording of Trial, October 26, 2017, at 10:13-10:17 a.m.  Perske and Larsen stopped dating about this time.  Perske Trial Declaration, ¶ 93.

 On October 22, 2015, Perske received an email message from Langer that she could no longer ride Alex and Langer was holding her equipment as collateral because Larsen had not made the payments for Alex.  Perske Trial Declaration, ¶ 94.  On the same day, Perske received a telephone call from Lexus that she had to surrender the leased car because of missed lease payments.  *Id.*  Also, on the same day, she learned from the benefits department at work that the prior 401(k) loan balance of $3,403.69 had still not been paid and that her new

$30,000 401(k) loan was thus going into default.  *Id.*  Perske then texted Larsen about these issues, and in response, he told her that he had "blacked out at the store" and was in St. Joseph's Hospital.  *Id.*, ¶ 95.

Perske ultimately had to borrow money to pay Fidelity the amount of $3,403.69 for the prior 401(k) loan in order to avoid a default on the new $30,000 401(k) loan, which she paid on October 27, 2015.  *Id.*, ¶ 137 and Exhibit 77 attached thereto.  Perske has been making payments of $363.00 from her paycheck every two weeks to pay back the $30,000 401(k) loan.  *Id.*, ¶ 137.

On October 23, 2015, Perske looked up the smoke shop online on Google and discovered Larsen had listed the shop for sale on Craigslist.  Perske Trial Declaration, ¶ 96 and Exhibit 21 attached thereto.  The listing posted on October 8, 2015 stated:  Smoke Shop for Sale - $32250 – Twenty Past Four Smoke Shop is selling of there [sic] Locations.  Low Rent for being on Melrose.  On Smoke shop in area.  Despinsary [sic] . . . ."  *Id.*  According to Perske, Larsen did not tell her about trying to sell the shop before doing so, and when she confronted him on October 23 about selling the shop, he said that he was going to try to sell it to dissolve the business.  *Id.*, ¶¶ 96-97.  Also, according to Perske, after she saw the smoke shop for sale, she called Larsen and demanded her money back.  *Id.*, ¶ 98.  Larsen asked what she wanted, and she sent him a text listing the items that she wanted him to pay back at the time.  *Id.*  Larsen responded 20 minutes later that he had just been "diagnosed with MS."  *Id.*

In early November 2015, Perske saw online that Larsen listed the smoke shop for sale a second time.  Perske Trial Declaration, ¶¶ 96-98 and Exhibit 21 attached thereto.  The first time that Larsen listed the smoke shop for sale online on Craigslist, in October 2015, the listing price was $32,250, and the second listing online for the smoke shop on Craigslist on November 3, 2015 was for $17,000.  *Id.*  The second listing stated:

Smoke shop for sale $17,000 - $17000 (Melrose ave)

Smoke shop for sale with all inventory only $17,000.  Must sell due to partnership dissolving [sic].  Well over $30,000 inventory included.  Low Low rent for this area on Melrose.  Awesome foot traffic and loyal customers.  Dispensary right next store and 3

1   more on the same block.  This is the only smoke shop in a 3 mile radius.  Must go
    today.

2   *Id.*

3       Larsen testified at trial that he only listed the business for sale once online and also

4   received an offer for the shop in early October after claiming that he discussed the sale with

5   Perske.  Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 2:00-2:02 p.m.

6   Larsen's testimony on listing the smoke shop online for sale more than once and getting

7   Perske's consent to do so was inconsistent, and the evidence indicates Larsen listed the

8   smoke shop for sale on Craigslist without informing Perske and did so more than once.

9   Perske Trial Declaration, ¶¶ 96-98 and Exhibit 21 attached thereto; Larsen Testimony, Audio

10  Recording of Trial, October 26, 2017 at 2:00-2:03 p.m.; Larsen Testimony, Audio Recording of

11  Trial, January 22, 2018 at 4:19-4:20 p.m.

12      As of late October 2015, Larsen recognized that the personal relationship between him

13  and Perske was deteriorating.  Larsen Amended Trial Declaration, ¶ 134 ("It was around this

14  time that Plaintiff began to back off communicating and our relationship.").  The two of them

15  began to exchange increasingly hostile text messages and emails.  Perske Trial Declaration,

16  ¶¶ 92-115 and Exhibits 57, 62, 64, 65, 66, 68, 69 and 70 attached thereto; Larsen Amended

17  Trial Declaration, ¶¶ 134-143.  Larsen repeatedly stated that he was closing the business in

18  emails and texts to Perske in late October and early November 2015.  Perske Trial

19  Declaration, ¶¶ 76, 113 and Exhibit 57 at 0744 (threatening to close the shop on October 25,

20  2015), Exhibit 24 at 0279 (stating that he was going to walk away and dissolve the business),

21  Exhibit 57 at 0748 (stating that he planned to close the doors, walk away, and file for

22  bankruptcy).  In his text message to Perske on October 23, 2015, Larsen said that if she

23  wanted nothing more to do with the business, then send him confirmation of that: "So basically

24  im out all the money I have put to this shop ur name is on and all the taxes and everything

25  right.  I will email you.  Ur the most expensive girlfriend a guy can have.  Before I have

26  something written up I need u to write something to me stating u want nothing from the

27  business and u want nothing to do with it and will not receive nothing from it."  Plaintiff's Exhibit

28  57 at 0742.  In Larsen's email message to Perske of November 2, 2015, he denied that he

defrauded her, telling her: "Fraud?  Never bought inventory?  You were with me one time whe

you bought your bongs for personal use. . . I did not do any fraud, you are the one that treated

me like a ATM . . . ."  Plaintiff's Exhibit 24.  Larsen told Perske that he was ending their

business relationship:  "I have certified mailed you . . . [a letter] informing you of my intentions

to dissolve your half of the business . . . You clearly stated you want nothing to do with the

business.  I will mka sure that is the case by 11/4/2015.  I will proceed as needed."  *Id.*  Larsen

did acknowledge that he was obligated to pay back Perske's investment:  "I will hold on to the

$700 a month until you figure out what you want to do.  I have tried and tried to send it to but

you never respond.  I am not disputing the business needs to pay you $30,000 of your

investment.  Never once.  But our agreement was the payments needed to be paid so I am

asking again were [sic] do i send the $700 to."  *Id.*  Larsen did not inform Perske in this email

message that he would be trying to offer the smoke shop for sale online on Craigslist the next

day at a much reduced price of $17,000, which would have incurred a substantial loss on

Perske's investment of $28,750, nor did he offer any proof that he had the means to otherwise

pay back her investment.

On November 3, 2015, Larsen sent an email to Perske, stating that "[I] am walking away

from the business just like you have and will be filing bankruptcy due to your negligence on not

holding up your end of the business relationship."  Perske Trial Declaration, ¶ 113 and Exhibit

68 attached thereto.  Larsen confirmed the email message by a separate text message, stating

that "[a]gain doors will be closed and locked for the final time by 9pm tonight."  *Id.*, ¶ 76 and

Exhibit 57 at 0749.  Later that day, Perske sent an email to Larsen, asking him for business

documents, including "his lease," but he never provided her with the business documents she

requested.  *Id.*, ¶ 114 and Exhibit 69 attached thereto.  This email message that Perske sent

Larsen on November 3, 2015 at 6:41 p.m. stated:

Mr. Larsen

All of these supposed agreements and business arrangements were made before I
discovered what a fraud you are.  In reliance upon your empty promises and false
statements, I am now in desperate financial distress.  I am not interested in doing
business with you or in any "settlement" with you.  No more excuses.

> I am repeating my simple request for three things.  First, please give me a copy of any business-related documents you allegedly signed, including any lease.  I have never seen your name on a single such document and presume that nothing exists.  If I am wrong, show me immediately.  Second, if you recorded our private discussions in secret and/or without my consent, I demand that you provide me with such recordings immediately.  Third, and finally, I expect you to return all of my money---or whatever remains of the $30,000 I gave your from my retirement account---by close of business on Friday.

*Id.*

In her trial declaration, Perske stated that about an hour afterwards, she received an email from Larsen, stating that he had a recording of them having sex on the store security camera on October 16, 2015 and that he was "BRINGING THE DVR HOME AND RECORDING EVERYTHING TO MY COMPUTER . . . IT WILL PROVE THE TRUTH." *Id.*, ¶ 115 and Exhibit 70 attached thereto.[9]  After Larsen disclosed the existence of the sex video to Perske, he informed her that his offer to settle with her by paying $700 monthly payments to buy her interest was "off the table" and that "You really have me mad now and next time i hear from you it better be from your lawyer." *Id.*   According to Perske, this was the first time she learned that he had made a recording of them having sex, and she understood his email in the context of this conversation as threatening to release the video. *Id.*

This email message that Larsen sent Perske on November 3, 2019 at 7:32 p.m., disclosing the existence of the sex video, in its entirety stated:

> Jackie,
>
> 1. There was no fraud.  You know that.  Remember when you were smoking in the backyard and i told you I DO NOT WANT YOU TO HELP OR YOUR MONEY AND YOU SAID NO YOU WANTED TO BE EQUAL.
>
> 2. You are very aware of recording of video and voice IN THE STORE I HAVE TEXT MESSAGES OF YOU BEING AWARE.  Remember you came in and took pictures for Instagram and we walked around the store.  I did not record anything you were not aware of.
>
> Remember when you came down in the afternoon crying and you specifically said you know i did not steal your money.  You said you know im not around because im working for us.
>
> Then remember we then had sex right after.  Its all recorded.  You are aware of this.  I AM BRINGING THE DVR HOME AND RECORDING EVERYTHING

---

[9] "DVR" refers to Digital Video Recorder which was used on the premises at the smoke shop for surveillance purposes connected to the surveillance camera.

1

TO MY COMPUTER.  THEN I WILL EMAIL YOU IT AS SOON AS I HAVE.
IT WILL PROVE THE TRUTH.

2

3.  Jackie, if you don't accept my deal, you will need to sue me.  I have told you
this.  I have signed paperwork, remember outside your bank when you took
money out, you signed the same paper I did.  Please stop lying.  Its going to
blow up in your face.

3

4

5

I have done nothing wrong.  Nothing.  I have tried many times to hold up my
end of the deal and now you want to change and refuse becouse I wont
support you and your son and get you a range rover OR A HORSE OR
WHATEVER ELSE YOU WANTED.  I DID WHAT BOYFRIENDS DO BUT
YOU TOOK ADVANTAGE OF ME.  YOU EVEN TEXT ME THAT YOU FEEL
THAT WAY.  I HAVE EVERY TEXT MESSAGE FROM YOU.  I WAS SO IN
LOVE WITH YOU THAT I ALWAYS WENT BACK TO READ THEM OR SEE
A PICTURE OF YOU.  I would love for you to serve me papers so we can just
end this so i can move on.  I have my counsel ready for your next move.  My
offer is off the table.  And if you have a lawyer, I cant wait till he subpoena me
for documents and he will see there is no case and the proof is overwhelming
for my side.  Jackie, my sons phone and my daughters phone have text
messages from your son even saying we are going into business.  And this
fraud you talk about.  Really?  I can show how much money i have in the
bank now and before i even met you and when i met you.  I DO NOT, DID
NOT OR EVER WILL NEED YOUR MONEY OR ANYONE ELSES MONEY.
I AM A MAN AND HAVE DONE VERY WELL FOR MYSELF.  YOU LIKED A
PICTURE OF WHEN MY MOVIE WAS BOUGHT BY THE STUDIOS 3
MONTHS BEFORE I EVEN MET YOU. 3 MONTHS.  Stop with the fraud.
Stop.

6

7

8

9

10

11

12

13

14

15

It didn't work out Jackie because you are very in patient.  Very much so.  Im
done.  You really have me mad now and next time i hear from you it better be
from your lawyer.

16

17

Again, please stop with the fraud talk.  I will sue you for defamation of
character and all expenses you have not paid for the business you are tied to.
So stop.

18

19

I am represented by LIMITED SCOPE SERVICES FROM MY COUNSEL.
PLEASE HAVE ALL LEGAL QUESTIONS FROM YOUR ATTORNEY GO
THROUGH ME.

20

Best,

21

Jens

22

Perske Trial Declaration, ¶ 115 and Exhibit 70 attached thereto.[10]  According to Perske,

23

Larsen's disclosure of the existence of the sex video recorded by the surveillance camera at

24

the smoke shop and his intent to download a copy of the video onto his personal computer and

25

to email her a copy was "emotionally wrecking" and was still upsetting to her at trial over two

26

[10]  The court quotes this email at length since it is heavily relied upon by Perske as evidencing her
claim against Larsen for intentional infliction of emotional distress by indicating that he was threatening
to release the sex tape as a bargaining chip regarding the dispute over the smoke shop business.

27

28

1  years later.  Perske Testimony, Audio Recording of Trial, January 22, 2018 at 11:25-11:27

2  a.m., 1:19-1:20 and 1:35 p.m.

3      That same night, on November 3, 2015, Larsen sent Perske another email demanding

4  that she "cease and desist from making any allegations" against him, and claiming that her

5  comments were "defamation of character."  *Id.*, ¶ 116 and Exhibit 71 attached thereto.  Larsen

6  attached to this email message a proposed settlement contract for her review which provided:

7          This contract is between Larsen Investment Group LLC, Jackie Perske, and Jens F.
8          Larsen LLC.  It states on 11/3/2015, Jackie Perske Dissolves her position as 50%
           owner of Twenty Past Found Smoke Shop and will not be responsible for any Tax Lien
           or Debt, any unpaid Loans or statements, any suits or complains to the establishment
9          and will not receive any income from the Said Smoke Shop.  She will Dissolve all 50%
           or her part and will not be held responsible.  All utilities will be switched into Larsen
10         Investment Group LLC name by 11/4/2015.

11  Plaintiff's Exhibit 71.

12      According to Perske, she stopped responding to Larsen's emails, but he continued to

13  constantly text and email her and started to drive by her house at night.  Perske Trial

14  Declaration, ¶ 117.  Perske's son also told her that he saw a car parked in their driveway that

15  he thought was Larsen's while she was not at home, which made her son feel afraid.  *Id.*

16      At the same time, Aljojo, the landlord, told her that she needed to vacate the smoke

17  shop premises because the rent was still not paid.  Perske Trial Declaration, ¶ 119.   According

18  to Perske, the total amount owed under her lease with Aljojo for the smoke shop was

19  $1,500.00 per month for 24 months, and after subtracting out the first and last month's rent

20  and the security deposit, the total remaining amount owed is $31,500.00.  *Id.,* ¶ 138 and

21  Exhibit 56 attached thereto.  Perske said that Aljojo told her that she would be responsible for

22  the lease payments until he found a new tenant, though she understood that he signed a new

23  lease for the premises with Larsen's father.  *Id.*

24      On November 5, 2015, Perske applied for a temporary restraining order ("TRO") against

25  Larsen in the Superior Court of California for the County of Los Angeles, which would prevent

26  Larsen from operating the smoke shop since she was the only person on the lease.  Perske

27  Trial Declaration, ¶¶ 120-121 and Exhibits 2 and 72 attached thereto; Stipulation of Facts,

28  ¶ 11, Joint Pre-Trial Stipulation.  The Superior Court granted the TRO.  *Id.*  The TRO

prohibited Larsen from coming near Perske or her son and from operating the smoke shop since she was the only person on the lease.  Perske Trial Declaration, ¶¶ 120-121 and Exhibit 72 attached thereto.   According to Larsen, on November 6, 2015, he was served with the TRO, and he then called the landlord and told him what happened, and he then locked the store down and left.  Larsen Amended Trial Declaration, ¶¶ 147-155.

On November 10, 2015, after consulting with counsel, Perske, bringing a witness with her, Frank Villaneda ("Villaneda"), went to check on the smoke shop and take stock of the inventory at the shop.  Perske Trial Declaration, ¶ 123; Trial Declaration of Frank Villaneda ("Villaneda Trial Declaration"), ¶ 2; Villaneda Testimony, Audio Recording of Trial, January 22, 2018 at 10:30-10:33 a.m.  When Perske and Villaneda arrived at the smoke shop, they saw that the doors were locked and none of the doors or windows appeared damaged to them. Perske Trial Declaration, ¶ 123; Villaneda Trial Declaration, ¶ 4.  According to Perske, she did not have a key to the premises, and she and Villaneda had to have a locksmith let them in the smoke shop.  Perske Trial Declaration, ¶ 124; Villaneda Trial Declaration, ¶ 4. According to Perske and Villaneda, once inside the shop, they saw that no inventory was left on the premises, except a box of small glass pipes on the counter, and the electronics had been removed.  Perske Trial Declaration, ¶ 125; Villaneda Trial Declaration, ¶ 5.  According to Villaneda, when they first entered the smoke shop, it looked like it had been ransacked, the shop was almost empty with no merchandise on the shelves or in the display cases, and wires were hanging on the walls where the electronics had been removed.  Villaneda Trial Declaration, ¶ 5; Perske Testimony, Audio Recording of Trial, January 22, 2018 at 10:24 and 11:28 a.m.  According to Perske, she and Villaneda spent about an hour at the smoke shop during this visit.  Perske Testimony, Audio Recording of Trial, January 22, 2018 at 10:24 and 11:29 a.m.

Perske saw that the DVR was still in the shop, but unconnected, and removed it from the premises and destroyed it because she believed that it contained the explicit recording that Larsen mentioned in his email, and she did not want him to be able to show anyone the "sex

tape".  Perske Trial Declaration, ¶ 127; Villaneda Trial Declaration, ¶ 6; Perske Testimony, Audio Recording of Trial, January 22, 2018 at 10:24, 11:24 and 11:26-11:27 a.m.

On or around November 13, 2015, Perske reported the inventory missing from the smoke shop to the police.  Perske Trial Declaration, ¶ 129 and Exhibit 78 at 1003–04. However, Perske admitted at trial that she did not tender the video footage on the DVR to the police when she made the police report of the break-in of the smoke shop.  Perske Testimony, Audio Recording of Trial, January 22, 2018 at 11:28-11:29 a.m.

On December 8, 2015, Perske and Larsen agreed to a mutual "stay away" order in lieu of the TRO, and as a result of this mutual "stay away" order, Larsen was allowed to return to the smoke shop.  Stipulation of Facts, ¶¶ 13-14, Pre-Trial Stipulation; Perske Trial Declaration, ¶ 130; Larsen Amended Trial Declaration, ¶ 163.  Larsen returned to the smoke shop on or around December 11, 2015.  Stipulation of Facts, ¶ 14, Pre-Trial Stipulation; Larsen Testimony, Audio Recording of Trial, January 22, 2018 at 3:34-3:35 p.m.

Larsen then reopened the smoke shop in December 2015 without Perske and with financial help from his father.  Stipulation of Facts, ¶ 14, Pre-Trial Stipulation;  Established Facts, ¶ 4, Order Denying Plaintiff's Motion for Partial Summary Judgment and Granting Motion in Part Deeming Certain Facts Established; Larsen Testimony, Audio Recording of Trial on October 26, 2017 at 2:27-2:28 p.m.; Larsen Testimony, Audio Recording of Trial on February 16, 2018 at 11:18-11:19 a.m.; Larsen Amended Trial Declaration, ¶¶ 164-166; Larsen Deposition Transcript, Vol. II at 367:24-368:2; Earl Larsen Deposition Transcript at 21:2-26:24.

Larsen ostensibly transferred the smoke shop business to his father in January 2016, saying that he "turned over" the business to his father around January 18, 2016.  Larsen Testimony, Audio Recording of Trial on October 26, 2017 at 2:48-2:52 p.m.; Larsen Testimony, Audio Recording of Trial on February 16, 2018 at 11:23-11:24 a.m.  Larsen said that the smoke shop business was turned over by him through Frederick Investments, LLC, to his father through his business, Earl Larsen LLC.  *Id.*  According to Larsen, the smoke shop had inventory and was "fully stocked" when he turned it over to his father, but has no

documentation of the inventory at that time.  Larsen Testimony, Audio Recording of Trial on

October 26, 2017 at 2:50-2:51 p.m.  Larsen did not receive any consideration for the transfer,

and there was no written contract.  Larsen Testimony, Audio Recording of Trial on October 26,

2017 at 2:52-2:53 p.m.; Larsen Testimony, Audio Recording of Trial on February 16, 2018 at

11:23-11:24 a.m.  Larsen has no records of the assets in the smoke shop business at the time

of the transfer to his father.  Larsen Testimony, Audio Recording of Trial on October 26, 2017

at 2:50 and 2:53 p.m.  According to Larsen, Perske was no longer part of the business.  Larsen

Testimony, Audio Recording of Trial on February 16, 2018 at 11:18 a.m.  In Larsen's view, the

business between him and Perske was "over," and the reopening of the smoke shop with his

father was a "new" business, and thus, there was no "transfer".  Larsen Testimony, Audio

Recording of Trial on January 22, 2018 at 4:01-4:02 p.m.  Larsen admitted at trial that the

smoke shop that he and Perske started was a "joint venture," and while he had 100% legal

ownership of the business, they each had a 50% interest in the business based on their verbal

agreement.  Larsen Testimony, Audio Recording of Trial on January 22, 2018 at 4:03-4:04

p.m.  Larsen also admitted at trial that the joint venture between him and Perske had not been

formally dissolved, though he said that in January 2016, he submitted the paperwork to

dissolve Frederick Investments, LLC, the entity that formally owned the smoke shop.  Larsen

Testimony, Audio Recording of Trial on January 22, 2018 at 4:04-4:06 p.m.

Larsen and his father entered into a new lease of the premises at 4718 Melrose

Avenue, Los Angeles, California, where the smoke shop was located, with the landlord, Aljojo,

on December 15, 2015, keeping the same name of the prior business, Twenty Past Four

Smoke Shop.  Plaintiff's Exhibit 89 (copy of new lease attached to unlawful detainer complaint,

indicating that the business name of the tenant as Twenty Past Four Smoke Shop); Larsen

Amended Trial Declaration, ¶ 165; Larsen Deposition Transcript, Vol. II at 364:13-15.

According to Larsen, the smoke shop was his father's business after his father took it over in

December 2015, and although he was involved in the business, he was working with "two

other guys" that his father hired.  Larsen Testimony, Audio Recording of Trial on January 22,

2018 at 4:01-4:02 and 4:08-4:09 p.m.  Larsen said that after the turnover of the business, he

helped his father run the business day to day.  Larsen Testimony, Audio Recording of Trial on

October 26, 2017 at 2:52-2:53 p.m.    However, Larsen's testimony characterizing the smoke

shop as his father's business after having been transferred by Larsen to his father is directly

contradicted by his father's deposition testimony as Earl Larsen testified that "[i]t was his

[Larsen's] smoke shop," which he [Earl Larsen] was trying to help save," neither the father's

LLC, Earl Larsen LLC, nor the father personally owned an interest in the smoke shop, and at

no point in time did Larsen transfer the smoke shop to the father.  Earl Larsen Deposition

Transcript at 21:2-26:24.  During his deposition, Larsen's father was asked about the smoke

shop: "Whose business was it?," and the father answered, "It was – it was my son's business

that failed."  *Id.* at 21:22-24.

On December 16, 2015, Larsen reported a break-in at the smoke shop to the police,

stating as reflected in the police report that property was taken from the premises, including

electronics, the CCTV DVR, the Time Warner cable box, internet modem, hot spot wi-fi and

phone modem box.  Larsen also indicated his strong belief that Perske took these items

because they were involved in civil litigation.  Plaintiff's Exhibit 78 at 0997–0999.  The police

report indicated that the property taken was electronic items, but not any inventory. *Id.*

According to the police report and investigation, the unknown suspect(s) used a possible

key/lock picking tool to unlock the side door, and there was no sign of forced entry or pry

marks at the two entry doors.  *Id.*

Larsen continued to operate the smoke shop until around April 2016 despite having

transferred ownership of the smoke shop from Frederick Investments, LLC to an entity owned

by his father in January 2016**.**  Larsen Testimony, Audio Recording of Trial, October 26, 2017

at 2:48-2:53 p.m.; Larsen Testimony, Audio Recording of Trial on January 22, 2018 at 4:08-

4:09 p.m.; Larsen Testimony, Audio Recording of Trial, February 16, 2018 at 11:23-11:24 a.m.

On February 22, 2016, Larsen reported another break-in at the smoke shop, and as

reflected on the police report, the property taken included a DVR, a monitor, a cell phone, a

water pipe and two bottles.  Plaintiff's Exhibit 78 at 1000–1002.  According to the police report,

the police investigation of the incident found unknown suspect(s) gained entry to the premises

by smashing the rear door frame, and while there was a surveillance camera owned by the

landlord covering the entry point, the landlord declined to provide a copy of the surveillance

video due to a current financial dispute with Larsen.  *Id.*  According to Larsen, he was starting

to get out of the smoke shop, but then he and his father went back into the business for a short

period of time.  Larsen Deposition Transcript, Vol. II at 367:7-368:9.  Also, according to Larsen,

although he bought some more inventory at this time, he is not sure what happened to it

because he just walked away from the store.  *Id.*

Larsen kept no records of the assets of the reopened smoke shop, its income or

expenses, the results of the police investigation of the alleged burglary of the smoke shop, or

any records of efforts to restart the business and buy new inventory for the smoke shop with

his father.  Established Facts, ¶ 6, Order Denying Plaintiff's Motion for Partial Summary

Judgment and Granting Motion in Part Deeming Certain Facts Established; Larsen Testimony,

Audio Recording of Trial on October 26, 2017 at 2:50-2:51 p.m., 2:53-2:54 p.m.

On March 23, 2016, the landlord, Aljojo, filed in the Superior Court an unlawful detainer

lawsuit against Larsen and his father for failure to pay rent, and the smoke shop closed when

Larsen and his father were evicted.  Plaintiff's Exhibit 89.  On May 24, 2016, the landlord

obtained a judgment for possession and for unpaid rent and statutory damages totaling

$4,474.58 against Larsen and his father.  *Id.*

There is no evidence that the landlord, Aljojo, ever took any collection action or brought

any lawsuit against Perske for breach of the lease contract that she signed for the smoke

shop.

According to Perske, she made the investment in Larsen's smoke shop business based

on his statements about his success, his experience in the smoke shop business and his plan

for opening the chain of smoke shops, as well as his promises to her about matching her

investment, paying her prior 401(k) loan balance and how he planned to use her investment.

Perske Trial Declaration, ¶ 60.  Perske said she believed that Larsen actually planned to open

three smoke shops, to invest himself and to pay her investment back.  *Id.*  When Perske and

Larsen were planning opening the smoke shop business, she asked him if they should put

their agreement in writing, but he told her that there was no need to do that because they were going to be together. *Id.* According to Perske, at that time, she did not know that Larsen was unemployed and had no experience in the smoke shop business, that his primary income was from his father, that he was nearly bankrupt, that he was trying to get rid of his horses because he was losing money and could not afford them, that he had been sued several times—including by a former girlfriend who also invested with him—and that he had a history of passing bad checks. *Id.,* ¶ 61. Also, according to Perske, Larsen did not tell her any of this, and had she known any of this information, she would not have agreed to join his horse business, to make any purchases for that business, or invest with him in a smoke shop. *Id.*

**E. Larsen's Recordkeeping and Bankruptcy Disclosures**

In the beginning of June 2016, Larsen decided that he needed to enter bankruptcy and hired Legal Experts Inc. to process his bankruptcy. Larsen Amended Trial Declaration, ¶¶ 169-171. Larsen filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C., on June 28, 2016, which commenced the underlying bankruptcy case. Petition, Main Bankruptcy Case, ECF 1.

In his bankruptcy schedules, Larsen listed assets of $215,000.00, all of which was personal property, and liabilities of $132,660.99, all of which was listed as nonpriority unsecured claims. *Id.* at 11. Among the assets, he listed four bank accounts, Bank of America account #0845 for Frederick Investments LLC, Bank of America account #2380 for Frederick Investments LLC, Bank of America account #2393 for Frederick Investments LLC and Bank of America #6843 for Jens Larsen, all of which were listed as having balances of $0.00, and horses of a total value of $215,000.00. *Id.* at 14-15 and 16-17. On Schedule A/B, Property, Larsen answered "no" to the question asking for ownership of non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership and joint venture. *Id.* at 15.

On his Statement of Financial Affairs, in response to the question asking whether he had any income from employment or from operating a business during this year or the two previous calendar years, he did not state his income during the current year, 2016, he stated

gross income of $29,558.00 in wages, commissions, bonuses and tips and from operating a business for calendar year 2015 and gross income of $19,329.00 from operating a business for calendar year 2014.  *Id.* at 46-47.  On his Statement of Financial Affairs, Larsen answered "no" to the question asking whether within 2 years before he filed for bankruptcy, did he sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of business.  *Id.* at 50.  On his Statement of Financial Affairs, in response to the question asking whether within 4 years before he filed for bankruptcy, did he own a business or have any of a connection with a business as a sole proprietor, member, partner, officer, director or managing director or 5% shareholder, he listed Jens F. Larsen LLC, Abbrie Thoroughbreds, Frederick Investments L.L.C. and Larsen Investment Group.  *Id.* at 52.

Larsen attested in an Electronic Filing Declaration and at the meeting of creditors pursuant to 11 U.S.C. § 341(a) in this bankruptcy case that he read and understood his complete bankruptcy petition.  Established Facts, ¶ 12, Order Denying Plaintiff's Motion for Partial Summary Judgment and Granting Motion in Part Deeming Certain Facts Established.

In his trial declaration, Larsen asserted: "I answered every single question I was asked truthfully and continue to do so as my obligation as a debtor in bankruptcy."  Larsen Amended Trial Declaration, ¶ 174.

On April 19, 2017, Edward M. Wolkowitz, the Chapter 7 Trustee in this case, filed a report of no distribution as reflected on the case docket, stating that he had made a diligent inquiry into the financial affairs of the debtor and the location of property belonging to the bankruptcy estate and determined that there is no property available for distribution from the estate over and above that exempted by law.  Case Docket Entry dated April 19, 2017.  The Chapter 7 Trustee stated that the value of assets being abandoned was $215,000.00 and that the claims scheduled were $179,235.99.  *Id.*

According to Larsen, before the Chapter 7 Trustee issued his no distribution report, the Trustee stated on March 8, 2017:

No one has paid for the "room" and board for the horses since the filing, and I have the impression that there were substantial sums owing when Mr Larsen filed.  State law imposes a lien on the horses for the value of the food and rent.  The Trustee is not in a position to do the kind of negotiating with the stables that Mr Larsen could do on his

> own behalf, and his costs of sale are much higher, such that sale of the horses is a very
> high risk endeavor.  We have also been told that the horses have diminished in value,
> because they are not regularly trained, and we have been unable to find anyone who is
> willing to go up and value the horses on a contingency basis (only lawyers work that
> way).  I don't see an auction of the horses by the Trustee as a highly profitable event---I
> just thought that Mr Larsen might be able to make some money if he bought them back.

Larsen Amended Trial Declaration, ¶ 184.  These remarks were probably made at the

continued meeting of creditors pursuant to 11 U.S.C. § 341(a) conducted on March 7, 2017 as

reflected on the case docket and are consistent with the no distribution report filed by the

Trustee a month later.

On August 21, 2017, with the assistance of Attorney Matthew D. Resnik, Larsen filed his

amended bankruptcy schedules.  Amended Schedules, Main Bankruptcy Case, ECF 51.  In his

amended bankruptcy schedules, Larsen listed assets of $132,500.00, all of which was

personal property.  *Id.* at 23.  Among the assets, he listed 27 bank accounts, Bank of America

account #0845 for Frederick Investments LLC, Bank of America account #2380 for Frederick

Investments LLC, Bank of America account #2393 for Frederick Investments LLC and Bank of

America account #6843 for Jens Larsen, plus 23 personal bank accounts at various banks, all

of which were listed as having balances of $0.00, personal and household items of a total

value of $3,500.00 and horses of a total value of $129,000.00.  *Id.* at 16-23.  The value of

scheduled assets on the amended schedules was less than the original schedules.  On the

Amended Schedule A/B, Property, Larsen answered "no" to the question asking for ownership

of non-publicly traded stock and interests in incorporated and unincorporated businesses,

including an interest in an LLC, partnership and joint venture.  *Id.* at 19.  On his Amended

Statement of Financial Affairs, in response to the question asking whether he had any income

from employment or from operating a business during this year or the two previous calendar

years, he stated gross income of $0.00 during the current year, 2016, he stated gross income

of $67,500.00 in wages, commissions, bonuses and tips and from operating a business for

calendar year 2015 and gross income of $75,436.00 (total business gross) and $16,329.00

(debtor's net profit) from operating a business for calendar year 2014.  *Id.* at 52-53.  On his

Amended Statement of Financial Affairs, Larsen answered "yes" to the question asking

whether within 2 years before he filed for bankruptcy, did he sell, trade, or otherwise transfer

1    any property to anyone, other than property transferred in the ordinary course of business,

2    stating that he transferred a thoroughbred horse named Anything to Get Even in exchange for

3    "$2,500 per Stewardship".  *Id.* at 57.  On his Amended Statement of Financial Affairs, in

4    response to the question asking whether within 4 years before he filed for bankruptcy, did he

5    own a business or have any of a connection with a business as a sole proprietor, member,

6    partner, officer, director or managing director or 5% shareholder, he listed Banff Farms (with

7    the notation "Was added by father to business as manager/member for banking purposes

8    only"), Jens F. Larsen LLC, Abbrie Thoroughbreds, Frederick Investments L.L.C. and Larsen

9    Investment Group.  *Id.* at 59.

10        Regarding the amended schedules, Larsen asserted in his amended trial declaration:

11    "My bankruptcy is discharged, however, in an abundance of caution I am amending or have

12    amended some of the schedules which are not material in nature but solely to provide the

13    complete transparency of my estate despite the insignificant nature of the amendments."

14    Larsen Amended Trial Declaration, ¶ 185.

15        Larsen was an officer, director, or majority owner of at least five businesses in the four

16    years preceding his bankruptcy case: (a) Banff Farms, LLC; (b) Abbrie Thoroughbreds, LLC;

17    (c) Jens Frederick Larsen, LLC; (d) Larsen Investment Group, L.L.C.; and (e) Frederick

18    Investments L.L.C.  Established Facts, ¶ 7, Order Denying Plaintiff's Motion for Partial

19    Summary Judgment and Granting Motion in Part Deeming Certain Facts Established.  In both

20    his testimony at the meeting of creditors pursuant to 11 U.S.C. § 341(a) in this bankruptcy

21    case and in his pre-bankruptcy communications, Larsen stated that he had dissolved all of his

22    limited liability companies (LLCs).  *Id.,* ¶ 8.  At his deposition, Larsen stated that he had

23    dissolved all of these LLCs by early 2016.  *Id.*

24        Larsen used business and personal bank accounts interchangeably because he did not

25    have a personal bank account for long periods of time.  *Id.,* ¶ 9.  Larsen kept large amounts of

26    cash at home and engaged in a number of large cash transactions through his bank accounts.

27    *Id.*  Larsen disclosed only four of these bank accounts in his bankruptcy petition, schedules

28    and statement of financial affairs filed in this bankruptcy case .  *Id.,* ¶ 10.

Larsen had not amended his bankruptcy petition at the time that Perske filed her motion for partial summary judgment in this adversary proceeding, although he was represented by counsel.  *Id.*, ¶ 13.  In the discovery process in this adversary proceeding, Perske requested records relating to Larsen's business and financial affairs in the period leading up to his Petition.  *Id.*, ¶14.

On June 19, 2017, the court ordered Larsen to identify all of his, and his business entities', bank accounts from 2015 to the petition date.  *Id.*, ¶ 15.  In response, Larsen provided a declaration only disclosing the following bank accounts: Bank of America Account Nos. 7671, 5589 and 6843; Chase No. 3995; Citibank Nos. 4721 and 9850.  *Id.*, ¶16.  At his deposition in this case, Larsen testified that he had no undisclosed bank accounts until presented with bank account records from undisclosed accounts.  *Id.*, ¶ 11.  Larsen did not disclose Bank of America Account No. 7817 despite being questioned about it at his deposition.  *Id.*, ¶ 16.

According to Perske, Larsen only produced a meager amount of business or financial records in response to her discovery, consisting primarily of a few months of bank statements from his personal bank account from after the petition date and one of his seven business accounts used in the year before the petition date.  Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF 147, citing Plaintiff's Exhibit 132 at 2174-2177 and 2178-2221, Plaintiff's Exhibits 6-8, 130-138 and 144; Trial Declaration of Damion Robinson, ¶¶ 47-59.  Larsen did not produce bank records for the accounts set up for Frederick Investments, LLC, which was the entity in which he held the smoke shop business, and he admitted that he no longer has access to any other business records.  Larsen Deposition Transcript, Vol. I at 16:18-24, 17:9-23, 52:23-53:20 and 55:2-7.  Larsen kept no accounting records for any of his business entities, including the smoke shop business, because he "ran it sloppy."  Larsen Deposition Transcript, Vol. I at 96:17-24; Larsen Deposition Transcript, Vol. II at 321:6-13.  Larsen has no records of the assets of the smoke shop business.  Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 2:50 p.m.  He admitted that he kept no records of the smoke shop at all when he ran it with his father's assistance and abandoned what records there were for the business when the business finally closed.  Larsen Testimony, Audio

Recording of Trial, October 26, 2017 at 2:51 p.m.  He has no records to document his purported investment or Perske's actual investment in the smoke shop.  Larsen Deposition Transcript, Vol. I at 174:15-17; Larsen Testimony, Audio Recording of Trial, January 22, 2018 at 4:02-4:03 p.m.  He has no records evidencing the transfer of the smoke shop to his father, including any contract reflecting the transfer.  Larsen Testimony, Audio Recording of Trial, October 26, 2017 at 2:50-2:53 p.m.  Regarding his failure to maintain business records, Larsen admitted that he simply threw his records away after doing his tax returns and that he was "sloppy" about recordkeeping.  Larsen Deposition Transcript, Vol. I at 64:7-25, 96:17-24 and 130:25-131:7; Larsen Deposition Transcript, Vol. II at 321:6-13.

At his deposition in this case, Larsen testified that he was not involved in any business entities other than the four listed in his bankruptcy schedules until he was asked about Banff Farms, LLC.  Established Facts, ¶ 17, Order Denying Plaintiff's Motion for Partial Summary Judgment and Granting Motion in Part Deeming Certain Facts Established.  According to Larsen, he was asked by his father to be "on Bannff [sic] Farms so I could be on the banking as this was the entity he wished to create."  Larsen Amended Trial Declaration, ¶ 179.

Larsen did not disclose all of his bank accounts and did not disclose all of his business entities in his bankruptcy schedules.  Established Facts, ¶¶ 11, 14-17, Order Denying Plaintiff's Motion for Partial Summary Judgment and Granting Motion in Part Deeming Certain Facts Established.   Larsen's explanation as to the bank accounts at trial was: "Regarding the bank accounts, I listed all active and used accounts that I was aware of were still in use and that I actually used.  Some account[s] were savings accounts that were never used and that I did not even know existed."  Larsen Amended Trial Declaration, ¶ 182.  Larsen explained as to the business entities: "I disclosed every entity that I was aware of and could think of and did not intentionally defraud the court."  Id., ¶ 181.

///

///

///

///

### III.    ANALYSIS

#### A. Whether Larsen Owes a Debt to Perske

##### 1. State law claims for alleged underlying debts owed by Larsen to Perske

In this adversary proceeding, Perske seeks a determination that the debts owed by Larsen to her are nondischargeable pursuant to 11 U.S.C. § 523. This statute, 11 U.S.C. § 523, contains provisions for excepting debts owed by a debtor to a creditor from discharge for various reasons. Perske asserts specifically that the debts owed to her by Larsen should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6). As observed by one bankruptcy law treatise, "[c]reditors seeking a nondischargeability determination must first establish an *enforceable claim* under state law (whether or not the claim has been filed in the bankruptcy proceeding)." 4 March, Ahart and Shapiro, *Rutter Group Practice Guide: Bankruptcy,* ¶ 22-1641 (2018) (emphasis in original). This is so because the statutory language of 11 U.S.C. § 523 does not provide for the creation of debts, but rather for determination of such existing debts as nondischargable under certain conditions. *Del Bino v. Bailey (In re Bailey),* 197 F.3d 997, 1001 (9th Cir. 1999) (bankruptcy law governs whether a claim is nondischargeable pursuant to 11 U.S.C. § 523, state law determines whether the creditor has a claim against debtor, such as for the tort of conversion).

In Perske's proposed findings of fact and conclusions of law, she contends that Larsen owes her a debt of $105,363.20, including indemnity, for her total economic loss damages and a debt of $52,681.58 for emotional distress damages (representing one-half of her economic loss damages, including indemnity). Plaintiff's Proposed Findings of Fact and Conclusions of Law after Trial, ECF 147, ¶¶ 202, 204. However, none of the debts allegedly owed by Larsen have been determined and liquidated in any legal action, and in order to determine Perske's claims for nondischargeability of debt, the court will have to determine whether there are underlying debts owed by Larsen to her under state law.

Perske's adversary complaint does not allege any state law claims that Larsen owes her debts from his alleged misconduct since the complaint only alleges federal law claims under the Bankruptcy Code, 11 U.S.C., for determination of dischargeability of debt and for denial of

discharge.  In her first claim for relief under 11 U.S.C. § 523(a)(2), Perske alleges that "the

debt owed by [Larsen to her] is for money and property that were obtained through false

pretenses, false representations and/or actual fraud. . . . "  Complaint, ECF 1, ¶ 51.  In her

second claim for relief under 11 U.S.C. § 523(a)(4), Perske alleges that "the debt owed by

[Larsen to her] is for fraud or defalcation while acting in a fiduciary capacity, embezzlement or

larceny. . . ."  Complaint, ECF 1, ¶ 51. In her third claim for relief under 11 U.S.C. § 523(a)(4),

Perske alleges that "the debt owed by [Larsen to her] is for a willful and malicious injury. . . ."

Complaint, ECF 1, ¶ 60.  Also, in this claim for relief, Perske alleges that Larsen "intended to

defraud, harm, and maliciously injure [her] by improperly using and misappropriating [her]

funds . . . ."  *Id.*  The substantive bases under state law for these claims asserting debts owed

by Larsen are not identified in these three claims for relief.

In the Pre-Trial Stipulation, the parties identified the issues of fact and law to be litigated

for trial, including whether Larsen's conduct constituted false pretenses, false representations,

actual fraud, fraud or defalcation, embezzlement or larceny, tortious breach of contract,

conversion or waste, intentional infliction of emotional distress, and/or common law fraud for

purposes of 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6).  Pre-Trial Stipulation, Issues of Fact, ECF

62, ¶¶ 1-77 and Issues of Law, ECF 62, ¶¶ 1-15.  The substantive bases under state law for

Perske's claims asserting debts owed by Larsen are not identified in the issues of fact and law

in the Pre-Trial Stipulation.  *Id.*

In Plaintiff's Proposed Findings of Fact and Conclusions of Law after Trial, Perske

submitted proposed findings of fact and conclusions of law for her claims under 11 U.S.C.

§ 523(a)(2), (a)(4) and (a)(6).  ECF 147.

With respect to her claim under 11 U.S.C. § 523(a)(2)(A), Perske contends that she is

entitled to relief based on the elements of a claim for fraud as set forth in federal case law

interpreting 11 U.S.C. § 523(a)(2)(A), namely, (1) misrepresentation, fraudulent omission, or

deceptive conduct; (2) knowledge of the falsity or deceptiveness; (3) intent to deceive the

creditor; (4) justifiable reliance by the creditor; and (5) damage to the creditor proximately

caused by its reliance.  Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF

147, ¶ 93, *citing, In re Shane,* 548 B.R. 291, 297-298 (N.D. Cal. 2016), *citing, In re Sabban,*
600 F.3d 1219, 1222 (9th Cir. 2010).  Perske then argues in her proposed findings of fact and
conclusions of law how the evidence at trial satisfies these elements under federal common
law.  Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF 147, ¶¶ 93-154.
However, Perske does not argue or show how she has an enforceable claim under state law to
establish a debt owed to her by Larsen for purposes of her claim under 11 U.S.C.
§ 523(a)(2)(A).  *Id.*   Since Perske, the complainant, and Larsen, the alleged tortfeasor, are
California residents, and the alleged tortious acts occurred in California, California law applies,
and the court should analyze whether Perske has an enforceable claim for tort damages
against Larsen based on California law.  Perske's reliance on federal common law governing
claims under 11 U.S.C. § 523(a)(2)(A) and conflating it with the California tort law standard to
establish her tort claims against Larsen is not fatal to her cause because the elements of
common law fraud, which she basically alleges, are essentially the same under California law.
5 Witkin, *Summary of California Law,* Torts, § 890 (11th ed., online ed. July 2019 update),
*citing inter alia,* California Civil Code, § 1709; *Seeger v. Odell,* 18 Cal.2d 409, 414 (1941);
*compare Engalla v. Permanente Medical Group, Inc.,* 15 Cal.4th 951, 974 (1997) (setting forth
elements of fraudulent misrepresentation under common law standard) *with Turtle Rock*
*Meadows Homeowners Association v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir.
2000) (setting forth elements of fraudulent misrepresentation under 11 U.S.C. § 523(a)(2)(A)).
"The elements of fraud that will give rise to the tort action for deceit, are: (a) misrepresentation
(false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter');
(c) intent to defraud (i.e., to induce reliance); (d) justifiable reliance; and (e) resulting damage."
*Engalla v. Permanente Medical Group, Inc.,* 15 Cal.4th at 974 (citation omitted); *see also, In re*
*Slyman*, 234 F.3d at 1085 (same factors).

       With respect to 11 U.S.C. § 523(a)(2)(B), it appears that Perske does not assert a claim
under that provision as stated in her proposed findings of fact and conclusions of law:
"Perske's claims are not subject to [11 U.S.C.] Section 523(a)(2)(B)."  Plaintiff's Proposed
Findings of Fact and Conclusions of Law, ECF 147, ¶¶ 155-157, *citing, In re Belice,* 461 B.R.

1    564, 577-578 (9th Cir. BAP 2011) (adopting a narrow interpretation of the phrase, "statements

2    reflecting the debtor's . . . financial condition").  However, Perske did assert that if 11 U.S.C. §

3    523(a)(2)(B), certain written statements might support such a claim.

4    With respect to her claim under 11 U.S.C. § 523(a)(4), Perske contends that she is

5    entitled to relief based on the elements of a claim for fraud or defalcation while acting in a

6    fiduciary capacity as set forth in federal case law interpreting 11 U.S.C. § 523(a)(4), namely,

7    (1) the debtor was acting in a fiduciary capacity, i.e., a fiduciary relationship; and (2) the debtor

8    engaged in fraud or defalcation.  Plaintiff's Proposed Findings of Fact and Conclusions of Law,

9    ECF 147, ¶ 158, *citing, In re Stanifer,* 236 B.R. 709, 713 (9th Cir. BAP 1999).  According to

10   Perske, the element of fiduciary relationship is established under California law by evidence

11   that she and Larsen were joint venturers in the smoke shop business and, similarly, partners in

12   the "fledgling horse venture."  *Id.,* ¶¶ 159-160, *citing, Ragsdale v. Haller,* 780 F.2d 794, 796

13   (9th Cir. 1986); *Boyd v. Beilacqua,* 247 Cal.App.2d 272, 288 (1966); California Corporations

14   Code, § 16202(a); and *Enea v. Superior Court,* 132 Cal.App.4th 1559, 1564 (2005).  As to the

15   fraud element, Perske asserts that fraud under 11 U.S.C. § 523(a)(4) means "actual fraud,"

16   and the elements of actual fraud are the same as under 11 U.S.C. § 523(a)(2)(A).  *Id.,* ¶ 161.

17   As to the defalcation element, Perske asserts that "[d]efalcation means the misappropriation of

18   funds, using trust (or partnership) property in a manner inconsistent with the duties and

19   obligations imposed, or failing to account."  *Id.,* ¶ 162, *citing, In re Lewis,* 97 F.3d 1182, 1186-

20   1187 (9th Cir. 1996) and *In re Stanifer,* 236 B.R. at 719.  According to Perske, "The failure to

21   properly account for challenged transactions, on its own, is sufficient to establish a

22   defalcation," and "[o]nce the creditor shows that it has entrusted funds to the fiduciary, the

23   burden then shifts to the fiduciary to account fully for all transactions involving the creditor's

24   funds 'by persuading the trier of fact that [he] complied with [his] fiduciary duties with respect to

25   all questioned transactions.'"  *Id.,* ¶¶ 162-163, *citing, In re Niles,* 106 F.3d 1456, 1460, 1462

26   (9th Cir. 1997) and *Larez v. Holcomb,* 16 F.3d 1513, 1518 (9th Cir. 1994).  Perske then

27   proceeds to argue how the evidence at trial satisfies these elements under federal common

28   law.  *Id.,* ¶¶ 93-154.  However, Perske does not argue or show how she has an enforceable

1  claim under state law to establish a debt owed to her by Larsen for purposes of her claim

2  under 11 U.S.C. § 523(a)(4).  *Id.*

3       As discussed previously, Perske's claim for fraud may be shown under the applicable

4  California legal standard.  *See, e.g.,* 5 Witkin, *Summary of California Law,* Torts, § 890, *citing*

5  *inter alia,* California Civil Code, § 1709; *Seeger v. Odell,* 18 Cal.2d at 414; *Engalla v.*

6  *Permanente Medical Group, Inc.,* 15 Cal.4th at 974.  However, Perske's claim for defalcation is

7  perhaps more problematic because the concept of defalcation was apparently not recognized

8  in the California case law until the case of *Ivy v. Plyler,* 246 Cal.App.2d 678 (1966).  In that

9  case, the court observed:

> Although we find no California case defining defalcation, there are a number
> of definitions from other jurisdictions noted in <u>163 A.L.R. 1008.</u> Generally speaking,
> the cases have held that as used in the Act, 'defalcation' is not a synonym for fraud,
> embezzlement or misappropriation, but has a broader meaning. Defalcation means
> 'the failure of a fiduciary to account for money received in his fiduciary capacity.'
> ( <u>First Citizens Bank & Trust Co. v. Parker, 225 N.C. 480, 35 S.E.2d 489, 492.)</u> To
> constitute defalcation there must be a showing of bad faith or misconduct, as
> distinguished from negligence or mistake (<u>Aetna Casualty & Surety Co. v.</u>
> <u>Lauerman, 12 Wis.2d 387, 107 N.W.2d 605, 609)</u> and it may consist of a mere
> deficit resulting from misconduct. (<u>Kaufman v. Lederfine, D.C., 49 F.Supp. 144.)</u>

16  *Id.* at 683-684.  The court, in defining defalcation under California law, rejected a corporate

17  director's defense that his debt to the corporation for breach of contract based on his discharge

18  of debt from his bankruptcy case, holding that he had engaged in "misappropriation and

19  defalcation" which made his debt excepted from discharge.  *Id.* at 682-684.  Based on this

20  precedent, Perske would have to show by a preponderance of the evidence, the normal

21  standard in civil cases in California, that Larsen acted in bad faith or engaged in misconduct by

22  failing as a fiduciary to her to account for money received in his fiduciary capacity (which may

23  consist of a mere deficit from misconduct).  *Id.*

24       Contrary to Perske's assertion that the burden of proof shifts to Larsen by simply

25  showing that she entrusted funds to him, the case law indicates that she has to show some

26  bad faith or misconduct on the part of Larsen as a fiduciary, which may be fraud or

27  defalcation.  However, as the Ninth Circuit recognized in *In re Niles,* if Perske establishes

28  that Larsen had violated his fiduciary duties under California law, then the burden then

1  shifts to him as the fiduciary to render an accounting.  *In re Niles,* 106 F.3d at 1461,

2  *citing, Paramount Mfg. Co. v. Mohan,* 196 Cal.App.2d 372, 16 Cal.Rptr. 417, 421 (1961).

3  The Ninth Circuit also recognized that some California decisions establish an even lesser

4  standard for activating the fiduciary's duty to account.  *In re Niles,* 106 F.3d at 1461,

5  *citing Batson v. Strehlow,* 68 Cal.2d 662, 68 Cal.Rptr. 589, 598, 441 P.2d 101, 110 (1968)

6  ("When the principal questions the acts done by the agent in the course of the agency the

7  burden is cast upon the latter to prove that he acted with the utmost good faith toward the

8  principal...."); *Kennard v. Glick,* 183 Cal.App.2d 246, 7 Cal.Rptr. 88, 91 (1960).

9      With respect to her claim under 11 U.S.C. § 523(a)(6), Perske contends that her

10  underlying state law claims are the torts of intentional fraud and intentional infliction of

11  emotional distress.  Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF 147,

12  ¶¶ 190 and 191.  Regarding her fraud claim, Perske said "[t]he elements of a claim of fraud

13  under California law are effectively identical [sic]."  *Id.*, ¶ 190, *citing, Engalla v. Permanente*

14  *Medical Group, Inc.,* 15 Cal.4th at 974.  However, Perske did not identify the elements of her

15  state law claim of fraud based on California law underlying her claim under 11 U.S.C.

16  § 523(a)(6) and did not show how each element was met by a preponderance of the evidence.

17  Perske identified the elements of her tort claim for intentional infliction of emotional distress

18  under California law: (1) outrageous conduct; (2) intent to cause emotional distress or action

19  undertaken with reckless disregard of the probability of such distress; (3) severe emotional

20  distress; and (4) outrageous conduct as a substantial factor in causing severe emotional

21  distress.  *Id.*, ¶191, *citing, Hughes v. Pair,* 46 Cal.4th 1035, 1050-1051 (2009).

22      Based on the foregoing, the court thus construes Perske's arguments after trial as set

23  forth in her proposed findings of fact and conclusions of law that she has enforceable claims

24  against Larsen under California law for fraud, defalcation and intentional infliction of emotional

25  distress to support her claims under 11 U.S.C. §§ 523(a)(2), (a)(4) and (a)(6) that Perske has

26  debts owing to her that are nondischargeable.

27      ///

28      ///

### a. **State law claims underlying alleged debts owed by Larsen to Perske regarding the horse purchase and car lease transactions**

Regarding the alleged horse business, Perske argues that Larsen defrauded her by making false representations to her that he was a successful businessperson and that he was bringing her into his horse business.  She also argues that Larsen defrauded her by representing that he would start a new horse business with her and making false promises that he or his business would pay for expenses and debt obligations that she was induced to incur, resulting in damage to her from making payments and incurring debt for a business that did not materialize.

In support of Perske's fraud claims, she contends that Larsen owes her a debt arising from her incurring these expenses due to false pretenses and Larsen's creating a misimpression that he was carrying out the horse business that they discussed because he later admitted that he did not intend to engage in such a business with her.  Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶ 104, *citing inter alia, In re Del Valle,* 577 B.R. 789, 802 (Bankr. C.D. Cal. 2017) (false pretenses include misleading conduct intended to convey an inaccurate impression or intended to create and foster a false impression), *citing inter alia LiMandri v. Judkins*, 52 Cal.App.4th 326, 335 (1997).  As noted by the court in *In re Del Valle,* "[t]he circumstances under which a duty arises for nondisclosure of material facts under California law include (i) when the defendant is in a fiduciary relationship with the plaintiff; (ii) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (iii) when the defendant actively conceals a material fact from the plaintiff; or (iv) when the defendant makes partial representations but also suppresses some material facts." *In re Del Valle,* 577 B.R. at 802, *citing, LiMandri v. Judkins,* 52 Cal.App. 4th at 335.

Perske contends that Larsen caused Perske to incur major business expenses for her purchase of Alex and her lease of a new car by creating a false appearance of legitimacy (i.e., wealth and business success) and falsely promising to make the payments on both the purchase of Alex and the vehicle lease, and fostering a further misimpression by making the initial payments on these items to give the appearance that he was fulfilling these promises as

part of his scheme to induce her investment in the smoke shop business.  Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF 147, ¶¶ 104-106.

In order to prove fraudulent misrepresentation under California law, "[T]he misrepresentation must ordinarily be an affirmation of fact."  5 Witkin, *Summary of California Law,* Torts, § 891, *citing inter alia,* California Civil Code § 1710(1); *Hauter v. Zogarts,* 14 Cal.3d 104, 112 (1975).  "Statements relating to what may happen in the future are generally not actionable, and the mere failure to perform a promise is not a tort."  *Id,* § 899, *citing inter alia, Rheingans v. Smith*, 161 Cal. 362, 366 (1911).  "On the other hand, a statement of what the defendant or some third person intends to do relates to an existing state of mind and is a representation of fact. It is on this theory that a promise made without any intention to perform may constitute fraud."  *Id.*, § 899, *citing inter alia,* California Civil Code § 1710(4); *Union Flower Market Ltd*. *v. Southern California Flower Market*, 10 Cal.2d 671, 676 (1938); *Lazar v. Superior Court,* 12 Cal.4th 631, 638 (1996); Restatement (Second) of Torts, §§ 530, 544 (1977 and 2019 update).  A promise to do an act "necessarily implies the intention to perform, and where that intention is absent, there is an implied misrepresentation of fact, which is actionable fraud."  *Id.*  "This type of action has been referred to as one of 'promissory fraud.'" *Id., citing inter alia, Lazar v. Superior Court*, 12 Cal.4th at 638.  "Liability is imposed for concealment where the defendant is in a fiduciary or other confidential relationship that imposes a duty of disclosure."  *Id.*, § 914, *citing inter alia,* California Civil Code § 1710(3) ("suppression of a fact, by one who is bound to disclose it"); Restatement (Second) of Torts, § 551.  Such a fiduciary or confidential relationship is demonstrated if the parties are joint venturers.  *Id., citing, Fink v. Weisman*, 129 Cal.App. 305, 311 (1933); *Sime v. Malouf*, 95 Cal.App.2d 82, 94 (1949).

### i.   Larsen's representations to Perske regarding the horse purchases and new car lease

With respect to the horse named Alex, Perske testified that Larsen induced her to sign an installment payment contract to purchase Alex and to incur boarding, training and equipment expenses for Alex because he told her that they were going into business together,

that they were purchasing Alex for this business and that he and his business would make the payments for Alex.

With respect to the leased 2015 Lexus RC 350 car, Perske testified that Larsen induced her to trade in her 2007 Lexus car that she was driving at the time and sign a lease for a new 2015 RC 350 Lexus car because he told her that they were going into business together and she needed a new car to take clients around. Perske testified that Larsen also represented that he and his business would make the lease payments for the new car because making the payments would be a business expense write-off.

Perske's testimony that Larsen made representations to her that they were going into business together to retrain retired racehorses as jumpers and to resell them either as part of his existing business or a new business, that they were purchasing the horses named Alex and Leo for this business and that he and his business would make the payments for Alex and Leo, which representations were false, is credible. Larsen was in the horse business, which is not disputed. While the horse business was originally his mother's business, Larsen took it over when she became ill and later died. It is also undisputed that Larsen made the initial contact to Perske on Facebook for business reasons related to his horse business. In his deposition testimony, Larsen admitted that he wanted to get rid of horses rather than acquiring new ones. Larsen said he thought that she could help him find someone to take his horses, and he told Perske that he had prior experience retraining retired horses and selling them. Apparently, because Larsen and Perske hit it off in their initial interactions, Larsen and Perske talked about going into business to buy and retrain retired racehorses and sell them. That is why Perske introduced Larsen to Langer and McAllister, whom she knew from her contacts at the Hansen Dam. As corroborated by Langer and McAllister, whose testimony the court finds credible, Larsen and Perske talked to them about going into business together to buy retired racehorses, retrain them and resell them.

Larsen talked to Langer and McAllister about his horse business. Specifically, he told them that he was interested in boarding his horses at Hansen Dam. As McAllister testified, he thought Leo would be a good horse for Perske and Larsen in their new horse business, and

Perske and Larsen talked to McAllister about buying Leo and agreed to buy Leo from McAllister for their business.  Larsen gave McAllister a check in the amount of $46,500 to buy Leo, drawn on his business account under the name of Larsen Investments LLC.  Larsen, however, told McAllister that the purchase was contingent on having Larsen's veterinarian examine Leo.  Perske incurred some expenses in purchasing equipment for Leo based on her understanding that she and Larsen were purchasing Leo for their business.

As corroborated by Langer's testimony, Perske and Larsen talked to Langer about purchasing Alex for their business.  Perske and Larsen agreed to buy Alex for $15,000 for their business, and when Langer asked if the horse was going to be in both their names, Larsen asked to have Alex in Perske's name only—as an apparent "romantic gesture."  Perske signed the contract to buy Alex for $15,000 based on installment payments, and Larsen made the down payment of $1,000 by making a credit card payment.

As stated previously, Perske's testimony that Larsen made representations to her that she needed a new car because she would be meeting with wealthy clients in connection with their new horse business, that her current car was not nice enough to drive to business meetings or to drive clients around, that she told him that she could not afford a new car, that he told her that this was a business expense for the horse business which was a "write off", that he and his businesses "would cover it," and thus, based on these representations, she agreed to trade in her 2007 Lexus for a new car, is credible.  In addition, the facts that Perske signed the car lease only two days after her purchase of Alex, and only four days after the purchase of Leo by Larsen, which purchases were tangible signs to her that their horse business was underway, and that he made the first payment on the lease, all support the credibility of her testimony that Larsen made such representations encouraging her to lease the new Lexus car for their business.  Also, Perske's testimony was also corroborated by her Lexus account history showing returned payments in September and October 2015, which show that Larsen's attempted payments were rejected.  These attempted payments were consistent with the representations that he would make the payments on the Lexus lease for their horse business rather than his contention that he only agreed to make the first payment,

and thus, the court so found that he made these representations to induce her to lease the new Lexus.

### ii. **Larsen's knowledge of the falsity of his representations to Perske regarding the horse purchases and new car lease**

In order to prove fraudulent misrepresentation, a plaintiff must ordinarily prove knowledge of falsity or "scienter" as an essential element of fraud.  5 Witkin, *Summary of California Law,* Torts, § 920, *citing inter alia, Anderson v. Deloitte & Touche LLP*, 56 Cal.App.4th 1468, 1475 (1997); Restatement (Second) of Torts, § 526(a).  "Ambiguous statements, with a possible true or false meaning, are fraudulent only if the false meaning was intended, or if the statement was made with either reckless indifference as to how it would be interpreted or without any belief as to how it would be understood." *Id., citing,* Restatement (Second) of Torts, § 527.

Larsen knew the falsity of the representations that he made to Perske.  Those representations included: (i) that they were going into business together to retrain retired racehorses as jumpers and to resell them either as part of his existing business or a new business and (ii) that they were purchasing the horses named Alex and Leo for this business and that he and his business would make the payments for Alex and Leo.  Larsen made these promises which he did not intend to perform as shown by his conduct.  Larsen gave McAllister the check to pay for Leo with the condition of having his veterinarian examine Leo, but never arranged for the examination.  Larsen also made the first payment on Alex but stopped making payments after Perske agreed to invest in his smoke shop business.  Larsen never paid for the expenses related to Leo and Alex after promising Perske that he would do so.  As Larsen admitted during his deposition, he was trying to get rid of the horses he had and was not trying to buy new horses.  Larsen had no intention of going into the business of buying and training retired racehorses to be jumpers and reselling them.

Larsen knew that his promises to Perske about her leasing the new Lexus that he and his businesses would make the lease payments because she would be using the car in the horse business that they were starting, so she could meet with clients were false.  As for the

horse expenses, Larsen never intended to make the lease payments because he had no intention of going into a new business with Perske to buy, retrain and resell retired racehorses as jumpers as he wanted her to invest in a new smoke shop business that he wanted to open. Larsen only made the first lease payment to induce Perske to invest in his smoke shop business and did not make the subsequent payments after she agreed to make her investment in the smoke shop.

### iii. **Larsen's intent to deceive Perske by his representations regarding the horse purchases and new car lease**

To prove fraudulent misrepresentation, "[t]he representation must be made with the intent to defraud the plaintiff, that is, to induce his or her reliance." 5 Witkin, *Summary of California Law,* Torts, § 922, *citing inter alia,* California Civil Code § 1709; Restatement (Second) of Torts, § 531. The evidence shows that Larsen had the intent to defraud Perske in making false representations to her because he had ulterior motives in making these false representations to Perske, including befriending her to induce her to invest in his smoke shop venture and to seduce her, or as he candidly admitted, he lied to her to "get down her panties." Larsen Deposition Transcript, Vol. I, March 31, 2017, at 207:1-10. Larsen made promises to Perske to go into a horse-related business and was aware of her interest in horses. He knew Perske was an avid equestrian, and he actively induced her into spending money and making financial commitments for the horse business he told her that they were starting, including the Lexus lease and the purchase of Alex.

### iv. **Perske's justifiable reliance on Larsen's representations regarding the horse purchases and new car lease**

In proving reliance as an element of fraudulent misrepresentation under California law, "[t]he plaintiff must show not only actual reliance, but justifiable reliance; i.e., that the circumstances were such as to make it reasonable for plaintiff to accept the defendant's statements without an independent inquiry or investigation." 5 Witkin, *Summary of California Law,* Torts, § 933, *citing inter alia, Kahn v. Lischner,* 128 Cal.App.2d 480, 489 (1954); *Wilhelm v. Pray, Price, Williams & Russell,* 186 Cal.App.3d 1324, 1332 (1986); Restatement (Second)

of Torts, § 537 *et seq.*  "Whether reliance is reasonable is a question of fact."  *Id., citing,*

*Blankenheim v. E.F. Hutton & Co.*, 217 Cal.App.3d 1463, 1473, 1475 (1990).

Perske's testimony that she relied upon Larsen's misrepresentations, which induced her

to spend money on horse-related expenses and to incur financial obligations, such as the new

Lexus car lease and the purchase of Alex, for the anticipated horse-related business that

Larsen said that they were starting, but never materialized, was and is credible.  Larsen went

to great lengths to show Perske that he had all the trappings of business and financial success

in the entertainment and horse businesses.  Larsen boasted in person and on his Facebook

page about his personal and business successes, and he took Perske to fancy and expensive

restaurants like Nobu Restaurant [11] and Boa Steakhouse [12] and the Burke Williams luxury day

spa.[13]  Larsen picked Perske up for their first dates in luxury cars, which she did not know that

he had rented on a short-term basis.  Although Larsen was actually in the horse business and

was knowledgeable about horses, Perske was unaware that Larsen was not successful in the

industry.  To show that he was serious about going into a horse-related business with Perske,

Larsen talked with her and her acquaintances at the Hansen Dam, McAllister and Langer,

---

[11]  According to the review of the Nobu Restaurant in Los Angeles on the website of Zagat.com, the well-known restaurant recommendation service, the restaurant is: 'Still a favorite', this 'superlative' Beverly Grove 'go-to' has been convincing the 'luxury' crowd to 'give in to its desires' for years with 'impeccable sushi' and 'outstanding' Japanese-Peruvian specialties served by a 'gracious' staff amid sleek, cavernous surrounds designed by David Rockwell; some suggest it's 'not as trendy' as its Malibu sib, and the 'prices will make your eyes water', but "you get what you pay for" – 'magic.'"  Review of the Los Angeles Nobu Restaurant in Zagat.com, https://www.zagat.com/r/nobu-los-angeles-los-angeles (accessed online on September 20, 2019).

[12]  According to the restaurant's website, BOA Steakhouse is a bastion of fine dining catering to celebrities and the Hollywood elite:  "Whether visiting the location on the Sunset Strip, Santa Monica coastline or Abu Dhabi's mangroves, BOA is an unforgettable experience through and through. We focus on every detail of a guest's visit, down to our Wine Spectator award-winning wine selection and craft cocktails by in-house mixologists. This dedication to quality and originality makes BOA a favorite among celebrities and Hollywood's elite as well as our locals and visitors from around the world."  About Us on the BOA Steakhouse website, https://www.boasteak.com/about-us (accessed online on September 20, 2019).

[13]  According to its website, Burke Williams Spa is a luxury spa: "In the early 1980's, Theresa and Bill Armour shared the vision of bringing the luxury experience of a world-class resort spa to the city. What began as their vision has now become a thriving industry. The husband and wife team opened the first urban day spa – Burke Williams – in 1984, creating a brand that would become synonymous with elegance and refinement."  About Us on the Burke Williams Spa company website, https://burkewilliamsspa.com/about-burke-williams/ (accessed online on September 20, 2019).

about their business plan to start a horse-related business.  Larsen also told Perske that he

would pay for the acquisition of horses to retrain and resell, and for related expenses.  Larsen

gave a check to McAllister for full payment of Leo, he made the first installment payment for

the purchase of Alex and he made the first monthly payment for the new leased Lexus that

Perske was supposed to drive for the business, but Perske did not know this was all a sham.

Perske has shown by a preponderance of the evidence that she would not have traded in her

old car and leased the new car, but for Larsen's statements that she could use the car in their

new business and that he and his businesses would make the lease payments.  The court

finds Perske's testimony that Larsen made these statements to be credible and Larsen's

contrary testimony denying that he made these statements not to be credible.  These

circumstances indicate that Perske's reliance upon Larsen's misrepresentations were

reasonable and justifiable.

## v. **Resulting damage to Perske from Larsen's false representations regarding the horse purchases and new car lease**

Finally, Perske must establish the element of resulting damage from Larsen's alleged

fraud to prove her fraudulent misrepresentation claim.  California Civil Code § 3343(a)

provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover

the difference between the actual value of that with which the defrauded person parted and the

actual value of that which he received."  *See also,* Witkin, *Summary of California Law,* Torts,

§ 1893, *citing inter alia,* Restatement (Second) of Torts, § 549; *see also, Garrett v. Perry*, 53

Cal.2d 178, 186 (1959); *Alliance Mortgage Co. v. Rothwell,* 10 Cal.4th 1226, 1240 (1995).

Moreover, a defrauded party may recover any additional damage arising from the fraud,

including the following: "Amounts actually and reasonably expended in reliance upon the

fraud."  California Civil Code, § 3343(a)(1).

However, as to any claim for prospective damages based on fraud, as Witkin's

Summary of California Law explains, "[a] plaintiff can establish liability only on a cause of

action that accrued before the filing of the complaint.  But once that liability is established,

recovery may be had not only for loss already suffered, but also for (1) loss suffered after

commencement of the action and before trial, and (2) loss reasonably certain to occur in the

future. This is known as prospective damage."  Witkin, *Summary of California Law,* Torts*,*

§ 1719, *citing inter alia,* California Civil Code, § 3283; and *Melone v. Sierra Railway Co. of*

*California,* 151 Cal. 113, 117 (1907); Restatement (Second) of Torts, § 910.

Perske contends that she was damaged from Larsen's alleged misconduct regarding

the purchase of Alex because she has an outstanding obligation to "indemnify" Langer

Equestrian Group in an amount of $13,000 (i.e., the difference between the contract sales

price of $15,000 and the price of $2,000 that Langer resold Alex) arising from Langer's "live"

claim within the four-year statute of limitations for breach of contract under California Code of

Civil Procedure § 337, and that Larsen owes a debt to her arising from an obligation to

indemnify her for the purchase of Alex, which she argues is nondischargeable under 11 U.S.C.

§ 523.  Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF 147, ¶ 152.

Perske also contends that she was further damaged from Larsen's alleged misconduct

regarding the purchases of Alex and Leo because she incurred the obligation to pay the

boarding, veterinary and dental care and training expenses of Alex to Team McAllister in the

amount of $5,710.32 and to pay equipment expenses for Alex and Leo in the amount of

$800.00.  Perske also alleges that Larsen owes a debt to her arising from an obligation to pay

her for these expenses which are nondischargeable under 11 U.S.C. § 523.  Plaintiff's

Proposed Findings of Fact and Conclusions of Law, ECF 147, ¶ 151.

With respect to Perske's claims for damages relating to the horse purchases, the court

determines that she has proven her claim by a preponderance of the evidence in the amount

of $3,725.00 and has not proven her claim for the remaining amounts related to the horse

purchases.  Perske has proven her claim with respect to the amount of $3,725.00 that she paid

to settle her obligations with Team McAllister for Alex's boarding, veterinary and dental care

and training expenses after she purchased Alex for what she thought was going to be the

horse business that she and Larsen were going to operate.  Perske, as Alex's owner, was

contractually obligated to Team McAllister for these expenses, and Larsen was not Alex's

owner.  He therefore was not contractually obligated.  Perske is seeking to obligate Larsen

based on an indemnity for what she was obligated to pay Team McAllister, but she cannot claim that Larsen had to indemnify her for the full amount of $5,710.32 because Team McAllister agreed to a reduced payment of $3,500.00 to settle its claims against her.  In addition, Perske has substantiated the veterinary dental expenses of $225.00 for Alex with the invoice for the work.  Perske's testimony that she made these expenditures for Alex because he was going to be part of the business that she and Larsen were starting is credible.  Perske was at the time a full-time legal secretary and only would have incurred expenses for Alex in connection with the business that she was going into with Larsen.  However, as discussed previously, the court finds that Perske's claims for additional boarding and care expenses billed by Team McAllister and the veterinarian expenses are not substantiated and allowable as prospective damages because the Team McAllister expenses were the subject of a complete settlement with McAllister, and there is no written documentation in support of the veterinarian expenses.

Perske has not proven by a preponderance of the evidence her claim with respect to the amount of $13,000.00 for the outstanding balance that she owes Langer Equestrian Group on the contract to purchase Alex.  Perske, as the purchaser of Alex, was contractually obligated to Langer Equestrian Group for the contract purchase price, and Larsen was not the purchaser of Alex on the contract and was not contractually obligated.  Perske is seeking to obligate Larsen based on an indemnity for what she was obligated to pay Langer Equestrian Group, but she cannot claim that Larsen has to indemnify her for the outstanding balance of the purchase price because the evidence shows that she has not paid any of the outstanding balance of $13,000.00 to Langer Equestrian Group which might give rise to an obligation to indemnify. Further, based on the testimony of its principal, Marnye Langer, Langer Equestrian Group has not and will not take legal action to pursue collection of the outstanding balance from Perske. Thus, there is no evidence of any likelihood of a future obligation to indemnify, which would warrant an award of prospective damages for this claimed item.

The court finds that Perske has not met her burden of proving by a preponderance of the evidence damages in the amounts of $800.00 for equipment purchases relating to Alex

1    and Leo, which are substantiated by her bank account statements for purchases at horse-

2    related businesses.  As discussed above, Perske's testimony that she made these

3    expenditures for Leo and Alex because they were going to be part of the business that she and

4    Larsen were starting is not credible because they were incurred after the purchase of Leo fell

5    through and after she returned Alex to Langer and the expenses were not substantiated with

6    invoices showing the nature of the purchases.

7        Perske contends that she was damaged from Larsen's alleged misconduct regarding

8    the Lexus car lease because she is entitled to "the benefit of [her] bargain with respect to the

9    vehicle [which was] the full cost of the lease," i.e., the unpaid vehicle lease payments of

10    $20,949.15, or, in the alternative, her out of pocket loss in the amount of $8,500.00

11    representing the fair value of the car she traded in for the new Lexus, plus the remaining

12    indebtedness in the amount of $10,877.88 that she owes to Lexus Financial, for a total claim of

13    $19,377.88.  Perske argues that Larsen owes a debt to her arising from an obligation to pay

14    her for these expenses which is nondischargeable under 11 U.S.C. § 523.  Plaintiff's Proposed

15    Findings of Fact and Conclusions of Law, ECF 147, ¶ 153.

16        With respect to Perske's claims for damages relating to the Lexus car lease, the court

17    determines that she has proven her claim by a preponderance of evidence in the amount of

18    $8,500.00 and has not proven her claim for the remaining amounts related to the vehicle lease.

19    Perske has proven by a preponderance of the evidence her claim with respect to the amount

20    of $8,500.00 representing the fair market value of the 2007 Lexus car that she traded in to

21    lease the new 2015 Lexus car for use in what she thought was going to be the horse business

22    that she and Larsen were going to operate.  Perske has shown by a preponderance of the

23    evidence that she would not have traded in her old car and leased the new car, but for

24    Larsen's statements that she could use the car in their new business and that he and his

25    businesses would make the lease payments.  The court finds Perske's testimony that Larsen

26    made these statements to be credible and Larsen's contrary testimony denying that he made

27    these statements not to be credible.  Because Perske had to return the new car, she lost the

28

1  value of her old car which had been traded in, which she would not have lost if she had not

2  leased the new car based on Larsen's broken promises.

3      Perske has not proven by a preponderance of the evidence her claim that she was

4  damaged from Larsen's alleged misconduct regarding the Lexus car lease because she is

5  entitled to "the benefit of [her] bargain with respect to the vehicle [which was] the full cost of the

6  lease," i.e., the unpaid vehicle lease payments of $20,949.15.  Perske has not shown by a

7  preponderance of the evidence that she is entitled to "the benefit of her bargain" with respect

8  to the Lexus because she has not shown that there is any legal basis for her entitlement to the

9  benefit of the alleged bargain, such as an actual contract between her and Larsen for him to

10 buy her a car.  Perske, as a victim of fraud, is entitled to her "out of pocket" losses under

11 California Civil Code § 3343(a), not her "benefit of the bargain" damages.  *See also,* Witkin,

12 *Summary of California Law,* Torts, § 1893, *citing inter alia,* Restatement (Second) of Torts,

13 § 549; *see also, Garrett v. Perry*, 53 Cal.2d at 186; *Alliance Mortgage Co. v. Rothwell,* 10

14 Cal.4th at 1240.   In any event, Perske's damages from Larsen's failure to follow through with

15 his promise to make the lease payments is not the balance of the payments owed to Lexus

16 Financial on the lease, but what she gave up in signing the lease and what she actually paid or

17 will likely have to pay to Lexus, which as discussed below is at most the value of her old car

18 that was traded in.

19     Perske has not proven by a preponderance of the evidence her claim with respect to the

20 amount of $10,877.88 for the outstanding balance that she owes Lexus Financial on the

21 contract to lease the 2015 Lexus vehicle.  Perske, as the lessee of the 2015 Lexus vehicle,

22 was contractually obligated to Lexus Financial for the lease obligations, and Larsen was not

23 the lessee of the 2015 Lexus car on the lease contract.  Larsen had no contractual obligations

24 under the Lexus lease.  Perske is seeking to obligate Larsen based on an indemnity for what

25 she was obligated to pay Lexus Financial, but she cannot claim that Larsen has to indemnify

26 her for the outstanding balance of the lease obligations because the evidence shows that she

27 has not paid any of the outstanding balance of $10,877.88 to Lexus Financial to give rise to an

28 obligation to indemnify.  There is no evidence that Lexus Financial has taken any action to

pursue collection of the outstanding balance from Perske after sending its balance due letter in February 2016.  Accordingly, there is no evidence of any likelihood of a future obligation to indemnify Perske since she has not made any payment of the outstanding balance and it is not likely that she will or will have to, and thus, the amount of alleged indemnity obligation is not sufficiently proven as prospective damages.

### b. **State law claims underlying alleged debts owed by Larsen to Perske regarding the smoke shop business**

#### i. **Fraud**

With respect to her fraud claims regarding the smoke shop business, Perske testified that Larsen induced her to invest $30,000 in a new smoke shop business and to sign a lease for the business because he told her that he had prior business experience co-owning and operating smoke shops, that the business would be a chain of new smoke shops and that he would match her investment of $30,000 in the new business.  Perske also testified that Larsen said he would pay her balance of $3,400 on her existing 401(k) loan to help her take out a new 401(k) loan of $30,000 to make her investment in the smoke shop, that he needed her to sign the lease for the smoke shop as a co-signer, and that he had signed a separate lease for the smoke shop himself.

##### (a) **Larsen's representations to Perske regarding the smoke shop business**

Perske's testimony that Larsen made representations to her that he had prior smoke shop business experience as an owner or co-owner, that they were going in business together to start a new chain of smoke shops, that he would match her $30,000 investment in the business with his own $30,000 investment, that he would pay off the balance of approximately $3,400 on her existing 401(k), and that he needed her to co-sign the lease on the new smoke shop business because he had already signed a separate lease, is credible.

The preponderance of the evidence shows that Larsen made representations to Perske about his prior experience in the smoke shop business as an owner or co-owner, which were not true.  In the conversations between Larsen and Perske about starting a smoke shop, and

potentially a franchise, Larsen represented that he had been an owner or co-owner of smoke

shops, which was false, because, as Larsen admitted at trial, he had not owned or co-owned a

smoke shop before and his total "experience" in running a smoke shop was that a friend of his

owned one.  Larsen represented to Perske that he had an accountant who had smoke shop

accounting experience working for Larsen, which was also false, because Larsen did not have

such experience owning or co-owning a smoke shop, and thus, the accountant could not have

done any smoke shop accounting work for Larsen.  That Larsen made false representations of

his prior ownership or co-ownership of smoke shops is also evidenced by his representations

in his posting on his Facebook page on September 10, 2014 that he owned smoke shops.

Larsen represented to Perske that he would match her $30,000 investment in the

smoke shop business and pay back her existing 401(k) loan so she could get a new loan to

make her $30,000 investment.  The evidence, including Perske's testimony, the

correspondence between the parties and the documents filed by them, indicates that Larsen

made this representation.  Larsen made references to Perske wanting to be "equal" in the

business in his email message to her of October 26, 2015; he described Perske's "50% of the

Partnership" in his proposed settlement agreement for his email message of November 2,

2015; he stated in the proceedings involving Perske's request for a domestic violence

restraining order, "[w]e both contributed financially to the business" and Perske "took out a loan

from her 401K for her half of the business."  Larsen's representations to Perske that he would

invest $30,000 in the business—like her—were untrue, as shown by the fact that he did not

produce any evidence at trial to substantiate that he made any investment of money in the

smoke shop business.  Larsen admitted at trial that although he could have received a loan for

$30,000 from his father to invest in the smoke shop, he never took any steps to do that.

Larsen represented to Perske that he would pay the $3,403.69 balance on her existing

401(k) account loan, so she could take out a new loan of $30,000 to invest in the smoke shop,

but this representation was also untrue.  The evidence shows that Larsen helped Perske set

up an online payment system to his own bank account, which he knew would not have funds to

cover repayment of the prior loan balance.  Thus, the payments set up on this account never

went through to pay off Perske's existing 401(k) loan, which put her in default on the new

$30,000 401(k) loan.  Although Perske informed Larsen that the payments were not going

through, he never corrected this issue or otherwise made the payments of her existing 401(k)

loan as he promised.

Additionally, Larsen represented to Perske that he needed her to "co-sign" the lease for

the smoke shop premises since his credit was bad, and he had signed a separate lease for the

premises.  These representations were untrue because only Perske signed the lease for the

smoke shop premises, and Aljojo, the landlord, later confirmed to Perske that she was the only

lessee.  Larsen never signed any lease of the smoke shop premises when he and Perske

started the business, and at trial, Larsen never produced a copy of any such lease that he

signed for the smoke shop with Perske.

### (b) Larsen's knowledge of the falsity of his representations to Perske regarding the smoke shop business

Larsen knew that he was making false representations to Perske that he had prior

experience with smoke shops as owner and co-owner because he had no such experience

when he made such representations, as he admitted at trial.  Larsen knew that he was making

false representations to Perske that he was matching her investment of $30,000 in the smoke

shop business because the evidence indicates that he never did match her investment.

Larsen said at trial that he intended to get a loan from his father to make a matching

investment, but never took any steps to get that loan.  Larsen knew that he was making false

representations to Perske that he would pay the $3,403.69 balance on her existing 401(k)

account loan so she could take out a new loan of $30,000 to invest in the smoke shop.  Larsen

helped her set up an online payment system to his own bank account, which he knew would

not have the funds to make any possible payment of the loan balance.  Larsen took no

remedial action to make the payment of Perske's loan balance as he promised her.  Larsen's

knowledge that he would not have funds in his bank account to cover the payment of Perske's

401(k) loan balance, which he set up for that purpose, indicates knowledge of the falsity of his

representations that he would pay her existing 401(k) loan balance.

Larsen knew that he was making false representations to Perske that he needed her to "co-sign" the lease for the smoke shop premises. The evidence in the case only shows one lease for the smoke shop, with Perske as the only person signing the lease. Larsen never produced at trial a copy of any such lease that he "separately" signed for the smoke shop and thus, Larsen knew that he was asking Perske not to be just a "co-signer" of the lease, but the only signer with sole and full liability under the lease.

### (c) Larsen's intent to deceive Perske by his representations regarding the smoke shop business

Larsen had the intent to deceive Perske when he made the misrepresentations to her that he had prior smoke shop business experience as an owner or co-owner, that they were going in business together to start a new chain of smoke shops, that he would match her $30,000 investment in the business with his own $30,000 investment, that he would pay off the balance of $3,400 on her existing 401(k) so she could get a new 401(k) loan in a higher amount to make her $30,000 investment in the new business and that he needed her to co-sign the lease on the new smoke shop business. Larsen did not have money to open a smoke shop, and he knew he could get money from Perske. Larsen needed to make the false promises to match her investment and to pay off her existing 401(k) loan in order to induce her take out a new $30,000 401(k) loan to get the funds that he needed to open the smoke shop business. He also needed her to sign the lease because he did not want any liability himself for the lease, and so he lied to her so that she would be the only lessee. The court finds that Perske has proven by a preponderance of the evidence that Larsen had the intent to deceive her when he made these false representations to her.

### (d) Perske's justifiable reliance on Larsen's representations regarding the smoke shop business

Perske's testimony that she made the investment in Larsen's smoke shop business based on his statements about his success, his experience in the smoke shop business and his plan for opening the chain of smoke shops, as well as his promises to her about matching her investment, paying her prior 401(k) loan balance and how he planned to use her

1  investment, is credible.  Specifically, her testimony that she believed that Larsen actually

2  planned to open three smoke shops, to invest himself and to pay her investment back, and that

3  she asked him if they should put their agreement in writing, but he told her that there was no

4  need to do that because they were going to be together, is credible.  Perske's additional

5  testimony that at that time, she did not know that Larsen was unemployed and had no

6  experience in the smoke shop business, that his primary income was from his father, that he

7  was nearly bankrupt, that he was trying to get rid of his horses because he was losing money

8  and could not afford them, that he had been sued several times—including by a former

9  girlfriend who also invested with him—and that he had a history of passing bad checks is

10  credible.  Perske testified that Larsen did not tell her any of these facts, and had she known

11  any of this information, she would not have agreed to join his horse business, to make any

12  purchases for that business or invest with him.  The court finds that by her testimony, which

13  the court finds credible (except as to Larsen's alleged history of bad checks, since she could

14  not remember at trial a factual basis for such assertion), Perske has shown justifiable reliance

15  on Larsen's false representations regarding the smoke shop business by a preponderance of

16  the evidence.

17  **(e) <u>Resulting damage to Perske from Larsen's false representations</u>**

18  **<u>regarding the smoke shop business</u>**

19  With respect to Perske's claims for damages relating to Larsen's false representations

20  regarding the smoke shop, the court determines that she has proven her claim by a

21  preponderance of the evidence in the amount of $28,750.00, which is the amount that the

22  evidence has shown she actually invested in the business as induced by Larsen's false

23  representations.  Perske has shown by a preponderance of the evidence that she would not

24  have invested in the smoke shop business with Larsen, but for his false representations.

25  As set forth in the Statement filed in April 2019, Larsen argues that Perske "has not

26  proven her case" because the money that Perske gave him to invest in the business was

27  invested in the business:  Statement, ECF 68 at 2-3 ("The money she gave me went towards

28  the business that it was supposed to go to.  That is a fact.  The smoke shop opened, that is a

1    fact. I told her the money was for opening a smoke shop, that is a fact"). Larsen further

2    argues that Perske "has not proven her case" because it was her who "sabotaged the

3    business," causing him "to lose money that [he] proved [he] put into the business any future

4    earnings." *Id.* Specifically, Larsen contends:

5    
6    > The smoke shop was only open for 27 days. I ask the court, how could the business start paying back her investment with being open for only 27 days?

7    > Remind you, Mrs. Perske is the one who had me removed from the business and closed it down. It was not me. Mrs. Perske was the one who broke the lock and entered the business and removed inventory and other items from the business, not me.

8    
9    > Mrs. Perske filed a false police report and had me arrested for stealing inventory from the business. After a police investigation it was found that I had never entered the premises. It was found Mrs. Perske did.

10   
11   > I was served with an order of protection that was dropped by Mrs. Perske. She did this to gain access to the premises and make sure I was not there.

12   > Mrs. Perske sabotaged the business and caused me to lose money I proved I put into the business and any future earnings.

13   *Id.*

14   
15   Larsen's contention that the funds invested by Perske were put to legitimate use in the

16   smoke shop business, such as paying rent and a security deposit to the landlord, purchasing

17   merchandise and paying employees to operate the smoke shop, is problematic. While there is

18   no dispute that the smoke shop went out of business by April 2016, it is difficult to evaluate

19   Larsen's claim that all of Perske's invested funds went into the business as he says because

20   Larsen, who ran the business, did not maintain or retain any financial records for the business

21   to support such a claim. The maintenance of such records would have shown income and

22   expenses to evaluate the financial performance of the business and to track the use of capital,

23   such as Perske's invested funds, and expenses of the business. Larsen's admissions that no

24   such records exist because he was sloppy with recordkeeping defeats his claim because the

25   evidence to support or defeat such a contention would have been in the financial records of the

26   business had they been maintained and kept by Larsen. It appears that Larsen's not

27   maintaining or retaining financial records for the smoke shop was a conscious decision on his

28   part so that no one other than himself knew what really happened in the business.

As to Larsen's further contention that Perske "sabotaged" the smoke shop business, the evidence in this case does not support this contention.  The impact of Larsen's lack of business experience and acumen was evident early on.  The business was bad from the beginning, and he knew it.  On October 7, 2015, days after the opening on October 3, 2015, Larsen sent his email message to Perske, stating that he "just wanted" to let her know what had been spent on the smoke shop so far, claiming that the business incurred expenses totaling $47,153.29.   Plaintiff's Exhibit 22 ("I just wanted u to know what has been spent so far for Twenty Past Four Smoke Shop.").  As Perske testified at trial, there was reason to be skeptical of Larsen's numbers, which seemed to her to be inflated, but still, Larsen knew that the only capital the business had was Perske's contribution of $28,750  from her new 401(k) loan.  Larsen's email message of October 7, 2015 was really a disguised capital call directed to his partner, Perske, because he knew that the expenses of opening and running the smoke shop were running higher than he anticipated and he had not and was not putting his own money into the business.  Plaintiff's Exhibit 22 ("Now we still have $12,286.71 for operation expenses.  We need to keep minimum of $10,000 in our account at all times so we have $2,826.71 liquid cash available.  Please reply to this email stating you understand what I sent you.  I just don't want any surprises or us not on the same page.").

Meanwhile, Larsen was giving up on the business.  The next day, on October 8, 2015, he was offering the business for sale online on Craigslist without telling Perske or asking for her consent as the co-owner.  The asking price for the business that Larsen sought on his Craigslist posting of October 8, 2015 was only $32,500, which was barely enough to recoup the amount of Perske's investment of $28,750 and without any profit to either of them.  Moreover, Larsen offered the smoke shop for sale again online without Perske's knowledge or consent in his second Craigslist posting of November 3, 2015, and his asking price plummeted to $17,000, about half of what he first asked for (in this listing, Larsen was offering to sell the smoke shop for $17,000, including inventory valued at $30,000).  Larsen was willing to sell the business at a substantial loss, which would have meant Perske's loss since she was the only one who has proven to have made an actual monetary investment in the business.

1       These facts indicate that the business was "sabotaged", to use Larsen's term, before

2    the 27-day closure of the business starting on the date that Larsen was served with Perske's

3    TRO, November 6, 2015, which restrained him from being on the premises, and when he said

4    that he just closed up the shop by locking the doors.

5       When Perske entered the smoke shop premises with Villaneda on November 10, 2015,

6    she had to have a locksmith open the lock to get into the premises since she never had a key.

7    She saw that all the inventory had been removed and the electronics taken out, with the wires

8    hanging out of the walls.  As stated earlier, the court found Perske's testimony corroborated by

9    Villaneda's testimony to be credible that the assets of the business had been removed by the

10    time they entered the premises on November 10, 2015.  Thus, Larsen's claim that Perske

11    "sabotaged" the business or that the business failed due to the 27-day closure from

12    implementation of Perske's TRO is not supported by the evidence.  The business was a failure

13    before then, as discovered by Perske and Villaneda when they entered the premises on

14    November 10, 2015.

15       It might be argued, as suggested by Larsen's counsel during his cross-examination of

16    Perske, that because she took and destroyed the DVR which might have had a surveillance

17    video of the perpetrator who broke in and took the inventory, Perske is at fault, because the

18    DVR was destroyed, and any evidence like a surveillance video tape, which could have shown

19    who was the perpetrator, is now lost.  However, as Perske testified, she found that the DVR

20    was unconnected and the electronics had been removed with the wires hanging out, which

21    indicates that most likely, whoever broke into the premises and took the inventory probably

22    disabled and removed the electronics, disconnecting the DVR, to make sure that no one could

23    see him or her taking the inventory.  The evidence in this case is inconclusive as to who took

24    the inventory from the business or if it had been taken.  Despite Larsen's valuation of the

25    inventory at $30,000 in his Craiglist posting of November 3, 2015, the inventory could have

26    been dissipated during the operation of the business beforehand.  This cannot be known now,

27    however, since Larsen "kept it sloppy" and thus did not maintain and keep records of the

28    business from which the inventory could have been tracked.  The circumstantial evidence in

this case indicates that given Larsen's lack of prior business experience and acumen and the intentional lack of recordkeeping, the smoke shop was destined for failure, and Perske's investment was also destined for a total loss because of Larsen's management or mismanagement of the business, since he had no prior experience in owning and running a smoke shop and did not know what he was doing.

As the evidence indicates, Perske was induced by Larsen and his false representations to invest in a business that she otherwise would not have invested in if she had been told the truth. Perske's testimony that if she had known that she was investing in a business run by someone who had no experience in owning or running the business, or any business, successfully, and who put her at risk by only using her money in the business and having her sign the lease on her own, she would not have done it, is reasonable and credible. Perske has shown by a preponderance of the evidence that the loss of her investment funds was proximately caused by Larsen's business incompetence and fraud.

Perske has not proven by a preponderance of the evidence her claim with respect to the amount of $31,500.00 for the outstanding balance that she said that she owes the landlord, Aljojo, on the lease of the smoke shop premises after she vacated the premises in November 2015. Perske as the sole signatory on the original lease of the smoke shop was contractually obligated to the landlord, Aljojo, and Larsen was not the lessee on the original lease of the smoke shop and was not contractually obligated. Perske is seeking to obligate Larsen based on an indemnity for what she was obligated to pay the landlord, but she cannot claim that Larsen has to indemnify her for the outstanding balance of the lease payments because the evidence shows that she has not paid any of the outstanding balance of $31,500 to the landlord to give rise to an obligation to indemnify. Based on the absence of evidence that the landlord has taken any action to pursue collection of the outstanding balance from Perske after she vacated the premises, there is no evidence of any likelihood of a future obligation to indemnify Perske. She has not made any payment of the outstanding balance and it is not likely that she will or will have to. The court also notes, as discussed above, that the landlord signed a new lease with Larsen's father for the premises in December 2015, which should

have mitigated the landlord's damages from Perske's breach.  Therefore, Perske's claim of prospective damages against Larsen for an indemnity obligation under the smoke shop lease is not proven.

Perske has not proven by a preponderance of the evidence her claim with respect to the amount of $3,403.69 for the outstanding balance on her original 401(k) loan that Larsen promised to pay in order for her to take out the new $30,000 401(k) loan to invest in the smoke shop business.  Perske as the borrower on the original 401(k) loan was contractually obligated to Fidelity, the 401(k) lender, and had benefitted from the receipt of the proceeds of that loan. Larsen was not the borrower on the original 401(k) loan and was not contractually obligated. Perske is seeking to obligate Larsen based on an indemnity for what she was obligated to pay Fidelity, the 401(k) lender, on the original 401(k) loan, but she cannot claim that Larsen has to indemnify her for the outstanding balance of the original 401(k) loan because she owed the balance anyway.  Perske borrowed the money under the original 401(k) loan, had the benefit of the money and used it for personal purposes,[14] and had to pay it back to the lender when the lender demanded repayment.  Conceivably, Perske has a breach of contract claim against Larsen because they had an agreement for him to repay the original 401(k) loan balance and for her to take out the new 401(k) loan, but damages for fraud are not "benefit of the bargain" damages, but "out of pocket" damages.  Because Perske received the benefit of the original 401(k) loan, she did not have an "out of pocket" loss with respect to Larsen's nonpayment of the 401(k) loan.

In sum, Perkse has proven her claim that Larsen defrauded her by a preponderance of the evidence showing that, unfortunately, she was taken advantage of by his grifter behavior[15] in tricking her into spending her money and incurring expenses on a horse business that he made false representations to her that they were starting, that he knew these representations

---

[14]   Perske acknowledged in her trial testimony that she used the money from the original 401(k) loan for personal purposes.  Perske Testimony, Audio Recording of Trial, January 22, 2018 at 10:45 a.m.

[15]   The Cambridge English Dictionary defines "grifter" as "someone who gets money dishonestly by tricking people: *She fell for a charming, fast-talking grifter.*"  Cambridge English Dictionary (online edition accessed on September 20, 2019),  https://dictionary.cambridge.org/us/dictionary/english/grifter.

were false because he never intended to start such a business, that he intended to deceive her with these representations to induce her to invest in a smoke shop business and to seduce her, that she justifiably relied on such representations, and that as a result of her reliance on Larsen's false representations, she suffered damages, consisting of $3,725.00 in expenses she incurred in the horse business and of $8,500.00 of the value of her 2007 used Lexus car that she traded in for the horse business.  Perske has also proven her claim that Larsen defrauded her by a preponderance of the evidence showing that he tricked her into investing into a smoke shop business with him that he had no prior experience in, that he had put no money in and that he ran irresponsibly without making any record of her investment and the expenses of the business, that he knew that these representations were false because he had no prior experience owning and running a smoke shop, he intentionally did not invest any of his own money in the business and he did not maintain and keep records of the business because like his other business ventures, he "ran it sloppy", that he intended to deceive her because if she knew otherwise, she would not have invested in his smoke shop business, that she justifiably relied upon his representations and that as a result, she suffered damages from the loss of her entire investment of $28,750.00 in the smoke shop business.  Thus, Perske has proven her total loss of $40,975.00 from Larsen's fraudulent misrepresentations.

### ii.  Intentional Infliction of Emotional Distress

As observed by Witkin's Summary of California Law treatise, "Peace of mind is now recognized as a legally protected interest, the intentional invasion of which is an independent wrong, giving rise to liability without the necessity of showing the elements of any of the traditional torts.  The Torts Restatement, which formerly contained the older rule, was amended to state the liability of one who, without a privilege, intentionally or recklessly causes 'severe emotional harm' to another by 'extreme and outrageous conduct[,]'" and "California has fully accepted the doctrine."   5 Witkin, *Summary of California Law,* Torts, § 524, *citing inter alia,* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 46; *State Rubbish Collectors Association v. Siliznoff*, 38 Cal.2d 330, 336 (1952); *Alcorn v. Anbro Engineering*, 2 Cal.3d 493, 497 (1970).

As discussed earlier, Perske's claims under 11 U.S.C. § 523(a) are styled as ones to determine the dischargeability of a debt, but the underlying debts, or claims, that she is asserting in this case have not yet been liquidated.  Ordinarily, the bankruptcy court cannot liquidate an unliquidated personal injury tort claim for the purpose of distribution in a bankruptcy case, and such a claim must be tried by the federal district court.  28 U.S.C. § 157(b)(2)(B) and (O) and (b)(5); 1 March, Ahart and Shapiro, *Rutter Group California Practice Guide: Bankruptcy*, ¶¶ 1:526-1:527.1 at 1-69 (2018).  Because 28 U.S.C. § 157(b)(5) is not jurisdictional, a party may effectively consent to the bankruptcy court adjudicating a personal injury tort claim by failing to raise an objection in that court and thus waive the restriction on bankruptcy court adjudication under § 157(b)(5). *Stern v. Marshall*, 564 U.S. 462, 478-482 (2011).  The court determines that the parties have effectively consented to it adjudicating the matter of the liquidation of Perske's claim or debt as part of the debt dischargeability action, waiving any restriction under 28 U.S.C. § 157(b)(5), because the case was fully tried before it and neither party raised any objection to this court adjudicating the matter. *Id.*; *see also, In re Sasson*, 424 F.3d 864, 866-875 (9th Cir. 2005) (holding bankruptcy court has subject matter jurisdiction to enter a money judgment in adversary proceedings determining debt dischargeability) (citations omitted); *see also, In re Smith*, 389 B.R. 902, 913-915 (Bankr. D. Nev. 2008) (discussing 28 U.S.C. § 157(b)(5) and *Sasson* and holding that "a conclusion that 28 U.S.C. § 157(b)(5) is jurisdictional would effectively destroy the bankruptcy court's ability to estimate or otherwise treat personal injury claims" and that "*Sasson* thus stands for the proposition that this court has the power to determine [defendant's] liability to [plaintiff] as well as the amount of any damages [for personal injury tort claims].").

To state a cause of action for intentional infliction of emotional distress under California law, a plaintiff must show the following: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."

1   *Hughes v. Pair,* 46 Cal.4th 1035, 1050, *citing and quoting, Potter v. Firestone Tire & Rubber*

2   *Co.,* 6 Cal.4th 965, 1001 (1993) (internal quotation marks omitted).

3       "A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of

4   that usually tolerated in a civilized community.'"  *Hughes v. Pair,* 46 Cal.4th at 1050-1051,

5   *citing and quoting, Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th at 1001.  Liability for

6   intentional infliction of emotional distress "does not extend to mere insults, indignities, threats,

7   annoyances, petty oppressions, or other trivialities."  *Id.* at 1050 (internal quotation marks

8   omitted)*, citing and quoting, Molko v. Holy Spirit Association*, 46 Cal.3d 1092, 1122 (1988),

9   *overruled on another ground, Aguilar v. Atlantic Richfield Co*., 25 Cal.4th 826, 853 n. 19

10  (2001), *quoting*, Restatement (Second) of Torts § 46 cmt d.

11      The conduct must be "intended to inflict injury or engaged in with the realization that

12  injury will result."  *Hughes v. Pair,* 46 Cal.4th at 1051, *citing and quoting, Potter v. Firestone*

13  *Tire & Rubber Co.,* 6 Cal.4th at 1001 (internal quotation marks omitted); *see also,* 5 Witkin,

14  *Summary of California Law*, Torts, § 527, *citing inter alia, Huntingdon Life Sciences v. Stop*

15  *Huntingdon Animal Cruelty USA*, 129 Cal.App.4th at 1259 (cause of action for intentional

16  infliction of emotional distress requires showing that defendant intended to cause, or recklessly

17  disregarded probability of causing, emotional distress); Restatement (Third) of Torts, § 46.

18      With respect to the requirement that a plaintiff show severe emotional distress, the

19  California Supreme Court "has set a high bar," that is, "[s]evere emotional distress means

20  'emotional distress of such substantial quality or enduring quality that no reasonable

21  [person] in civilized society should be expected to endure it.'"  *Hughes v. Pair,* 46 Cal.4th at

22  1051, *citing and quoting, Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th at 1004.  The

23  conduct must result in severe emotional harm.  5 Witkin, *Summary of California Law,* Torts,

24  § 526, *citing, Agarwal v. Johnson*, 25 Cal.3d 932, 946 (1979).  Severe means "substantial or

25  enduring as distinguished from trivial or transitory."  *Id.*, *citing, Fletcher v. Western National*

26  *Life Insurance Co*., 10 Cal.App.3d 376, 397 (1970).   In the words of the Restatement, the

27  distress must be so severe that "no reasonable person could be expected to endure it."  *Id.*

28

*citing and quoting,* Restatement (Third) of Torts: Liability for Physical and Emotional Harm
§ 46, cmt j.

In support of her claim for intentional infliction of emotional distress, Perske argued that
the preponderance of the evidence was met as to each of these elements by evidence of
Larsen's fraud in inducing her to enter into the transactions for the horse business and to
invest in the smoke shop, and by his making escalating threats against her after she
demanded her money back, including threatening to sue her without basis, to report her to the
IRS, to hold her liable for fabricated business expenses, to download a "sex tape" from a
surveillance camera at the smoke shop, and driving by her house late at night.  Perske argued
that this conduct was intended to cause her emotional distress or was undertaken with
reckless disregard of the possibility of such harm, that she suffered severe emotional distress,
and that Larsen's conduct was a substantial factor in causing such emotional distress.
Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF 147, ¶¶ 191-201.

As discussed above, Larsen committed acts of fraud against Perske despite their being
in a romantic relationship for a time, and these acts of fraud included making false
representations to her about going into business together to purchase, retrain and resell retired
racehorses as jumper horses, which preyed upon her personal interest in riding and caring for
horses.  Larsen's fraud induced her to incur expenses for this purported business as well as
the smoke shop enterprise.  Larsen was trying to get rid of his horses, however, and he had no
ownership or other relevant business experience related to smoke shops.  When Perske
confronted Larsen about his fraudulent conduct, he denied the truth of her allegations, tried to
bargain with her to leave the business and buy her over with future payments.  When that
failed, he started to make threats against her, including threatening to sue her and take
advantage of the existence of a sex video captured by a surveillance camera at the smoke
shop.  Larsen claimed he was going to make a copy of the sex video by downloading the
recording to his personal computer for leverage against her.  While Larsen did not make an
express threat in his email message to her on November 3, 2015 to release the sex video,
there is no legitimate purpose for him to make a copy and download the video onto his

1  personal computer at his residence.  The context of the email message indicates that he was

2  making an implied threat to release the video.  Larsen stated that he was downloading the

3  video and then making a copy to send to her, which would indicate that the recording existed

4  and he had control over its dissemination.  That Perske felt humiliated when Larsen said that

5  he was going to make a copy of the sex video by downloading it onto his personal computer

6  and send it to her after their breakup, and her confronting him about his fraud scheme, was his

7  intention.  The court finds that Larsen's conduct was outrageous, "so extreme as to exceed all

8  bounds of that usually tolerated in a civilized community," and was conduct "intended to inflict

9  injury or engaged in with the realization that injury will result" because he was using his

10  possession and control of the sex video as an emotional weapon against Perske, implying that

11  he could and would disclose the recording to others.  The court determines that Larsen's

12  conduct meets the first element of a claim of intentional infliction of emotional distress.

13        Perske's evidence in support of her claim of suffering severe emotional distress was her

14  testimony that she suffered anxiety attacks after she realized that Larsen was not being honest

15  with her about their business dealings.  Perske also stated that she was suffering financial

16  distress and on one occasion went to a hospital for anxiety, dehydration and heart palpitations.

17  She described herself as "emotionally wrecked" about Larsen controlling and possibly

18  releasing the sex video, and it was still upsetting to Perske at trial two years later.  Further,

19  Langer's testimony that Perske was distraught from her financial situation arising from her

20  financial transactions with Larsen is credible.

21        While the court does not doubt that Perske sincerely believes that she has suffered

22  severe emotional distress from Larsen's misconduct, given the high bar that the California

23  Supreme Court has set for a plaintiff to show severe emotional distress, the court does not

24  find that the distress suffered by Perske was so substantial or enduring to meet the

25  definition of severe emotional distress as described by the Restatement (Second) of Torts

26  and as adopted by the California Supreme Court: "emotional distress of such substantial

27  quality or enduring quality that no reasonable [person] in civilized society should be

28  expected to endure it."  *Hughes v. Pair,* 46 Cal.4th at 1051, *citing and quoting, Potter v.*

*Firestone Tire & Rubber Co.,* 6 Cal.4th at 1004.  Perske in her testimony said that she

suffered anxiety attacks from realizing Larsen's fraud, but she did not say how many

anxiety attacks she had or for how long, or whether these attacks were frequent or ongoing

occurrences.  In her testimony, she described only one anxiety attack on October 22, 2015,

which was at the time of her breakup with Larsen, and she said she went to the hospital for

anxiety, dehydration and heart palpitations.  Perske did not, however, say that there were

ongoing treatment or concerns stemming from this hospital visit.  It is difficult to assess the

severity of this one anxiety attack, particularly since there is no medical report of the

incident.  Langer's testimony is somewhat corroborative of this testimony in observing that

Perske was distraught when they met about Perske having to return Alex because she

could not afford the payments.  Perske testified that she was "emotionally wrecked" after

hearing about the existence of the sex video and Larsen's plan to download it onto his

personal computer and send a copy to her.  It is unclear, however, what the severity or

duration of her distress was when this occurred.  Apparently, the distress was reduced

because about one week later, Perske was able to retrieve and destroy the DVR with the

sex video on it, and she did not give testimony at trial on any subsequent distress, other

than that the incident was still upsetting for her.  These circumstances do not describe

substantial or enduring distress, and therefore, the court finds that Perske has not

established by a preponderance of the evidence that she suffered from severe emotional

distress sufficient to satisfy the second element of her claim for intentional infliction of

emotional distress.  *See, e.g., Hughes v. Pair,* 46 Cal.4th at 1051 ("[P]laintiff's assertions

that she has suffered discomfort, worry, anxiety, upset stomach, concern, and agitation

as the result of defendant's comments to her on the telephone and at the museum on June

27, 2005, do not comprise 'emotional distress of such substantial quality or enduring

quality that no reasonable [person] in civilized society should be expected to endure it.'")

(citations and internal quotation marks omitted).

Because Perske has not proven the second element of her claim for intentional infliction

of emotional distress, that she suffered severe or extreme emotional distress, it is not

necessary for the court to address whether she has proven the third element of a claim for intentional infliction of emotional distress—the actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

Based on the evidence discussed above, the court determines that Perske has not proven by a preponderance of the evidence her claim for intentional infliction of emotional distress, and no debt is owed by Larsen on such claim.

## B. Claims Under 11 U.S.C. § 523

As the party seeking a determination that the debt owed by Larsen is non-dischargeable under 11 U.S.C. § 523(a)(2), § 523(a)(4), and § 523(a)(6), Perske bears the burden of proving her nondischargeability claims by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289 (1991). The exceptions to discharge under 11 U.S.C. § 523 should be narrowly construed against the objecting creditor and liberally in favor of the debtor to ensure the goal of bankruptcy to provide honest debtors with a fresh start. *Mele v. Mele* (*In re Mele*), 501 B.R. 357, 363 (9th Cir. BAP 2013).

### 1. Larsen's debt to Perske for fraud is nondischargeable under 11 U.S.C. § 523(a)(2)(A)

Perske claims that the debt owed by Larsen to her is nondischargeable pursuant to 11 U.S.C § 523(a)(2)(A), which provides that a debt for money, property, services, or credit obtained through false pretenses, a false representation, or actual fraud is not dischargeable. 11 U.S.C. § 523(a)(2)(A). As stated by the Ninth Circuit in *Turtle Rock Meadows Homeowners Association v. Slyman (In re Slyman)*, 234 F.3d 1081 (9th Cir. 2000), "The purposes of th[is] provision are to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors." *Id.* at 1085, *citing and quoting,* 4 Collier on Bankruptcy ¶ 523.08[1][a] (15th ed. rev. 2000).

In *In re Slyman,* the Ninth Circuit set forth the standard for proving a claim under 11 U.S.C. § 523(a)(2)(A):

Consistent with these purposes, the Ninth Circuit has consistently held that a creditor must demonstrate five elements to prevail on any claim arising under § 523(a)(2)(A).

See, e.g., *Britton v. Price (In re Britton),* 950 F.2d 602, 604 (9th Cir.1991). The five elements, each of which the creditor must demonstrate by a preponderance of the evidence, are: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.  *American Express Travel Related Servs. Co. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996); *Citibank (South Dakota), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1086 (9th Cir.1996).

*In re Slyman,* 234 F.3d at 1085.

As the Ninth Circuit observed in *In re Eashai,* "in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court determined that when Congress used the term 'actual fraud' in § 523(a)(2)(A), Congress was referring to the general common law of torts.  116 S.Ct. at 443 n. 9.  Thus, the Supreme Court's interpretation of the term 'actual fraud' reaffirms the Ninth Circuit's practice of using the common law elements of fraud in exception to discharge cases."  *In re Eashai,* 87 F.3d at 1087.  At bottom, these requirements mirror the elements of common law fraud under state law as discussed above.

Because Perske has proven by a preponderance of the evidence the elements of actual fraud under the common law standard of California law, and thereby established a debt owed to her by Larsen as to the horse business and the smoke shop business, that debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A): (1) Larsen made false representations regarding the horse business and the smoke shop business to Perske; (2) Larsen knew that his representations to Perske were false; (3) Larsen made these false representations to Perske with an intent to deceive her; (4) Perske justifiably relied upon Larsen's false representations and (5) Perske suffered damage proximately caused by her reliance on Larsen's false representations.  Accordingly, the debt owed by Larsen to Perske for fraud is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

**2.  Larsen's debt to Perske is not excepted from discharge under 11 U.S.C. § 523(a)(2)(B)**

As stated earlier, Perske does not assert a claim under 11 U.S.C. § 523(a)(2)(B) as she stated in her proposed findings of fact and conclusions of law: "Perske's claims are not subject to [11 U.S.C.] Section 523(a)(2)(B)."  ECF 147, ¶¶ 155-157, *citing, In re Belice,* 461 B.R. 564,

577-578 (9th Cir. BAP 2011) (adopting a narrow interpretation of the phrase, "statements respecting the debtor's . . . financial condition").   Perske asserts, however, to the extent that a written statement was required, Larsen made many representations in writing bearing on his financial condition and cites to Larsen's Facebook postings.

In the Ninth Circuit, a creditor seeking to establish nondischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(B) must show: (1)  it provided the debtor with money, property, services or credit based on a written representation of fact by the debtor respecting the debtor's financial condition; (2) the representation was materially false; (3) the debtor made the representation with the intention of deceiving the creditor; (4) the creditor relied on the representation; (5) the creditor's reliance was reasonable; and (6) damage proximately resulted from the representation.  *In re Bacino,* BAP No. SC-14-1150-KiKuJu, 2015 WL 9591904, slip op. at *16 (9th Cir. BAP 2015), *citing, Northwestern National Insurance Co. v. Siriani (In re Siriani)*, 967 F.2d 302, 304 (9th Cir. 1992); *Candland v. Insurance Co. of America (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996).  Recently, the Supreme Court clarified that any written statement by the debtor that has a direct relation to or impact on his or her overall financial condition comes within the scope of 11 U.S.C., § 523(a)(2)(B), which may include a written statement about a single asset.  *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1761 (2018).

The court finds that to the extent that Perske asserts a claim under 11 U.S.C. § 523(a)(2)(B) based on the writings of Larsen she identified in her Proposed Findings of Fact and Conclusions of Law at paragraph 157, including his Facebook postings containing allegedly false representations about his race horse business and registering screenplays with the Writers Guild of America, and his Facebook message exchange with Perske containing allegedly false representations about his horse business and his writing career, she has not established such claim by a preponderance of the evidence.

Perske in her Proposed Findings of Fact and Conclusions of Law did not show, let alone discuss, how the evidence in the case supports each and every element of a claim under 11 U.S.C. § 523(a)(2)(B), so the court is left to guess what the basis of her claim under that

statute is.  Moreover, while such writings may be probative of intent for Perske's claims under

11 U.S.C. § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6), the writings by themselves do not

establish a claim under 11 U.S.C. § 523(a)(2)(B).  The Facebook postings in Plaintiff's Exhibit

43 predated Larsen's first contact with Perske in this case, so these writings were not directed

at her specifically to show that they were made with the intent to deceive her, and she has not

shown that they were the proximate cause of any damage to her.  The Facebook messages

exchanged between Larsen and Perske in Plaintiff's Exhibit 44 containing allegedly false

representations about Larsen's writing career and business success (i.e., his writing career

was so successful that he could afford the hobby of having race horses) were the initial

communications in the first few days of their reacquaintance before they had met face-to-face,

and there is no indication in these initial contacts that Larsen was trying to deceive Perske to

obtain money, property, services or credit at this time based on these written statements.

Thus, there is no justifiable reliance by Perske at this time to give him money, property,

services or credit based on these written statements at this time, and there is no likelihood that

these writings by themselves proximately caused her injury.  Accordingly, to the extent that

Perske asserts a claim under 11 U.S.C. § 523(a)(2)(B), the court determines that she has not

proven such claim by a preponderance of the evidence, and Larsen's debt to Perske is not

excepted from discharge pursuant to this provision of the Bankruptcy Code.

**3.  Larsen's debt to Perske for fraud while acting in a fiduciary capacity is nondischargeable under 11 U.S.C. § 523(a)(4)**

Perske claims that the debt owed by Larsen to her is nondischargeable pursuant to 11

U.S.C. § 523(a)(4), which makes debt for fraud or defalcation while acting in a fiduciary

capacity, embezzlement, or larceny non-dischargeable. 11 U.S.C. § 523(a)(4).  The purpose of

the Bankruptcy Code, including provisions like 11 U.S.C. § 523(a)(4), is to grant a discharge of

honest debts to honest debtors, not to allow discharges to those who have dishonestly

misappropriated funds entrusted to them.  *Ragsdale v. Haller*, 780 F.2d 794, 797 (9th Cir.

1986) (citation omitted).  The elements of a claim for fraud or defalcation while acting in a

fiduciary capacity as set forth in federal case law interpreting 11 U.S.C. § 523(a)(4), namely,

1 (1) the debtor was acting in a fiduciary capacity, i.e., a fiduciary relationship; and (2) the debtor

2 engaged in fraud or defalcation.

3       The meaning of "fiduciary" in 11 U.S.C. § 523(a)(4) is an issue of federal law. *Ragsdale*

4 *v. Haller*, 780 F.2d at 796, *citing Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)

5 (applying federal common law). The broad, general definition of fiduciary under state law—a

6 relationship involving confidence, trust and good faith—is inapplicable in the dischargeability

7 context. *Ragsdale v. Haller*, 780 F.2d at 796. Although a fiduciary is narrowly defined under

8 federal law, state law must also be referenced to establish when a fiduciary trust in this strict

9 sense exists. *Id.* The Ninth Circuit has adopted a narrow definition of "fiduciary" as a

10 relationship "arising from an express or technical trust that was imposed before and without

11 reference to the wrongdoing that caused the debt." *Cal-Micro, Inc. v. Cantrell* (*In re Cantrell*),

12 329 F.3d 1119, 1125 (9th Cir. 2003). The Ninth Circuit has held that business partners within

13 the meaning of California law are fiduciaries for purposes of 11 U.S.C. § 523(a)(4). *Ragsdale*

14 *v. Haller*, 780 F.2d at 796-797.

15       California Corporations Code § 16202(a) sets forth the standard for forming a

16 partnership in California and provides that "the association of two or more persons to carry on

17 as co-owners a business for profit forms a partnership." The evidence shows that the facts

18 here satisfy the California standard. Both Larsen and Perske acknowledged in their trial

19 testimony that they were partners in the smoke shop business. Larsen Testimony, Audio

20 Recording of Trial, October 26, 2017, 10:18 a.m.; Perske Testimony, Audio Recording of Trial,

21 January 22, 2018 at 11:30 a.m. The partnership between Larsen and Perske in the smoke

22 shop is corroborated by evidence of their email correspondence, Perske's records and

23 testimony that she gave Larsen $30,000 of her 401(k) loan proceeds to invest in their smoke

24 shop business, both Perske and Larsen's contribution to the first and last months' rent and

25 deposit for the retail space, and the lease Perske signed for retail space used for the shop.

26 Perske and Larsen were partners in the smoke shop business, and that they were partners in

27 this business is undisputed. Accordingly, they were business partners within the meaning of

28

California law and fiduciaries for purposes of 11 U.S.C. § 523(a)(4) as to the smoke shop
business.

Similarly, under California law "a joint venture is 'an undertaking by two or more persons
jointly to carry out a single business enterprise for profit.'"  *Nelson v. Abraham,* 29 Cal.2d 745,
749 (1947) (citations omitted).  "Such a venture or undertaking may be formed by parol
agreement or it may be assumed as a reasonable deduction from the acts and declarations of
the parties."  *Id. (*citation omitted).  That is, a joint venture need not be express and may be
implied from the conduct of the parties.  *Boyd v. Bevilacqua,* 247 Cal.App.2d 272, 285 (1966),
*citing, Universal Sales Corp. v. California Press Manufacturing Co.,* 20 Cal.2d 751, 764-765
(1942).  "The acts and conduct of the parties may speak above the expressed declarations of
the parties to the contrary."  *Id.*  "The law requires little formality in the creation of a joint
venture and the agreement is not invalid because it may be indefinite with respect to its
details."  *Id.* (citations omitted).   The distinction between a joint venture and a partnership is
minimal, as the "relationships are virtually the same," and "[a]ccordingly, the courts freely apply
partnership law to joint ventures when appropriate."  *Weiner v. Fleischman,* 54 Cal.3d 476, 482
(1991). "Like partners, joint venturers are fiduciaries with a duty of disclosure and liability to
account for profits."  *Id., citing and quoting,* 9, Witkin, *Summary of California Law,* Partnership,
§19 (9th ed. 1989).

The evidence indicates that Perske and Larsen were joint venturers as to the horse
business that never materialized because, among other reasons, they had agreed to establish
a business enterprise to buy, retrain and resell retired racehorses as jumpers for profit based
on Larsen's experience in the horse business and Perske's interest in the horse business, they
held themselves out as business associates to others, including Langer and McAllister, and
they took actions to conduct this business enterprise, including purchasing horses for the
purposes of the business, Leo and Alex, and incurring expenses for the business, such as
paying for training, care and boarding of the purchased horses and leasing a new car for
Perske to escort prospective customers of the business.  The lack of formalities in forming this
business is not an obstacle to determining that they had a joint venture.  Accordingly, Perske

1    and Larsen were joint venturers under California law and fiduciaries for purposes of 11 U.S.C.

2    § 523(a)(4) as to the horse business that never materialized.

3        Because Perske and Larsen were partners in the smoke shop business and horse

4    business, they were in a fiduciary relationship, and Perske has shown by a preponderance of

5    the evidence the element of a claim under 11 U.S.C. § 523(a)(4) that Larsen was acting in a

6    fiduciary capacity or relationship as to her.  As to proving the second element of fraud or

7    defalcation for a claim under 11 U.S.C. § 523(a)(4), the elements of actual fraud have already

8    been discussed.  For purposes of 11 U.S.C. § 523(a)(4), defalcation means the

9    misappropriation of funds, using trust (or partnership) funds in a manner inconsistent with the

10   duties and obligations imposed, or failing to fully account for such funds.  *In re Lewis*, 97 F.3d

11   1182, 1186-1187 (9th Cir. 1996).

12       In this case, as discussed above, Perske has proven by a preponderance of the

13   evidence that Larsen owes a debt to her from actual fraud, and thus, she need not also

14   establish that he owes a debt to her based upon defalcation.  The amount of money that

15   Perske invested and entrusted to Larsen of $28,750, which would be the loss on a defalcation

16   claim, is already included in her damages on her fraud claim which has been determined to be

17   nondischargeable under 11 U.S.C. § 523(a)(2)(A).

18       Because Perske has shown that Larsen was acting in a fiduciary capacity as to her and

19   he engaged in fraud, the debt that he owes to her from committing fraud while acting in a

20   fiduciary capacity is nondischargeable under 11 U.S.C. § 523(a)(4).

21   **4.  Larsen's debt to Perske for fraud is nondischargeable under 11 U.S.C.**

22       **§ 523(a)(6)**

23       Perske claims that the debts owed by Larsen to her are nondischargeable pursuant to

24   11 U.S.C. § 523(a)(6), which provides that debts incurred as the result of willful and malicious

25   injury are not dischargeable. 11 U.S.C. § 523(a)(6).  "The Supreme Court in *Kawaauhau v.*

26   *Geiger* (*In re Geiger*), 523 U.S. 57, 118 S.Ct. 974, 140 L. Ed. 2d 90 (1998), made clear that for

27   section 523(a)(6) to apply, the actor must intend the consequences of the act, not simply the

28   act itself."  *Ormsby v. First American Title Co. of Nevada* (*In re Ormsby*), 591 F. 3d 1199, 1206

1    (9th Cir. 2010).  Both willfulness and maliciousness must be proven to prevent discharge of the

2    debt.  *Id.*  But, reckless or negligent acts are not sufficient to establish that a resulting injury

3    falls within the category of willful and malicious injuries under § 523(a)(6).  *Kawaauhau v.*

4    *Geiger*, 523 U.S. at 64.

5        Willfulness means intent to cause injury.  *Kawaauhau v. Geiger,* 523 U.S. at 61.  "The

6    injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to

7    injury.'"  *In re Plyam*, 530 B.R. 456, 463 (9th Cir. BAP 2015) (quoting *Kawaauhau v. Geiger*,

8    523 U.S. at 61) (emphasis in original).  The court may consider circumstantial evidence that

9    may establish what the debtor actually knew when conducting the injury creating action and

10   not just what the debtor admitted to knowing.  *In re Ormsby,* 591 F. 3d at 1206 (citation

11   omitted).  Recklessly inflicted injuries, covering injuries from all degrees of recklessness, do

12   not meet the willfulness requirement of § 523(a)(6).  *In re Plyam,* 530 B.R. at 464.  Reckless

13   conduct requires an intent to act instead of an intent to cause injury.  *Id.*  Therefore, the willful

14   injury requirement "…is met when the debtor has a subjective motive to inflict injury or when

15   the debtor believes that injury is substantially certain to result from his own conduct."  *Carillo v.*

16   *Su* (*In re Su*), 290 F.3d 1140, 1142 (9th Cir. 2002) (citation omitted).

17       A malicious injury is one that involves; "(1) a wrongful act, (2) done intentionally, (3)

18   which necessarily causes injury, and (4) is done without just cause or excuse."  *Petralia v.*

19   *Jercich* (*In re Jercich*), 238 F.3d 1202, 1209 (9th Cir. 2001). In *In re Jercich*, the court found

20   that the debtor's withholding of wages to his employee, despite his ability to pay the employee,

21   and use of the wage money for his own personal benefit without any just cause or excuse for

22   withholding the wages, was substantially certain to cause injury to the employee and therefore

23   fulfilled the malicious prong of § 523(a)(6).  *Id.*  "Malice may be inferred based on the nature of

24   the wrongful act", but to make such an inference, willfulness must be established first.  *In re*

25   *Ormsby*, 591 F.3d 1199 at 1207.

26       The evidence establishing Perske's fraud claim against Larsen as to the horse

27   purchases and the Lexus lease establishes the willfulness requirement of 11 U.S.C.

28   § 523(a)(6) because Larsen had the intent to deceive her in his dealings with her on the horse

business that never materialized and on the smoke shop business.  Larsen had the subjective

motive to inflict injury or knew that substantial injury was certain to result from his conduct

regarding the purchases of Alex and Leo and the lease of the new Lexus car because he

induced Perske to incur expenses to buy Alex, to pay for the care of Alex and Leo and to lease

the new Lexus based on his false representations to pay for these expenses as part of the new

horse business.  When Larsen stopped paying for these expenses, knowing that he had no

intent to start such a new business, he knew that Perske would be liable for payment of those

expenses since she signed the purchase agreement for Alex and the lease of the new Lexus,

and he knew that she had limited income and assets to make these payments.  Larsen also

had the subjective motive to inflict injury or knew that substantial injury was certain to result

from his conduct regarding the smoke shop business because he induced Perske to take out a

new 401(k) loan of $30,000 and invest the loan proceeds in the new smoke shop business.

Larsen also induced Perske to sign the lease as the "co-signer" based on his false

representations that he had prior experience owning and operating smoke shops.  Larsen had

no such experience.  Larsen also made false representations: (i) that he would pay off the loan

balance on her existing 401(k) loan so Perske could take out a new 401(k) loan of $30,000 to

invest in the smoke shop business, (ii) that he would invest the same amount of $30,000 that

she did and (iii) that he needed her to sign the lease as a "co-signer."  Larsen knew that

Perske was investing in a risky business venture because neither of them had any experience

in owning and running a smoke shop.  The business was undercapitalized because Larsen

knew he did not have, and lacked the will to get, funds to match her $30,000 investment.

Larsen also knew that if the business was having problems paying the rent, Perske would be

the only one on the hook for payment under the lease because his misrepresentations were

the proximate cause of her signing the lease for the smoke shop premises.

While Larsen has not admitted knowledge of these facts, the court infers that he had to

know these facts because he knew that neither he nor Perske had any prior experience

owning and operating a smoke shop and therefore, her investment was very risky because the

business was going to only have half of the funds that he told her the business would have and

only Perske would be liable for the obligations under the lease.  The court finds that Perske

has established the willfulness requirement under 11 U.S.C. § 523(a)(6) as to the horse

business and the smoke shop business by a preponderance of the evidence.

The evidence establishing Perske's fraud claim against Larsen as to the horse business

and the smoke shop business also establishes the malicious injury requirement of 11 U.S.C.

§ 523(a)(6) because his conduct involved: (1) a wrongful act, fraud, which is a tort under

California law, (2) which was done intentionally, (3) which necessarily caused injury to her, and

(4) was done without just cause or excuse.  Larsen's false representations to Perske that they

were starting a new horse business to purchase, retrain and resell retired racehorses as

jumper horses are wrongful acts of fraud as discussed herein, which were done with the intent

to deceive Perske and induce her to invest in his smoke shop business and to seduce her, and

which caused her financial injury by subjecting her to unnecessary expenses for what she

thought was a new business.  Perske gave up her old car as a trade-in for a new car for use in

the new business.  This was done without just cause or excuse because, as the evidence

showed, Larsen had no intent to start the new business.  Larsen's false representations to

Perske related to his business experience and the purported future investments with Perske

are wrongful acts of fraud as discussed herein, which were done with the intent to deceive

Perske to induce her to invest in his smoke shop business, which caused her financial injury by

subjecting her to unnecessary risk of loss of her investment of approximately $30,000 and

liability for the lease of the smoke shop premises.  These wrongful acts of fraud were done

without just cause or excuse because, as the evidence showed, Larsen had no prior

experience owning and running smoke shops, had no intent to match Perske's investment of

$30,000 to start the new business and had no intent to sign the lease with her for the smoke

shop.  The court finds that Perske has established the malicious injury requirement under 11

U.S.C. § 523(a)(6) as to the horse business and the smoke shop business lease by a

preponderance of the evidence.

Based on the foregoing, the court determines that Perske has proven her claim that the debt owed by Larsen to her for fraud regarding the horse business and the smoke shop business as discussed above is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

**C.  Claims Under 11 U.S.C. § 727**

    **1.  Perske has proven a claim that Larsen's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2).**

Perske claims that Larsen's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2) because he made a property transfer or concealed property with the intent to hinder, delay or defraud.  A Chapter 7 discharge may be denied if, with intent to "hinder, delay, or defraud" a creditor or an officer of the estate charged with custody of property, the debtor transferred, removed, concealed, mutilated or destroyed (or caused to be transferred, removed, concealed, mutilated or destroyed): (1) property of the debtor within one year before the petition filing date; or (2) estate property, after the petition filing date.  11 U.S.C. § 727(a)(2)(A) and (B); *see also, In re Lawson*, 122 F.3d 1237, 1240-1241 (9th Cir. 1997).  Proof of harm to creditors is not a prerequisite to denial of discharge under 11 U.S.C. § 727(a)(2).  *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986).  To warrant denial of a discharge, the debtor's intent to hinder, delay or defraud creditors must be actual, rather than constructive.  *In re Adeeb*, 787 F.2d at 1342-1343.  But a 11 U.S.C. § 727(a)(2) denial of discharge does not require a finding of intent to defraud; a finding of either intent to hinder or intent to delay is sufficient under the statute.  *In re Retz*, 606 F.3d 1189, 1200 (9th Cir. 2010).  The debtor must have had a subjective intent to hinder, delay or defraud a creditor at the time the property transfer or concealment occurred.  *In re Lawson*, 122 F.3d at 1240.

Intent to hinder or delay creditors may be established by circumstantial evidence or by inferences drawn from a course of conduct.  *In re Adeeb*, 787 F.2d at 1343; *In re Beverly*, 374 B.R. at 235.  The so-called "badges of fraud" are indicative of intent to hinder, delay or defraud, including whether the transfer was to an insider, whether the debtor retained possession or control of the property transferred after the transfer, whether the transfer or obligation was disclosed or concealed, whether before the transfer was made or obligation was incurred, the

1  debtor had been sued or threatened with suit and whether the debtor removed or concealed

2  assets.  California Civil Code, §3439.04(b)(1)-(11); *see also, In re Beverly,* 374 B.R. at 237-

3  238.  The debtor's intent to hinder, delay or defraud a single creditor is sufficient to deny the

4  debtor's discharge under the statute.  *In re Adeeb*, 787 F.2d at 1343.

5        Denial of a discharge pursuant to 11 U.S.C. § 727(a)(2) requires that the debtor had an

6  interest in the property transferred, concealed or destroyed.  1 U.S.C. § 727(a)(2)(A); *Rosen v.*

7  *Bezner*, 996 F.2d 1527, 1531 (3rd Cir. 1993).  Whether a property interest exists is a matter of

8  state law.  *In re Harrell*, 73 F.3d 218, 219 (9th Cir. 1996); *see also* California Civil Code § 654

9  (defining property ownership).  On the other hand, federal bankruptcy law governs the extent

10  to which a debtor's property is included in the bankruptcy estate.  *In re Farmers Markets, Inc.*,

11  792 F.2d 1400, 1402 (9th Cir. 1986); *In re MacDonald*, 164 B.R. 325, 328 (Bankr. C.D.Cal.

12  1994).

13        A debtor's concealment of his or her property with the intent to hinder, delay or defraud

14  creditors is also a grounds for denial of discharge pursuant to 11 U.S.C. § 727(a)(3); *see also,*

15  *Rosen v. Bezner,* 996 F.2d at 1532.  This means a concealment of the debtor's property as

16  opposed to the concealment of the debtor's transfer of property.  *Id.*  As the Third Circuit has

17  pointed out, "In a situation involving a transfer of title coupled with retention of the benefits of

18  ownership, there may, indeed, be a concealment of property."  *Rosen v. Bezner,* 996 F.2d at

19  1532.  The Third Circuit further explained:

20        Where this is the case, however, the concealment is present not because retention of
      the benefits of ownership conceals the fact that the debtor no longer has legal title, but

21      rather because the transfer of title represents to the world that the debtor has
      transferred all his interest in the property while in reality he has retained some secret

22      interest---a secret interest of which retention of the benefits of ownership may be
      evidence.  A legally relevant concealment can exist, however, only if there is, in fact,

23      some secret interest in the property retained by the debtor.

24  *Id.* (citations omitted).

25        Perske contends that Larsen's transfer of the ownership of smoke shop business to his

26  father in December 2015, technically from Frederick Investments LLC, one of Larsen's

27  business entities in which he held his ownership of the smoke shop business, to his father's

28  LLC, wherein Larsen continued to run the smoke shop, was a property transfer or concealment

for purposes of 11 U.S.C. § 727(a)(2) because Larsen's ownership interest in the smoke shop

business was property within the meaning of California Civil Code, § 654.  The transfer of this

property interest took place in mid-January 2016 within one year of the filing of Larsen's

bankruptcy petition in June 2016.  Larsen transferred the smoke shop business to his father

after Larsen and Perske ended their romantic and business relationship in November 2015,

culminating in Perske's obtaining the TRO against Larsen.  While Perske and Larsen agreed to

lift the stay away order, they did not settle Perske's demand that he return her investment

representing her 50% share of their partnership or joint venture in the smoke shop business,

nor did he ever provide the financial documents for the business that she demanded in

November 2015.  Instead of compensating Perske for her 50% interest in the business since

Larsen and Perske could no longer do business together, he ignored Perske and her

ownership interest, did not formally and cleanly dissolve their partnership, treated the entire

business as his own, and simply continued running the business, which was then under his

name or his father's name.  The business was in the same location under the same name and

under the same management.  That Larsen's father was helping Larsen financially was

consistent with their relationship of the father supporting his son when his son needed financial

assistance.  Larsen went through the machinations of a sham transfer by transferring the

business to his father through the transfers from his LLC to his father's, putting the new lease

of the smoke shop premises in his father's name only, and pretending that he was only

working for his father in running the business when as his father testified, it was really Larsen's

continuation of the business that he and Perske had.

This circumstantial evidence proves that Larsen either made a property transfer of the

smoke shop, or concealed his continued interest in the smoke shop by a sham transfer to his

father, within the meaning of 11 U.S.C. § 727(a)(2) less than one year before he filed his

bankruptcy petition, namely, the continued smoke shop business, to delay, hinder or defraud

Perske, who was now a creditor and was demanding payment of her investment representing

a 50% ownership interest in the business because for all intents and purposes it was still

Larsen's business after the purported transfer since he was the person who was still running it,

even though it became purportedly owned by his father, a close relative and statutory insider under 11 U.S.C. §101(31), through his father's LLC, and the purported transfer was made without the knowledge or consent of Perske, the co-owner.  This evidence satisfies several statutory badges of fraud.  California Civil Code, §3439.04(b)(1), (2), (3), (4), (7) and (8).  The evidence shows that the purpose of Larsen's sham transfer of the smoke shop business to his father was to delay, hinder and/or defraud Perske from recovering her investment in the business.  The court determines that the evidence shows that within the statutory period of one year before he filed his bankruptcy petition, Larsen concealed his continued interest in the smoke shop business belonging to him and Perske through engaging in a sham transfer of the business to his father with the purpose to delay, hinder and/or defraud Perske from recovering her investment or interest in the business as opposed to a real transfer of property.  Accordingly, Perske has proven her claim to deny Larsen's discharge under 11 U.S.C. § 727(a)(2) by a preponderance of the evidence.

> **2. Perske has proven a claim that Larsen's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3).**

Perske alleges a claim under 11 U.S.C. § 727(a)(3) that Larsen must be denied a discharge for failure to maintain adequate books and records.  A Chapter 7 discharge may be denied if the debtor has concealed, destroyed, mutilated, falsified or failed to keep books and records relevant to the debtor's financial condition or business transactions … unless the act or failure was "justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).  The purpose of 11 U.S.C. § 727(a)(3) is to ensure that the trustee and creditors are provided with sufficient information to trace the debtor's financial history from a reasonable period in the past to the present.  4 March, Ahart and Shapiro, *Rutter Group California Practice Guide: Bankruptcy,* ¶ 22:950 at 22-132, *citing In re Cox*, 904 F.2d 1399, 1401 (9th Cir. 1990) and *In re Caneva*, 550 F3d 755, 761 (9th Cir. 2008).  A 11 U.S.C. § 727(a)(3) denial of discharge does not require proof of fraudulent intent.  *In re Scott*, 172 F.3d 959, 969 (7th Cir. 1999) (citation omitted).

The statute is directed at records and documents "from which the debtor's financial condition or business transactions might be ascertained. . . ." 11 U.S.C. § 727(a)(3).  A discharge is to be denied when the debtor fails to maintain and preserve records (unless such failure is justified under the circumstances) has made it impossible to ascertain the debtor's financial condition and/or material business transactions.  *In re Cox*, 41 F.3d 1294, 1296 (9th Cir. 1994) (citations omitted).  Whether a debtor's books and records are "adequate" is a fact-specific inquiry—i.e., what is reasonably required under the circumstances: "It is a question in each instance of reasonableness in the particular circumstances.  Complete disclosure is in every case a condition precedent to the granting of discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which [§ 727(a)(3)] applies." *Meridian Bank v. Alten*, 958 F2d 1226, 1230 (3rd Cir. 1992).  "The Bankruptcy Code does not require a debtor seeking a discharge specifically to maintain a bank account, nor does it require an impeccable system of bookkeeping." *Id*.  However, the records must sufficiently identify the debtor's transactions so that intelligent inquiry can be made of them.  "The test is whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained." *Id*.  A debtor's records are inadequate where they fail to establish the source of deposits made to a debtor's checking account, rendering it impossible to trace goods sold to the debtor or to substantiate the debtor's expenses. *Matter of Juzwiak*, 89 F3d 424, 428 (7th Cir. 1996).

In determining the adequacy of books and records under 11 U.S.C. § 727(a)(3), the court considers: (1) the debtor's intelligence and educational background; (2) the debtor's experience in business matters; (3) the extent of involvement in the businesses for which discharge is sought; (4) the debtor's reliance, including his or her knowledge of whether records were being kept; (5) the nature of the marital relationship; and (6) any recordkeeping or inquiry duties imposed upon the debtor by state law. *In re Cox,* 904 F.2d at 1403 n. 5.  A debtor's explanation that she was unaware of any need to keep business or personal records, though she was personally involved in the operation of a business and was a licensed realtor,

was insufficient for purposes of 11 U.S.C. § 727(a)(3).  *In re Lawler*, 141 B.R. 425, 428-429
(9th Cir. BAP 1992).

The plaintiff (creditor or trustee objecting to discharge) has the initial burden to establish
the debtor's failure to preserve adequate records.  Once this has been shown, the burden
shifts to the debtor to justify the inadequacy or nonexistence of the records.  *In re Cox*, 41 F.3d
at 1296.  A debtor who has failed to maintain adequate records may still be entitled to a
discharge by offering a satisfactory explanation for the lack of adequate records.  11 U.S.C.
§ 727(a)(3) (denial of discharge unless debtor's failure "was justified under all of the
circumstances of the case"); *see also In re Cox*, 904 F2d at 1404 and n. 5; *In re Lawler*, 141
B.R. at 429.

Based on the evidence offered by Perske at trial, she has met her initial burden to
establish Larsen's failure to preserve adequate records in support of her claim under 11 U.S.C.
§ 727(a)(3).  Perske has shown that Larsen only produced a meager amount of business or
financial records in response to her discovery requests, consisting primarily of a few months of
bank statements from his personal bank account from after the petition date.  Larsen produced
only one of his seven business accounts used in the year before the petition date, and he was
unable to produce any bank records, or any other business records, for the accounts set up for
Frederick Investments, LLC, which was the entity in which he held the smoke shop business.
Perske demonstrated by Larsen's testimonial admissions that he kept no accounting records
for his business ventures, including the smoke shop, because he "ran it sloppy," has no
records of the assets of the smoke shop business, admitted that he kept no records of the
smoke shop at all when he ran it with his father's assistance, and abandoned what records
there were for the business when it finally closed.  The evidence also indicates that Larsen has
no records to document his purported investment or Perske's actual investment in the smoke
shop, and he has no records evidencing the transfer of the smoke shop to his father, including
any contract reflecting the transfer.  Regarding his failure to maintain business records, Larsen
admitted that he simply threw his records away after doing his tax returns and that he was
"sloppy" about recordkeeping.  While there may have been two break-ins by unknown parties

at the smoke shop[16] and some records may have been missing from the break-ins, the break-ins do not explain the inadequacy of Larsen's financial records.  Larsen's failure to maintain any financial records not just of the smoke shop business, but of his personal finances and of his other business ventures, is attributable to his admitted sloppiness in recordkeeping. Larsen testified that he simply threw away his records after doing his tax returns.  Thus, it appears that Larsen intentionally maintained a practice keeping no business records that would make it difficult for his creditors and business partners to have any meaningful information about his financial affairs, including Perske.  Because of Larsen's inadequate recordkeeping, Perske was unable to trace what happened to her investment in the smoke shop business.  Larsen wanted to make it difficult to understand his financial affairs.  Based on this record, the court finds that Perske's claim under 11 U.S.C. § 727(a)(3) to deny Larsen's discharge for failure to maintain adequate records should be granted because he has not rebutted her initial showing by providing a satisfactory explanation for his failure to maintain adequate records.

3. **Perske has not proven a claim that Larsen's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) because she failed to prove materiality by a preponderance of the evidence.**

Perske claims that Larsen's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) for making a false oath or claim in bankruptcy.  A discharge may be denied if the debtor has made a false oath, claim or promise, or withheld information from any officer of the estate, in or in connection with the present case.  11 USC § 727(a)(4)(A)-(D).  The elements of a claim under 11 U.S.C. § 727(a)(4) are: (1) the debtor made a false oath in connection with the bankruptcy case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.  *In re Retz*, 606 F.3d at 1197 (citation omitted).  The false statements must be made under oath during the course of bankruptcy proceedings.  *In re Beeber*, 239 B.R. 13, 29 (Bankr. E.D.N.Y. 1999) (filing false tax return not ground for denial of discharge).

---

[16] As to the first break-in, Larsen and Perske accuse each other of the break-in.

The debtor's bankruptcy schedules are signed under penalty of perjury.  Thus, a false oath under § 727(a)(4) can involve a false statement or omission in the debtor's schedules. *Premier Capital, LLC v. Crawford (In re Crawford)*, 841 F.3d 1, 8-9 (1st Cir. 2016) (schedules omitted debtor's interest in retirement account); *Tan v. Tranche 1 (SVP-AMC), Inc., (In re Tan)*, 350 B.R. 488, 493-495 (Bankr. N.D. Cal. 2006) (schedules omitted debtor's interests in several closely-held corporations).

The debtor's amendment of false schedules does not negate the initial false oath in the original schedules: "The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive."  *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011) (internal quotation marks omitted).

Perske asserts that Larsen's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) because he made false oaths in signing his original bankruptcy schedules under penalty of perjury wherein the schedules were incomplete and inaccurate because he did not list all of his bank accounts within two years of the petition date, his income was understated for 2014 and 2015, he omitted on his original schedules three horses with a stated value of $15,500, which were added on his amended schedules, he omitted personal property assets of $3,500, which were added on his amended schedules, he omitted on his original schedules a loan of $7,000 from his father and he did not disclose all of his business ventures, including the Higher End Collective.  Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶¶ 229-260.

It is not disputed that Larsen made an oath for purposes of 11 U.S.C. § 727(a)(4) when he signed his bankruptcy petition and schedules under a declaration of penalty of perjury.  One of the elements that Perske must prove by a preponderance of the evidence is that the allegedly false oath made by Larsen related to a material fact.  While Larsen's schedules were not complete and accurate, it does not appear that the omissions identified by Perske were material.  With respect to the bank accounts not disclosed on the original schedules and disclosed on the amended schedules, the balances of the accounts disclosed on the amended

1  schedules were all zero, and there is no showing that the balances were not zero or that the

2  nondisclosures of the accounts on the original schedules were thus material.  That is, there is

3  no showing that the original nondisclosure of the omitted bank accounts was somehow

4  prejudicial to creditors.  *In re Swanson,* 36 B.R. 99, 100 (9th Cir. BAP 1984) (reversing

5  bankruptcy court's denial of discharge under 11 U.S.C. §727(a)(2), (a)(4) and (a)(5) based on

6  omission of accountancy practice from the bankruptcy schedules as an asset because no

7  showing that the omission was material since the practice was shown not to have a present

8  value for the estate).  While Larsen's income was understated for 2014 and 2015 on the

9  original schedules as shown by the disclosures on the amended schedules, there is no

10  showing that the inaccurate disclosures on the original schedules were material, particularly

11  since the disclosure of zero income for 2016, the year that the bankruptcy petition was filed,

12  was the same on both the original and amended schedules.  There is no showing that the

13  inaccurate income disclosures for 2014 and 2015, the two years before the year that the

14  petition was filed, was material, i.e., prejudicial to creditors.

15          With respect to Larsen's omission on his original schedules of three horses with a

16  stated value of $15,500 which were added on his amended schedules, the court notes that the

17  total value of the horses listed on the original schedules of $215,000 was higher than the total

18  value of the horses on the amended schedules of $129,000, including the three omitted

19  horses, and thus, it cannot be said that Larsen was "hiding" value of these assets by failing to

20  disclose the three horses.  As indicated by the evidence of the no distribution report of the

21  Chapter 7 Trustee who was cognizant of the horse assets, there was no benefit available to

22  creditors.  Moreover, the Trustee has not sought to reopen the case for administration by the

23  amendment of the schedules now listing the three horses.  Thus, based on this record, the

24  omission of three horses on the original schedules is not shown to be material.

25          With respect to the omitted personal property assets of $3,500 which were added on his

26  amended schedules, there is no showing that this omission is material and prejudicial to

27  creditors since the items of personal property were of de minimis value, including $1,300 of

28  value in furniture and appliances, $700 of value in miscellaneous electronics, $400 of value in

1    clothing and $1,100 of value in a diamond bracelet, which appears to be the gift that Larsen

2    gave Perske on August 21, 2015.  Given the minimal value of these assets, which probably

3    have little liquidation value, the omission of these items is not material.

4         With respect to the a loan of $7,000 from Larsen's father omitted on his original

5    schedules, there is no showing that this omission is material as prejudicial to creditors since

6    the existence of the loan indicates that the father lent Larsen $7,000, which would be another

7    claim against the estate rather than an asset which might be administered for the benefit of

8    creditors.

9         With respect to the lack of all of Larsen's business ventures, that is, two business

10   ventures, Banff Farms LLC, and the Higher End Collective, there is no showing that the

11   omission of these businesses is material and prejudicial to creditors since neither business

12   was in operation at the time that the petition was filed, and there is no evidence that either of

13   these business could have been administered for the benefit of creditors.

14        Given the lack of evidence demonstrating materiality of the facts that Larsen allegedly

15   had made a false oath, the court finds that Perske has not met her burden of proving her claim

16   under 11 U.S.C. § 727(a)(4) to deny his discharge by making a false oath by a preponderance

17   of the evidence.

18        **4.   Perske's claim that Larsen's discharge should be denied pursuant to 11 U.S.C.**

19             **§ 727(a)(5) should be denied as abandoned.**

20        Perske asserted a claim in her complaint that Larsen's discharge should be denied

21   pursuant to 11 U.S.C. § 727(a)(5) for failure to satisfactorily explain any loss of property or

22   deficiency of assets to meet the debtor's liabilities.  Complaint, ECF 1, ¶¶ 82-85.  However,

23   with respect to the proposed findings of fact and conclusions of law ordered by the court

24   pursuant to Local Bankruptcy Rule 7052-1, Perske did not submit any regarding her claim

25   under 11 U.S.C. § 727(a)(5), and therefore, the court will deem her claim under this provision

26   abandoned.  Audio Recording of Trial, March 7, 2018 at 1:40-1:47 p.m.  Accordingly, the court

27   deems that Perske's claim under 11 U.S.C. § 727(a)(5) is abandoned.

28

## IV.    **CONCLUSION**

For the foregoing reasons, the court determines the following:

1.  Perske has met her burden of proving by a preponderance of the evidence her claim under applicable California law that Larsen owes a debt to her for fraud in the amount of $40,975.00.

2.  Perske has not met her burden of proving by a preponderance of the evidence her claim under applicable California law that Larsen owes a debt to her for fraud in excess of the amount of $40,975.00.

3.  Perske has not met her burden of proving by a preponderance of the evidence that Larsen owes a debt to her for intentional infliction of emotional distress under applicable California law.

4.  Perske has met her burden of proving by a preponderance of the evidence that the debt that Larsen owes her for fraud is excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6).

5.  Perske has met her burden of proving her claims that Larsen should be denied his discharge pursuant to 11 U.S.C. §§ 727(a)(2) and 727(a)(3).

6.   Perske has not met her burden of proving her claims that Larsen should be denied his discharge pursuant to 11 U.S.C. §§ 727(a)(4) or 727(a)(5).

A separate judgment granting in part and deny in part Perske's claims in her adversary complaint consistent with this memorandum decision is being filed and entered concurrently herewith.

IT IS SO ORDERED.

Date: September 23, 2019

_____
Robert Kwan
United States Bankruptcy Judge